UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

ACRISURE, LLC,

            Plaintiff,

v.

MATTHEW KELLY, CHRISTOPHER
IOVINO, ROBERT KEMPNER,
MICHAEL RELLA, ROBERT
TRAGER, & ERIC WAGNER,

          Defendants.

Case No. 1:24-cv-00318

Hon.

---

Edward J. Bardelli  (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
*Attorneys for Plaintiff*
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@snj.com
jtrombley@wnj.com

James R. Carroll
Christopher G. Clark
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
*Co-Counsel for Plaintiff*
500 Boylston Street
Boston, Massachusetts 02116
james.carroll@skadden.com
christopher.clar@skadden.com

Michael L. Gutierrez (P79440)
Daniel V. Barnett (P82372)
Daniel J. Hatch (P79258)
BUTZEL LONG, P.C.
*Attorneys for Defendants*
300 Ottawa Ave NW, Suite 620
Grand Rapids, Michigan 49503
(616) 988-5600
gutierrez@butzel.com
barnett@butzel.com
hatchd@butzel.com

---

## DEFENDANTS' NOTICE OF REMOVAL

---

**NOW COME** all Defendants, by and through their counsel, Butzel Long, P.C., and for their Notice of Removal Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446(b), state as follows:

## NOTICE OF REMOVAL

Defendants, Matthew Kelly, Christopher Iovino, Robert Kempner, Michael Rella, Robert Trager, and Eric Wagner (collectively "Defendants") hereby request to remove the matter titled *Acrisure, LLC v Matthew Kelly, et al*, Case No. 24-02866-CB, currently pending in 17th Judicial Circuit Court for the County of Kent, State of Michigan, to the United States District Court for the Western District of Michigan, Southern Division. The bases for removal are set forth below.

## STATEMENT OF GROUNDS FOR REMOVAL

1.      On or about March 22, 2024, Plaintiff, Acrisure, LLC ("Plaintiff" or "Acrisure") commenced a civil action against the Defendants in the 17th Judicial Circuit Court for the County of Kent, State of Michigan, Case No. 24-02866-CB (the "Circuit Court Case").  Defendants were served with the Circuit Court Case on March 25 and March 26, 2024. A copy of the Summons and Complaint, which constitute all process and pleadings received from Plaintiff in this action, and of which Defendants have notice, are attached as **Exhibit 1**. *See* 28 U.S.C. § 1446(a).

2.     No other pleadings have been filed with the Kent County Circuit Court. A true and accurate copy of the Register of Actions in the Kent County Circuit Court is attached as **Exhibit 2**.

3.     Although no other pleadings have been filed in the Circuit Court Case, a request for a Temporary Restraining Order was contained in the Complaint, and a Temporary Restraining Order was entered on or about March 25, 2024 by the Kent County Circuit Court, the Honorable T.J. Ackert presiding.

4.     A true and accurate copy of the Temporary Restraining Order is attached as **Exhibit 3**.

5.     A *sua sponte* Order extending the Temporary Restraining Order was entered by Judge Ackert on March 26, 2024, and is attached as **Exhibit 4**.

6.     No notice to Defendants was given prior to either Order being entered.

7.     This Court has original jurisdiction over this matter under 28 U.S.C. § 1332, and this matter may therefore be removed to this Court on the basis of diversity jurisdiction.  As explained more fully below, this action is between citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.     Pursuant to 28 U.S.C. § 1446(b)(1) and Rule 6(a) of the Federal Rules of Civil Procedure, removal is timely because this Notice of Removal was filed within 30 days after Defendants received a copy of the Complaint.

9.     Pursuant to 28 USC 1441(a), the United States District Court for the Western District of Michigan, Southern Division, is the Federal District Court embracing the place where the state court suit is pending.

10.    As explained below, this Court has jurisdiction over this case based on diversity of citizenship pursuant to 28 USC 1332(a).

11.    This matter should be removed because it could have been filed originally in this Court pursuant to 28 U.S.C. § 1332, as this Court has diversity-of-citizenship jurisdiction over Plaintiff's claims against Defendants.

12.    Contemporaneously with the filing of this Notice of Removal, Defendants are providing written notice of this removal to Acrisure's counsel, and will file a copy of this Notice of Removal with the clerk of the Circuit Court, "which shall effect the removal and the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d).

## CITIZENSHIP OF THE PARTIES

13.    For the purposes of diversity jurisdiction, the citizenship of limited liability companies is the citizenship of their members. *Delay v. Rosenthal Collins Group, LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009) ("The general rule is that all unincorporated entities—of which a limited liability company is one—have the citizenship of each partner or member."); *Homfeld II, LLC v. Comair Holdings*, 53 Fed App'x 731 (6th Cir. 2002) (citizenship of the members of a limited liability company "is required in order

to establish diversity jurisdiction because a limited liability company is not treated as a corporation and has the citizenship of its members").

## I.      Citizenship of Plaintiff Acrisure, LLC

14.      Plaintiff Acrisure, LLC is a limited liability company.  Therefore, its members dictate its citizenship.  *See Delay*, 585 F.3d at 1005.

15.      Last month, in the action *Tucker v. Acrisure of California, LLC*, No. 3:24-cv-00015-L-BGS (the "California Federal Action"), Acrisure filed a Notice of Removal (the "California Notice") to transfer the matter from the Superior Court of California to the United States District Court of California, Southern District.

16.      A true and accurate copy of the California Notice is attached as **Exhibit 5**.

17.      The California Notice establishes that Acrisure is a citizen of Delaware and Michigan, and upon information and belief, those facts are still true today.

18.      The California Notice states that "Acrisure, LLC … is wholly owned by Acrisure Intermediate, Inc. a Delaware corporation with its principal place of business in Michigan."  (**Exhibit 5**, p. 4, ¶ 17).

19.      Further, Plaintiff alleges in its Complaint in this matter that it is a resident citizen of the State of Michigan. (**Exhibit 1**, p. 3, ¶ 5).

20.      Because Acrisure Intermediate, Inc. is a Delaware corporation with its principal places of business in Michigan, it is a citizen of Delaware and Michigan. 28 U.S.C. § 1332(c)(1).

21.    Accordingly, because Acrisure is a limited liability company and its sole member is a Delaware corporation with its principal place of business in Michigan, Acrisure is a citizen of Delaware and Michigan for diversity jurisdiction purposes. *See Delay*, 585 F.3d at 1005.

## II.    Citizenship of the Defendants

22.    Defendants are now, and at the time of the filing of the Complaint were, residents of the State of New York.

23.    Defendant Matthew Kelly is a natural person who resides in New York. Mr. Kelly is therefore a citizen of New York for diversity jurisdiction purposes.

24.    Defendant Christopher Iovino is a natural person who resides in New York.   Mr. Iovino is therefore a citizen of New York for diversity jurisdiction purposes.

25.    Defendant Robert Kempner is a natural person who resides in New York. Mr. Kempner is therefore a citizen of New York for diversity jurisdiction purposes.

26.    Defendant Michael Rella is a natural person who resides in New York.  Mr. Rella is therefore a citizen of New York for diversity jurisdiction purposes.

27.    Defendant Robert Trager is a natural person who resides in New York. Mr. Trager is therefore a citizen of New York for diversity jurisdiction purposes.

28.    Defendant Eric Wagner is a natural person who resides in New York.  Mr. Wagner is therefore a citizen of New York for diversity jurisdiction purposes.

29.    Accordingly, all Defendants are citizens of New York.

30.    Because Acrisure is a citizen of Delaware and Michigan, and the Defendants are citizens of New York, there is complete diversity between the parties to this action.

31.    All Defendants consent to the removal of this action, subject to and without waiving any defenses and rights available to them.

### AMOUNT IN CONTROVERSY

32.    The amount in controversy requirement is also satisfied.

33.    While Defendants deny any liability to Acrisure, the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

34.    In the Complaint, Acrisure alleges that Defendants' "wrongfully" (i) solicited at least 20 customers of Acrisure who have already left Acrisure to join Defendants' new employer; (ii) solicited each other to join their new employer; and (iii) used or disclosed Acrisure's confidential information.

35.    In the "Requested Relief" section of its Complaint, Acrisure seeks injunctive relief, including a temporary restraining order (which it already obtained *ex parte* without any notice to Defendants' counsel), as well as a preliminary and permanent injunction.  The value of Defendants' compliance with the injunctive relief is included in the amount in controversy for diversity jurisdiction purposes.  *See*, *e.g.*, *Hunt v. Ash. State Apple Adver. Comm'n*, 432, U.S. 333, 347 (1977) ("In actions seeking

declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.").

36.     In addition to injunctive relief, Acrisure seeks money damages, including a "Judgment against Defendants in favor of Acrisure in an amount to be determined." (**Exhibit 1,** p. 32).

37.     In cases involving restrictive covenants, courts regularly "reach the jurisdictional amount by including claims for losses that are difficult to quantify," such as revenues generated by an employee subject to an allegedly unenforceable restrictive covenant. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 510 (6th Cir. 1992) (looking to sales generated by former employees to determine if amount-in-controversy was satisfied); *see also FirstEnergy Solutiosn Corp. v. Flerick*, 521 Fed. App'x 521, 524-25 (6th Cir. 2013) (finding district court properly exercised diversity jurisdiction where gross profits of defendant employee exceeded $75,000 in claim for breach of restrictive covenant).

38.     Here, based on Acrisure's allegation that "Defendants are six former highly-compensated Acrisure sales and account executives," the revenues generated by the Defendants alone exceed the $75,000 jurisdictional threshold.[1] (**Exhibit 1**, p. 4, ¶

---

[1] To the extent that Acrisure seeks its "attorneys' fees and expenses," pursuant to a contractual or statutory mandate, attorney fees are included in determining the amount in controversy for purposes of diversity. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 376 (6th Cir. 2007) ("As a general rule, attorneys' fees are excludable in determining the amount in controversy for purposes of diversity, unless the fees are provided for by contract or where a statute mandates or expressly allows the

14; p. 9, ¶ 39) (alleging that Defendants were "highly compensated" and paid "hundreds of thousands of dollars").

39.     When considering the extensive relief that Acrisure seeks from Defendants, the $75,000 amount in controversy threshold is satisfied.

40.     Defendants believe Plaintiff's will affirmatively state that the amount in controversy is in excess of $75,000.

## ALL REMOVAL PREREQUISITES HAVE BEEN SATISFIED

41.     This Notice if Removal is filed within 30 days after Defendants received a copy of the Complaint. 28 U. S. C. § 1446(b)(l).

42.     Defendants have attached "a copy of all process, pleadings, and orders served upon [them] in [the state court civil] action" as **Exhibits 1, 3, 4**. 28 U. S. C. § 1446(a).

43.     All Defendants have consented to this removal.

44.     No Defendant has sought similar relief with respect to this matter.

45.     The prerequisites for removal under 28 U.S.C. §1441 have been met.

46.     Defendants are serving written notice of the filing of this Notice of Removal on Plaintiff and will cause a copy of this notice to be filed with the Clerk of

---

payment of such fees."). Defendants expressly deny and reserve all rights regarding Acrisure's claim for attorneys' fees and expenses.

the 17th  Judicial Circuit Court for the County of Kent, State of Michigan, in accordance with 28 USC 1446(d). (*See* **Exhibit 6**).

47.     The allegations of this notice are true and correct, and this cause is within the jurisdiction of the United States District Court for the Western District of Michigan, Southern Division.

48.     For the foregoing reasons, diversity jurisdiction exists under 28 U.S.C. § 1332.  Defendants therefore remove this case from the Circuit Court to this Court.

**NON-WAIVER OF DEFENSES AND NON-ADMISSIONS OF ALLEGATIONS**

49.     Nothing in this Notice of Removal shall be construed as a waiver by Defendants of any of its defenses to the claims set forth in the Complaint

50.     By removing Plaintiff's state court suit to this Court, Defendants do not admit any allegations in the Complaint and do not forfeit, waive, or abandon any defenses.

**WHEREFORE,** Defendants file this Notice of Removal and thereby seek to remove this civil action to the United States District Court for the Western District of Michigan, Southern Division. Plaintiff is notified to proceed no further in state court unless or until the case should be remanded by order of said United States District Court.

Respectfully submitted,

BUTZEL LONG, P.C.

/s/ Daniel V. Barnett
Michael L. Gutierrez (P79440)
BUTZEL LONG, P.C.
*Attorneys for Defendants*
300 Ottawa Avenue, NW, Suite 620
Grand Rapids, Michigan 49503
(616) 988-5600
barnett@butzel.com

DATED: March 27, 2024

## INDEX OF EXHIBITS

| Exhibit Number | Description |
|---|---|
| Exhibit 1 | Summons and Complaint with Exhibits |
| Exhibit 2 | Register of Actions |
| Exhibit 3 | Temporary Restraining Order |
| Exhibit 4 | Order extending the Temporary Restraining Order |
| Exhibit 5 | California Notice of Removal |
| Exhibit 6 | Notice to Kent County Circuit Court |

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Notice of Removal was created using Microsoft Word, and that the Notice contains 1,990 words in the text and footnotes exclusive of the case caption, cover sheets, table of contents, table of authorities, signature block, attachments, exhibits, and this certificate.

/s/ Daniel V. Barnett
Michael L. Gutierrez (P79440)
BUTZEL LONG, P.C.
*Attorneys for Defendants*
300 Ottawa Avenue, NW, Suite 620
Grand Rapids, Michigan 49503
(616) 988-5600
barnett@butzel.com

DATED: March 27, 2024

## CERTIFICATE OF SERVICE

On March 27, 2024, I e-filed the foregoing document with the Clerk of the Court using the CM/ECF system and sent a paper copy to Plaintiff's counsel by first class mail at the following address with postage prepaid:

**Edward J. Bardelli  (P53849)**
**Jarrod H. Trombley (P83517)**
**WARNER NORCROSS + JUDD LLP**
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503

**James R. Carroll**
**Christopher G. Clark**
**SKADDEN, ARPS, SLATE,**
**MEAGHER & FLOM LLP**
500 Boylston Street
Boston, Massachusetts 02116

/s/ Daniel V. Barnett
Michael L. Gutierrez (P79440)
BUTZEL LONG, P.C.
*Attorneys for Defendants*
300 Ottawa Avenue, NW, Suite 620
Grand Rapids, Michigan 49503
(616) 988-5600
barnett@butzel.com

DATED: March 27, 2024

# EXHIBIT 1

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>17th     JUDICIAL CIRCUIT<br>Kent                    COUNTY | **SUMMONS** | CASE NO.<br>24-0 2866-CBB |
|---|---|---|

| Court address<br>180 Ottawa Ave NW, Grand Rapids, MI 49503 | Court telephone no.<br>(616) 632-5025 |
|---|---|

| Plaintiff's name, address, and telephone no.<br>Acrisure, LLC | | Defendant's name, address, and telephone no.<br>Christopher Iovino<br>161 Brendan Avenue<br>Massapequa Park, NY 11762 |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Edward J. Bardelli (P53849); Warner Norcross + Judd LLP; 150 Ottawa Ave NW, Ste 1500, Grand Rapids, MI 49503; (616) 752-2000 | v | |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☒ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer  pending.

Summons section completed by court clerk.    **SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.

2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside of Michigan).

3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

4. If you require accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>MAR 2 2 2024 | Expiration date *<br>JUN 2 1 2024 | Court clerk<br>LISA POSTHUMUS LYONS |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (3/23)  **SUMMONS**
Summons  (3/23)

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

Case No. _____

| PROOF OF SERVICE |

**TO PROCESS SERVER:** You must serve the summons and complaint and file proof of service with the court clerk before the expiration date on the summons. If you are unable to complete service, you must return this original and all copies to the court clerk.

| CERTIFICATE OF SERVICE / NONSERVICE |

☐ I served ☐ personally ☐ by registered or certified mail, return receipt requested, and delivery restricted to the addressee (copy of return receipt attached)   a copy of the summons and complaint, together with the attachments listed below, on:

☐ I have attempted to serve a copy of the summons and complaint, together with the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| Place or address of service | |
| Attachments (if any) | |

☐ I am a sheriff, deputy sheriff, bailiff, appointed court officer or attorney for a party.

☐ I am a legally competent adult who is not a party or an officer of a corporate party. I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee | Miles traveled | Fee | | Signature |
|---|---|---|---|---|
| $ | | $ | | |
| Incorrect address fee | Miles traveled | Fee | TOTAL FEE | Name (type or print) |
| $ | | $ | $ | |

| ACKNOWLEDGMENT OF SERVICE |

I acknowledge that I have received service of a copy of the summons and complaint, together with

_____ on _____.
Attachments (if any)                                                        Date and time

_____ on behalf of _____
Signature

_____
Name (type or print)

## STATE OF MICHIGAN
## KENT COUNTY CIRCUIT COURT

ACRISURE, LLC,

              Plaintiff,

v.

MATTHEW KELLY, CHRISTOPHER
IOVINO, ROBERT KEMPNER,
MICHAEL RELLA, ROBERT TRAGER,
and ERIC WAGNER,

              Defendants.

Case No. 24-**02866**-CB

Honorable

**VERIFIED COMPLAINT FOR
TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTIVE RELIEF**

**Rec'd & Filed**

**MAR 22 2024**

**KENT COUNTY
CIRCUIT COURT**

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
James R. Carroll (*pro hac vice* forthcoming)
Christopher G. Clark (*pro hac vice* forthcoming)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

---

*There is no pending or resolved civil action between these parties arising out of the transaction
or occurrence alleged in this complaint.*
*This case involves a Business or Commercial Dispute under MCL 600.8031 and thus meets the
statutory requirements to be assigned to the Business Court Docket.*

Plaintiff Acrisure, LLC ("Acrisure"), by and through its attorneys Warner Norcross + Judd LLP and Skadden, Arps, Slate, Meagher & Flom LLP, states its Complaint against Matthew Kelly, Christopher Iovino, Robert Kempner, Michael Rella, Robert Trager, and Eric Wagner (collectively, the "Defendants"), upon personal knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      Defendants are six former highly-compensated Acrisure insurance sales and account executives who violated their contractual obligations to Acrisure by encouraging and soliciting current Acrisure employees to submit coordinated resignations last Friday, March 15, 2024 to work for a direct competitor, Woodruff Sawyer & Co. ("Woodruff Sawyer").   In addition to wrongfully soliciting Acrisure employees to join a competitor, Acrisure is aware of at least 20 Acrisure customers that have already left Acrisure, many of which have informed Acrisure of their intention to leave and become customers of Woodruff Sawyer.  The only plausible explanation for this wave of customer departures over the past few days is solicitation by one or more of the Defendants.  In furtherance of this unlawful conduct, upon information and belief, Defendants Michael Rella, Robert Trager, Christopher Iovino, Matthew Kelly, and Robert Kempner accessed or used Acrisure's proprietary and confidential information to solicit customers to terminate their business with Acrisure for the benefit of their new employer.

2.      Just hours before their coordinated resignation, multiple of the Defendants accessed, downloaded, or deleted Acrisure files.  The Defendants did so using electronic devices that were not issued by Acrisure.  In light of their plan to leave their employment at Acrisure, there was no legitimate Acrisure business reason for that conduct.

2

3.     Through this action, Acrisure seeks to protect its rights, safeguard its proprietary and confidential information, and enforce the reasonable restrictive covenants to prevent Defendants from further exploiting Acrisure's confidential information, unlawfully soliciting Acrisure employees and poaching Acrisure's customers.

4.     Acrisure has been and will continue to be irreparably harmed by the Defendants' unlawful conduct.

## PARTIES

5.     Acrisure is a Michigan limited liability company with its principal place of business in Kent County, Michigan.

6.     Defendant Matthew Kelly is an individual who upon information and belief resides in New York. Kelly was an Executive Vice President at Acrisure and had been employed at Acrisure since August 1, 2015 until his resignation on March 15, 2024 (*the same day every other Defendant resigned within hours of each other*).

7.     Defendant Chrisopher Iovino is an individual who upon information and belief resides in New York. Iovino was a Senior Insurance Broker at Acrisure and had been employed at Acrisure since October 11, 2017 until his resignation on March 15, 2024 (*the same day every other Defendant resigned within hours of each other*).

8.     Defendant Robert Kempner is an individual who upon information and belief resides in New York. Kempner was a Senior Vice President at Acrisure and had been employed at Acrisure since August 1, 2015 until his resignation on March 15, 2024 (*the same day every other Defendant resigned within hours of each other*).

9.     Defendant Michael Rella is an individual who upon information and belief resides in New York. Rella was a Vice President, Director of Insurance Operations at Acrisure and had

3

been employed at Acrisure since August 1, 2015 until his resignation on March 15, 2024 (*the same day every other Defendant resigned within hours of each other*).

10.     Defendant Robert Trager is an individual who upon information and belief resides in New York.  Trager was a Senior Vice President at Acrisure and had been employed at Acrisure since August 1, 2015 until his resignation on March 15, 2024 (*the same day every other Defendant resigned within hours of each other*).

11.     Defendant Eric Wagner is an individual who upon information and belief resides in New York.  Wagner was an Account Executive at Acrisure and had been employed at Acrisure since September 1, 2017 until his resignation on March 15, 2024 (*the same day every other Defendant resigned within hours of each other*).

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over Defendants because, pursuant to Paragraph 14 of the Defendants' agreements of employment with Acrisure (the "Employment Agreements"), Defendants consented to personal jurisdiction in this Court.

13.     Personal jurisdiction is proper under MCL 600.705.   The Employment Agreements are governed by and construed and enforced in accordance with the laws of the State of Michigan.

14.     This Court has jurisdiction over this matter because it involves a dispute in excess of $25,000 and Acrisure seeks equitable relief.

15.     Assignment to the Business Court is proper under MCL 600.8031.

16.     Venue is proper because the parties agreed pursuant to Paragraph 14 of the Employment Agreements that any action for enforcement of the Employment Agreements would

be brought exclusively in courts located in the County of Kent, State of Michigan and because

Kent County is a county in which Acrisure has a place of business under MCL 600.1621(b).

## FACTUAL BACKGROUND

### Acrisure Is A Global Fintech Leader Providing
### Financial Services In The Insurance Brokerage Industry

17.     Acrisure is a global fintech leader based in Grand Rapids, Michigan, that provides

intelligence-driven financial services solutions across many industries, including the insurance

brokerage industry.  Acrisure has offices throughout the United States, including in New York.

18.     The insurance brokerage industry is highly competitive to soliciting and

maintaining customers, accounts, and employees.

19.     Acrisure spends significant time and money developing an experienced and

leading team of insurance brokerage professionals who help Acrisure's customers to address

their unique needs and further their business relationship with Acrisure.

20.     Acrisure makes significant investments to acquire, build and retain its customer

base and customer relationships, its goodwill, business reputation and brand, and its employee

workforce.

21.     Acrisure invests in innovative technology, training of its workforce, strong

referral networks, and business contacts that are critical to developing and retaining its insurance

customer relationships.

22.     Acrisure invests substantial time and resources protecting its confidential,

proprietary, and trade secret information and prevents such information from being shared

publicly, either intentionally or by accident, through a variety of processes and procedures.

Acrisure takes reasonable and appropriate steps to protect its confidential information and

restricts access to that non-public information.   Among other things, Acrisure protects its

5

confidential information by password protecting its computers, network, and other databases; restricting access to certain databases or information so that only those personnel who require the information can access it; restricting access to Acrisure facilities, and alarming those premises; requiring employees to sign employment agreements which contain confidentiality clauses; requiring that employees return all confidential information upon termination of their employment; and requiring confidentiality from employees with respect to Acrisure's confidential information and trade secrets.

23. Acrisure also protects its proprietary and confidential information and business relationships by obtaining from employees who have particularly important roles non-solicitation agreements that reasonably restrict employment with direct competitors, the solicitation of certain client and prospective client accounts, and the solicitation of Acrisure employees for employment under certain circumstances for up to two-years after termination from Acrisure.

### The Defendants Agreed To Employment Agreements With Acrisure Pursuant To Which They Were Highly Compensated

**Defendant Kelly**

24. As a condition of his employment with Acrisure, Kelly entered into and is bound by the Employment Agreement (Producer) (the "Kelly Employee Agreement" is attached as Exhibit A). At Acrisure, Kelly was responsible for, among other things, soliciting and selling customers various insurance products and services and providing related services to customers in the New York region.

25. In his role, Kelly had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies and

6

employee relationships.  Upon information and belief, Kelly was hired as a Managing Director at Woodruff Sawyer as its New York Market Growth Leader.

**Defendant Iovino**

26.    As a condition of his employment with Acrisure, Iovino entered into and is bound by the Employment Agreement (Producer) (the "Iovino Employee Agreement" is attached as Exhibit B).  At Acrisure, Iovino was responsible for, among other things, soliciting and selling customers various insurance products and services and providing related services to customers in the New York region.

27.    In his role, Iovino had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies and employee relationships.  Upon information and belief, Iovino was hired as a Vice President, Commercial Insurance Broker at Woodruff Sawyer.

**Defendant Kempner**

28.    As a condition of his employment, Kempner entered into and is bound by the Employment Agreement (Producer) with Acrisure (the "Kempner Employee Agreement" is attached as Exhibit C).  At Acrisure, Kempner was responsible for, among other things, soliciting and selling customers various insurance products and services and providing related services to customers in the New York region.

29.    In his role, Kempner had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies and

employee relationships.  Upon information and belief, Kempner was hired as a Vice President at Woodruff Sawyer.

**Defendant Rella**

30.    As a condition of his employment, Rella entered into and is bound by the Employment Agreement with Acrisure (the "Rella Employee Agreement" is attached as Exhibit D).  At Acrisure, Rella was responsible for, among other things, soliciting and selling customers various insurance products and services and providing related services to customers.

31.    In his role, Rella had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies and employee relationships.  Upon information and belief, Rella was hired as a Vice President at Woodruff Sawyer.

32.    In addition, as part of his role as a member of Acrisure's internal committee in New York, Rella had additional access to confidential information concerning Acrisure's goals, objectives, strategies, employee conversations, financial information, and operational changes.

**Defendant Trager**

33.    As a condition of his employment, Trager entered into and is bound by the Employment Agreement (Producer) with Acrisure (the "Trager Employee Agreement" is attached as Exhibit E).  At Acrisure, Trager was responsible for, among other things, soliciting and selling customers various insurance products and services and providing related services to customers.

34.    In his role, Trager had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information, costs, pricing,

customer and vendor lists, customer contracts, sales strategies, marketing strategies and employee relationships.  Upon information and belief, Trager was hired as a Vice President at Woodruff Sawyer.

**Defendant Wagner**

35.     As a condition of his employment, Wagner entered into and is bound by the Employment Agreement (Producer) with Acrisure (the "Wagner Employee Agreement" is attached as Exhibit F).  At Acrisure, Wagner was responsible for, among other things, soliciting and selling customers various insurance products and services and providing related services to customers.

36.     In his role, Wagner had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies and employee relationships.  Upon information and belief, Wagner was hired in a similar position at Woodruff Sawyer.

37.     In addition, as part of his role as a member of Acrisure's internal committee in New York, Wagner had additional access to confidential information concerning Acrisure's goals, objectives, strategies, employee conversations, financial information, and operational changes.

38.     The Employment Agreements signed by the Defendants contained substantially the same terms.

39.     All of the Defendants were highly compensated by Acrisure, almost all of whom were receiving annual compensation of hundreds of thousands of dollars.

## The Defendants Agreed To Certain Reasonable Restrictions That Protect Acrisure

40.    Acrisure hired and highly compensated the Defendants in exchange for, among other things, their agreement to certain reasonable protections of Acrisure information and property and restrictive covenants.

41.    The confidential and competitive business and customer information to which Defendants had access throughout their employment with Acrisure is critical to Acrisure's competitive position in the insurance brokerage industry and would be of substantial value to a competitor such as Woodruff Sawyer, which sells similar or identical products and services that Acrisure offers.

42.    Defendants agreed in Paragraph 8 of their Employment Agreements to protect Acrisure's confidential information from unauthorized disclosure:

> Employee will have access to confidential information about the Company (the "Confidential Information"), including without limitation, information about the Company's operations, processes, procedures, trade secrets, agent lists, adjuster lists, rating techniques, rates, coverage, accounting rules, employee information, insurance companies, computer techniques, marketing techniques, advertising techniques, know-how, finances, business plans, costs, pricing, sales, customer lists, the needs and demands of customers, and vendor lists, including lists and contacts with insurance companies.  In addition, Employee will develop other information that the Company considers to be Confidential Information.  Employee will not, directly or indirectly, disclose, furnish, or make available, except in the course of performing Employee's duties of employment under this Agreement, any Confidential Information (regardless of how Employee learned of it or who developed it), without the Company's prior written approval.  These restrictions concerning Confidential Information shall remain in effect following termination of this Agreement or termination of Employee's employment with the Company, without limitation.

(Exhibits A-F.)

43.    The Defendants agreed in Paragraph 9 of the Employment Agreements to return
to Acrisure immediately upon termination of employment all Acrisure property:

> Employee shall, immediately upon termination of employment for
> any reason, return to the Company all client records of any sort and
> all Company literature, supplies, letters, written or printed forms,
> diaries, phone lists, documents containing customer lists, customer
> information, product information, pricing information, information
> as to sources of services, financial information of the Company and
> memoranda pertaining to the Company's business. Employee shall
> also, immediately upon termination of employment, return to the
> Company all Company property in Employee's possession,
> including automobiles, telephones, and any other Company-issued
> equipment.

(Exhibits A-F.)

44.    The Defendants agreed in Paragraph 10 of their Employment Agreements to
certain restrictive covenants regarding the solicitation of employees and customers:

> The Company and Employee agree that the Company will provide
> Employee with the opportunity to receive compensation pursuant to
> this Agreement and the same constitutes valuable consideration.
> Employee further acknowledges that Employee will be provided
> with access to customer and other confidential information
> concerning the Company's business, as well of that of the
> Company's affiliated entities without limitation ("Affiliated
> Entities" or individually "Affiliated Entity"). It is further agreed
> that it requires special and unique knowledge and information to act
> as a business agent on behalf of the Company and that the Employee
> shall gain such special and unique knowledge and information from
> the Company and/or Affiliated Entities throughout the time of
> his/her employment. This knowledge and information are integral
> parts of the business of the Company and/or of the Affiliated
> Entities, and the use of this knowledge and information by a
> competitor of the Company would cause irreparable harm to the
> Company. The Company and Employee agree that this knowledge
> and information constitute legitimate protectable business interests
> of the Company and/or of the Affiliated Entities. The Company and
> Employee further agree that the business Employee secures,
> develops or services for the Company or for an Affiliated Entity
> shall constitute the exclusive property of the Company or Affiliated
> Entity as applicable. In view of the foregoing, Employee agrees
> that, for the duration of Employee's employment, and in the event
> Employee's employment is terminated for any reason, for a period

11

of two (2) years after the termination of employment: [subsections (a)(1) – (iii) omitted and discussed below]

(Exhibits A-F.)

45. Pursuant to Paragraph 10 of their Employment Agreements, the Defendants agreed that during their employment and for two years after the termination of their employment they will not directly or indirectly contact any Acrisure customers that they engaged with or had knowledge of during their employment:

    a. Non-Solicitation/Non-Interference. Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

        i. Contacting or engaging in any communication with any Company or Affiliated Entity customer for whom Employee had responsibility, or contacting or engaging in any communications with any Company or Affiliated Entity customer or prospective Company or Affiliated Entity customer about whom Employee obtained knowledge during employment with the Company, to secure business competitive to the products and services provided by the Company or Affiliated Entity;

(Exhibits A-F.)

46. Pursuant to Paragraph 10 of their Employment Agreements, the Defendants agreed that during their employment and for two years after the termination of their employment they will not directly or indirectly solicit any Acrisure customer to "terminate or curtail its relationship" with Acrisure:

    a. Non-Solicitation/Non-Interference. Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee,

contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

    ii.    Requesting, advising, or encouraging any customer of the Company or of an Affiliated Entity to terminate or curtail its relationship with the Company or Affiliated Entity, or requesting or advising any person to refrain from becoming a customer or supplier of the Company or an Affiliated Entity;

(Exhibits A-F.)

    47.    Pursuant to Paragraph 10 of their Employment Agreements, the Defendants agreed that during their employment and for two years after the termination of their employment they will not directly or indirectly solicit any Acrisure employee to "terminate" its relationship with Acrisure or pursue any Acrisure employee for employment without permission from Acrisure:

    a.    <u>Non-Solicitation/Non-Interference</u>. Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

    iii.    Requesting, advising, or encouraging any employee, agent, representative or independent contractor of the Company or an Affiliated Entity to terminate his, her, or its relationship with the Company or Affiliated Entity, or requesting or advising any person to refrain from becoming an employee, agent, representative or independent contractor of the Company or of an Affiliated Entity, or otherwise pursuing, employing or retaining (as an employee, an independent contractor or otherwise) any employee, agent, representative or independent contractor of the Company or of an Affiliated Entity without the written permission of the Company.

(Exhibits A-F.)

48.     Pursuant to Paragraph 11 of their Employment Agreements, the Defendants further agreed that the restrictions contained in Paragraph 10 are reasonable and necessary to protect Acrisure's business and interests including Acrisure's goodwill and confidential information. (Exhibits A-F.)  Pursuant to Paragraph 11 of their Employment Agreements, the Defendants further agreed that "there is no adequate remedy at law if Employee violates Paragraph 10," that any violation of Paragraph 10 would cause Acrisure to suffer substantial and irreparable injury, and that Acrisure "is entitled, in addition to any other remedies, to preliminary and permanent injunctive relief." (Exhibits A-F.)

49.     The Defendants agreed in Paragraph 14 of their Employment Agreements that Acrisure may "recover damages for a breach of this Agreement by civil suit, injunction or otherwise, and Employee shall be liable to [Acrisure] for the reasonable costs and attorneys' fees of any such action in which a breach is established." (Exhibits A-F.)

50.     The restrictive covenants contained in Paragraph 10 of the Employment Agreements are reasonable in scope to protect Acrisure's legitimate business interests (including its proprietary and confidential information and relationships with customers), are not harmful to the general public and are not unreasonably burdensome to Defendants. (Exhibits A-F.)  Indeed, pursuant to the Employee Agreements, the Defendants agreed that the restrictive covenants are reasonable.

51.     Defendants' use and or disclosure of Acrisure's confidential information, retention of Acrisure property, and violation of the restrictive covenants would put Acrisure at a competitive disadvantage and could easily be used by Woodruff Sawyer or any other competitor to Acrisure's competitive disadvantage.

14

**Last Friday Evening, Defendants**
**Executed A Coordinated Resignation From Acrisure**

52.    On the evening of Friday, March 15, 2024, without warning, all of the Defendants resigned from their positions at Acrisure, effective immediately and without prior notice. All of the Defendants worked at the same Acrisure office in Woodbury, New York.

53.    All of the Defendants sent nearly identical emails to Acrisure tendering their resignation effective immediately.

54.    At 6:00 p.m., Kelly sent his resignation email to, among others, Rella.



Fri 3/15/2024 6:00 PM

Matt Kelly <mkelly17@gmail.com>

**Voluntary Resignation from Acrisure**

To   .: Matt Kelly;    Joseph Loughlin;  _ Michael Rella

You don't often get email from mkelly17@gmail.com. Learn why this is important

Dear Joe
By this letter, I am providing Acrisure with written notice that I am resigning my position with Acrisure effective immediately. I have left my Acrisure electronic devices and paperwork in my office.

I've enjoyed working with you and look forward to an amicable separation.
Very truly yours,

Matthew Kelly

15

55.    At 6:01 p.m., Kempner sent his resignation email to, among others, Rella.



Fri 3/15/2024 6:01 PM

**ROBERT KEMPNER** <bkempner17@icloud.com>

**Voluntary resignation**

To    Michael Rella;    jcofini@acrisure.com;    jloughlin@acrisure.com

[You don't often get email from bkempner17@icloud.com. Learn why this is important at https://aka.ms/LearnAboutSenderIdentification ]

Dear Mike,

By this letter, I am providing Acrisure with written notice that I am resigning my position with Acrisure effective immediately. I have left my Acrisure laptop and paperwork in my office.

I've enjoyed our working relationship, and look forward to an amicable separation.

Very Truly Yours,

Robert Kempner

56.    At 6:06 p.m., Rella sent his resignation email.



Fri 3/15/2024 6:06 PM

**Michael Rella** <mrella88@gmail.com>

**Voluntary Resignation**

To    jloughlin@acrisure.com;    jcofini@acrisure.com

Some people who received this message don't often get email from mrella88@gmail.com. Learn why this is important

Dear John and Joe,

By this letter, I am providing Acrisure with written notice that I am resigning my position with Acrisure effective immediately. I have left my Acrisure electronic devices and paperwork in my office.

I've enjoyed working with you and look forward to an amicable separation.

Very truly yours,

Michael Rella

16

57.    Also at 6:06 p.m., Trager sent his resignation to, among others, Rella.

 **Fri 3/15/2024 6:06 PM**

## Robert Trager <Rtrager@optonline.net>

**Voluntary Resignation**

To  : Michael Rella;   Joseph Loughlin

Dear Mike Rella and Joe Loughlin,

By this letter, I am providing Acrisure with written notice that I am resigning my position with Acrisure effective immediately.

I have left my Acrisure electronic devices and paperwork in my office and key fob in the desk drawer.

I've enjoyed working with you and look forward to an amicable separation.

Very truly yours,

Robert Trager

Sent from my iPhone

58.   At 6:16 p.m., Iovino sent his resignation to, among others, Rella.



Fri 3/15/2024 6:16 PM

## Chris Iovino <cjiovino@gmail.com>

**Voluntary Resignation**

To    .  jcofini@acrisure.com;    jloughlin@acrisure.com;    .  mrella@acrisure.com

Some people who received this message don't often get email from cjiovino@gmail.com. Learn why this is important

Dear John & Joe,

By this letter, I am providing Acrisure with written notice that I am resigning my position with Acrisure effective immediately. I have left my Acrisure electronic devices and paperwork in my office.

I've enjoyed working with you and look forward to an amicable separation.
Very truly yours,

Chris Iovino

--
Chris Iovino
516-567-6814

59.    At 9:36 p.m., Wagner sent his resignation email.



Fri 3/15/2024 9:36 PM

**Eric Wagner** <eraymondwagner@gmail.com>

**Voluntary Resignation**

To    : jcofini@acrisure.com|

You don't often get email from eraymondwagner@gmail.com. Learn why this is important

Dear John,

By this letter, I am providing Acrisure with written notice that I am resigning my position with Acrisure effective immediately. I have left my Acrisure electronic devices and paperwork in my office.

I've enjoyed working with you and look forward to an amicable separation.

Very truly yours,

Eric Wagner

60.    The six resignation emails are substantively similar and use many of the same phrases. The Defendants coordianted their resignations.

61.    The six resignation emails in fact were sent to and among the Defendants in this action. For example, Kelly, Kempner, Trager, and Iovino sent their resignation emails to Rella.

62.    Upon information and belief, Defendants each had already accepted offers to work at Woodruff Sawyer in substantially the same roles they had at Acrisure at the time they tendererd their resignations.

63.    Upon information and belief, Defendants recruited, solicited or encouraged each other to leave Acrisure while employed at Acrisure to join Woodruff Sawyer in violation of their contractual obligations to Acrisure.

19

**In The Hours Immediately Prior To Their Resignations,
<u>Several Of The Defendants Accessed, Deleted, And Downloaded Acrisure Files</u>**

64.     Although the Defendants' abrupt departure occurred just a few days ago, Acrisure's initial investigation already has revealed that at least five of the Defendants accessed and deleted Acrisure information, and two of the Defendants downloaded Acrisure information – and did so from non-Acrisure managed devices – just hours before resigning.

65.     For example, in the final hours of his employment at Acrisure, Kelly alone deleted more than 550 files and accessed more than 40 files on Acrisure's system.  At the time he did so, Kelly had already accepted employment at Woodruff Sawyer.  As such, Kelly's loyalties had shifted away from Acrisure and to Woodruff Sawyer.  He had no basis to delete Acrisure's files nor to access other files at that time.

66.     In addition, in the final hours of their employment at Acrisure, Rella and Wagner downloaded files from Acrisure's system.  In the final hours of their employment at Acrisure, Iovino, Trager, Wagner and Rella all deleted and accessed files on Acrisure's system.  All of these actions were performed on non-Acrisure managed devices.

67.     The Defendants did not – and do not – have permission to retain copies of Acrisure's information or transfer it outside of Acrisure.

68.     The Defendants would not have been given permission to do so had they asked.

69.     In light of the Defendants' impending plan to leave their employment at Acrisure, there was no legitimate Acrisure business reason for those documents to be accessed just hours before the Defendants' resignations.

70.     Acrisure's forensic investigation remains ongoing.

**The Next Day After Their Resignations,**
**A Direct Competitor Begins Advertising The Defendants' Arrival**

71.    Less than 24 hours after the Defendants' coordinated resignations, on Saturday morning, March 16, 2024, Woodruff Sawyer began advertising the hiring of the Defendants as part of Woodruff Sawyer's "Newest Market Expansion."

> Introducing our Newest Market Expansion — NY
> Construction Practice
>
> We are thrilled to welcome six exceptional members to Woodruff Sawyer's New
> York Construction and Real Estate Team.
>
> These former members of Acrisure bring their diverse experience in bonds, surety,
> and construction to one of the largest insurance brokerage and consulting firms
> with over 100 years in the industry – Woodruff Sawyer.
>
> Introducing our dynamic team:
>
> - Matt Kelly, Vice President, Market Leader
> - Bob Trager, Vice President
> - Bob Kempner, Vice President
> - Eric Wagner, Vice President
> - Chris Iovino, Vice President
> - Mike Rella, Client Relationship Director
>
> Our experts are ready to help you take your construction endeavors to new
> heights. Connect with us today to explore how our expanded team can transform
> the way you approach risk management and insurance in your projects.

72.    Then, on Monday, March 18, 2024, just one business day following Defendants' coordinated resignations from Acrisure, Woodruff Sawyer publicly announced that it had hired Defendants to expand its business and arrive in New York.

> **Woodruff Sawyer Arrives in New York – Expanding East Coast**
> **Presence**
> **MARCH 18, 2024**
>
> **New York, NY – March 18, 2024 – Woodruff Sawyer,** one of the largest independent insurance brokers in the
> United States, today announced the firm is expanding their East Coast footprint with the addition of six
> members formerly with Acrisure's Construction and Commercial Risk Practice. The new team will open Woodruff
> Sawyer's first office in New York.

21

("Woodruff Sawyer Arrives In New York – Expanding East Coast Presence" - https://woodruffsawyer.com/about-us/press/in-the-news/woodruff-sawyer-arrives-in-new-york-expanding-east-coast-presence/).

73. The Woodruff Sawyer press release states that Woodruff Sawyer is "expanding their East Coast footprint with the addition of six members formerly with Acrisure's Construction and Commercial Risk Practice" and "bringing together over 100 years of combined experience, the new team — Matthew Kelly, Robert Trager, Bob Kempner, Chris Iovino, Eric Wagner, and Michael Rella — brings diverse backgrounds in construction, bonding, and surety to further strengthen Woodruff Sawyer's established industry presence." (*Id.*)

74. The Woodruff Sawyer press release further states that Kelly is now the "New York Market Growth Leader" for Woodruff Sawyer and "will play a pivotal role in advancing Woodruff Sawyers's growth in the region."

75. On March 18, 2024, the same day that the Woodruff Sawyer press release was published, Acrisure sent written letters to Defendants advising them that their Employment Agreements prohibited them from soliciting Acrisure employees and customers, that Defendants remained bound to their Employment Agreements' non-solicitation clause and that any further breach of their Employment Agreements may result in instituting litigation to protect Acrisure's property and rights.

76. The Defendants have not responded to those letters.

77. On the same day, Acrisure sent a written letter to Woodruff Sawyer to inform Woodruff Sawyer of the Defendants' ongoing obligations to Acrisure pursuant to the Employment Agreements.

Case 1:24-cv-00318-JMB-PJG  ECF No. 1,  PageID.39  Filed 03/27/24  Page 39 of 214

**As Soon As Defendants Rella, Trager, Iovino, Kelly, and Kempner**
**Arrive At Woodruff Sawyer, They Began Unlawfully Soliciting Acrisure Customers**

78.    Upon information and belief, Defendants Rella, Trager, Iovino, Kelly, and Kempner wasted no time reaching out to Acrisure's customers in an attempt to obtain business for Woodruff Sawyer.

79.    From the day of the Defendants' coordinated resignation to today, at least 20 Acrisure customers switched their insurance program from Acrisure to another insurance broker. The timing of this wave of customer departures strongly suggest that Defendants Rella, Trager, Iovino, Kelly, and Kempner have directly or indirectly solicited, encouraged, or induced these former Acrisure customers.

80.    Upon information and belief, Defendants Rella, Trager, Iovino, Kelly, and Kempner unlawfully solicited these customers by using or disclosing Acrisure's confidential information.

81.    Many of these customers expressly stated that they switched their insurance program from Acrisure to Woodruff Sawyer as their exclusive broker for the insurance programs Acrisure previously managed.

82.    For example, on March 18, 2024, the same day as Woodruff Sawyer's press release, Acrisure learned that one of its long-standing and significant customers ("Customer A") indicated that it had appointed Woodruff Sawyer as its exclusive broker for the insurance programs that Acrisure previously had managed.

83.    While at Acrisure, Rella was Customer A's Account Executive and Trager was its broker.

84.    The primary insurance carrier was primarily managed by Rella.

85.     Customer A stated in its notice to Acrisure that "we have appointed Woodruff-Sawyer & Co. as our exclusive broker regarding the insurance programs listed above."

86.     Upon information and belief, Customer A switched its insurance program from Acrisure to Woodruff Sawyer because of Rella's and Trager's direct or indirect unlawful solicitation, encouragement or inducement.

87.     Upon information and belief, Rella and Trager unlawfully solicited Customer A by using or disclosing Acrisure's confidential information.

88.     Upon information and belief, Rella and Trager are continuing to solicit other Acrisure customers to no longer be a customer of Acrisure.

89.     On the same day, Acrisure learned that yet another one of its long-standing and significant customers ("Customer B") indicated that it had appointed Woodruff Sawyer as its exclusive broker for the insurance programs that Acrisure previously had managed.

90.     Customer B stated in its notice to Acrisure that "we have appointed Woodruff-Sawyer & Co. as our exclusive broker regarding the insurance programs listed…"

91.     While at Acrisure, Kelly was the Producer for Customer B's account.

92.     Upon information and belief, Customer B switched its insurance program from Acrisure to Woodruff Sawyer because of Kelly's direct or indirect unlawful solicitation, encouragement or inducement.

93.     Upon information and belief, Kelly's unlawfully solicited Customer B by using or disclosing Acrisure's confidential information.

94.     Upon information and belief, Kelly is continuing to solicit other Acrisure customers to no longer be a customer of Acrisure.

24

95.     Just one day later, on March 19, 2024, Acrisure learned that another one of its long-standing and significant customers ("Customer C") indicated that it had appointed a new exclusive broker for the insurance programs that Acrisure previously had managed.

96.     Upon information and belief, that new exclusive broker is Woodruff Sawyer.

97.     While at Acrisure, Iovino was the Producer for Customer C's account.

98.     Upon information and belief, the customer switched its insurance program from Acrisure to Woodruff Sawyer because of Iovino's direct or indirect unlawful solicitation, encouragement or inducement.

99.     Upon information and belief, Iovino unlawfully solicited Customer C by using or disclosing Acrisure's confidential information.

100.    Upon information and belief, Iovino is continuing to solicit other Acrisure customers to no longer be a customer of Acrisure.

101.    Just hours later, on March 19, 2024, Acrisure learned that yet another one of its long-standing and significant customers ("Customer D") indicated that it had appointed Woodruff Sawyer as its exclusive broker for the insurance programs that Acrisure previously had managed.

102.    Customer D wrote in its email to Acrisure "[w]e have decided to name Woodruff-Sawyer & Co. as our new broker for all of our insurance needs."

103.    While at Acrisure, Kempner was the Producer for Customer D's account.

104.    Upon information and belief, Customer D switched its insurance program from Acrisure to Woodruff Sawyer because of Kempner's direct or indirect unlawful solicitation, encouragement or inducement.

105.    Upon information and belief, Kempner unlawfully solicited Customer D by using or disclosing Acrisure's confidential information.

106.    Upon information and belief, Kempner is continuing to solicit other Acrisure customers to no longer be a customer of Acrisure.

107.    On March 20, 2024, Acrisure learned that another one of its long-standing and significant customers ("Customer E") indicated that it had appointed a new exclusive broker for the insurance programs that Acrisure previously had managed.

108.    Upon information and belief, that new exclusive broker is Woodruff Sawyer.

109.    While at Acrisure, Iovino was the Producer for Customer E's account.

110.    Upon information and belief, the customer switched its insurance program from Acrisure to Woodruff Sawyer because of Iovino's direct or indirect unlawful solicitation, encouragement or inducement.

111.    Upon information and belief, Iovino unlawfully solicited Customer E by using or disclosing Acrisure's confidential information.

112.    Upon information and belief, Iovino is continuing to solicit other Acrisure customers to no longer be a customer of Acrisure.

113.    Upon information and belief, the products and services of Woodruff Sawyer are the competitive to the products and services of Acrisure.

114.    Unless enjoined and restrained, Defendants will continue to violate their contractual obligations to Acrisure.

### Defendants Agreed That If They Breached Certain Restrictions In Their Employment Agreements, Acrisure Would Be Entitled To Obtain Injunctive Relief

115.    In their Employment Agreements, Defendants agreed that any violation of the restrictions contained in Paragraph 10 of the Employment Agreements would cause Acrisure to

suffer substantial and irreparable injury, and that Acrisure "is entitled, in addition to any other remedies, to preliminary and permanent injunctive relief." (Employment Agreements ¶ 11.)

116.    The Defendants' wrongful conduct is causing immediate, irreparable harm to Acrisure. Acrisure is therefore in need of immediate, temporary, and permanent relief from this Court.

**COUNT I**
**(Breach of Contract Against All Defendants:**
**Acrisure Confidential Information And Property)**

117.    Acrisure incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

118.    The Employment Agreements constitute valid and binding contracts between Acrisure and Defendants, which include reasonable restrictive covenants that are limited in scope. The Employment Agreements were made for valid consideration.

119.    In exchange for agreeing to these restrictions, Defendants were employed by Acrisure and received significant annual compensation from Acrisure in connection with their employment.

120.    The Employment Agreements are reasonable, consonant with public policy, and necessary to protect Acrisure's proprietary and confidential information, relationships with its customers and other reasonable competitive business interests and Acrisure property.

121.    While at Acrisure, the Defendants had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies and employee relationships.

27

122. Defendants breached Paragraph 8 of the Employment Agreements by using or disclosing Acrisure's Confidential Information, including, but not limited to, customer lists and customer demands.

123. Upon information and belief, Defendants breached Paragraph 9 of the Employment Agreements by failing to return to Acrisure immediately upon termination of employment all Acrisure property.

124. These breaches have and will directly and proximately cause Acrisure irreparable damage and injury, including to its competitive place in the insurance and risk management market and to its relationships with its customers.

## COUNT II
### (Breach of Contract Against All Defendants: The Non-Solicitation Of Acrisure Employees)

125. Acrisure incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

126. The Employment Agreements constitute valid and binding contracts between Acrisure and Defendants, which include reasonable restrictive covenants that are limited in scope. The Employment Agreements were made for valid consideration.

127. In exchange for agreeing to these restrictions, Defendants were employed by Acrisure and received significant annual compensation from Acrisure in connection with their employment.

128. The Employment Agreements are reasonable, consonant with public policy, and necessary to protect Acrisure's proprietary and confidential information, relationships with its customers and other reasonable competitive business interests.

129. While at Acrisure, the Defendants had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information,

28

costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies and employee relationships.

130.   Defendants breached Paragraph 10 of the Employment Agreements by directly or indirectly requesting, advising, or encouraging Acrisure employees to terminate their employment with Acrisure and join Woodruff Sawyer.

131.   These breaches have and will directly and proximately cause Acrisure irreparable damage and injury, including to its competitive place in the insurance and risk management market and to its relationships with its customers.

## COUNT III
### (Breach of Contract Against Defendants Rella, Trager, Iovino, Kelly, and Kempner:  The Non-Solicitation Of Acrisure Customers)

132.   Acrisure incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

133.   The Employment Agreements constitute valid and binding contracts between Acrisure and Defendants, which include reasonable restrictive covenants that are limited in scope. The Employment Agreements were made for valid consideration.

134.   In exchange for agreeing to these restrictions, Defendants were employed by Acrisure and received significant annual compensation from Acrisure in connection with their employment.

135.   The Employment Agreements are reasonable, consonant with public policy, and necessary to protect Acrisure's proprietary and confidential information, relationships with its customers and other reasonable competitive business interests.

136.   While at Acrisure, the Defendants had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information,

29

costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies and employee relationships.

137.   Upon information and belief, from the day of the Defendants' coordinated resignation to today, at least 20 Acrisure customers switched their insurance program from Acrisurer.

138.   For example, Customer A, Customer B, Customer C, Customer D, and Customer E were Acrisure customers.

139.   While at Acrisure, Rella was Customer A's Account Executive and Defendant Trager was its broker.

140.   While at Acrisure, Kelly was the Producer for Customer B's account.

141.   While at Acrisure, Iovino was the Producer for Customer C's account.

142.   While at Acrisure, Kempner was the Producer for Customer D's account.

143.   While at Acrisure, Iovino was the Producer for Customer E's account.

144.   Since the Defendants' coordinated resignations, at least five customers, Customer A, Customer B, Customer C, Customer D, and Customer E have notified Acrisure that they are no longer a customer of Acrisure.

145.   Customer A wrote in its notice to Acrisure "we have appointed Woodruff-Sawyer & Co. as our exclusive broker regarding the insurance programs listed above."

146.   Customer B wrote in its notice to Acrisure that "we have appointed Woodruff-Sawyer & Co. as our exclusive broker regarding the insurance programs listed…"

147.   Customer D expressly wrote in its email to Acrisure "[w]e have decided to name Woodruff-Sawyer & Co. as our new broker for all of our insurance needs."

148.   Upon information and belief, Customer C is now a customer of Woodruff Sawyer.

149.   Upon information and belief, Customer E is now a customer of Woodruff Sawyer.

150.   Upon information and belief, the products and services of Woodruff Sawyer are competitive to the products and services of Acrisure.

151.   Upon information and belief, Rella, Trager, Iovino, Kelly, and Kempner, are continuing to solicit other Acrisure customers to no longer be a customer of Acrisure.

152.   Rella, Trager, Iovino, Kelly, and Kempner breached Paragraph 10 of the Employment Agreement by directly or indirectly contacting, soliciting or engaging Acrisure customers to terminate their relationship with Acrisure and instead become a customer of Woodroof Sawyer.

153.   These breaches have and will cause Acrisure irreparable damage and injury, including to its competitive place in the insurance and risk management market and to its relationships with its customers.

## COUNT IV
### Common Law Conversion Against All Defendants

154.   Acrisure incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

155.   Upon information and belief, leading up to and on the day of the Defendants' coordinated resignation, the Defendants wrongfully exercised dominion and control over Acrisure's property inconsistent with their rights based on the pattern of practice of intentionally accessing, downloading, and deleting Acrisure files and information leading up to and on the day of their coordination resignations.

156.   The Defendants' accessing, downloading, and deleting of Acrisure files at that time constitutes conversion of Acrisure's property.

31

157.    The Defendants' conversion of Acrisure property will cause Acrisure irreparable damage and injury, including to its competitive place in the insurance and risk management market and to its relationship with its customers.

## REQUESTED RELIEF

WHEREFORE, Acrisure requests that this honorable Court:

A.    Enter a temporary restraining order, without notice, as requested in Acrisure's Proposed Temporary Restraining Order And Order To Show Cause.

B.    Enter a preliminary injunction enjoining Defendants from engaging in conduct in violation of the Employment Agreements until such time as this case can be decided on the merits.

C.    Enter a permanent injunction enjoining Defendants from engaging in conduct in violation of the Employment Agreements.

D.    Enter Judgment against Defendants in favor of Acrisure in an amount to be determined.

E.    Award Acrisure its attorneys' fees and expenses.

F.    Award Acrisure pre- and post-judgment interests and costs.

G.    Grant such other relief as the Court deems just and equitable, including exemplary damages.

ACRISURE, LLC

By _____

By: Andrew Schutt

Its: Head of North American Operations

On this 22nd day of March, 2024, before me appeared Andrew Schutt, who did swear that he/she is the authorized signatory of Acrisure, LLC, that he/she knows the contents of the foregoing Complaint based on personal knowledge and information assembled and provided to him/her, that the same is true and correct except as to the matters stated therein to be on information and belief, and as to such matters, he/she believes them to be true.

_____

Notary Public, Kent County, Michigan

My commission expires: 12/03/2024

Acting in the County of: Kent

30

Dated: March 22, 2024

WARNER NORCROSS + JUDD LLP

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
James R. Carroll (*pro hac vice forthcoming*)
Christopher G. Clark (*pro hac vice forthcoming*)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

# EXHIBIT A

## EMPLOYMENT AGREEMENT (PRODUCER)

This Employment Agreement (the "Agreement") is made effective as of August 1, 2015 (the "Effective Date"), by and between **ACRISURE, LLC**, a Michigan limited liability company (the "Company"), and **MATTHEW KELLY** ("Employee").

In consideration of the promises contained in this Agreement, and Employee's employment or continued employment with the Company, as the case may be, and other valid and adequate consideration, the parties agree as follows:

1.     Employment.  The Company shall employ Employee, and Employee shall work for the Company, subject to the terms and conditions of this Agreement and the Company's Employee Handbook, as may be amended from time to time.  All business Employee develops and secures during the term of this Agreement and all business Employee services during the term of this Agreement shall be the exclusive property of the Company.  In the event of a conflict between the terms of the Agreement and the Employee Handbook, the terms of this Agreement shall control.

2.     Definition of Business.  For purposes of this Agreement, the term "business" shall include all aspects of the Company's insurance business, professional employer organization and/or human resources services business, and any other business in which the Company is currently or may become involved.

3.     Exclusive Agreement.  Employee shall devote his/her full time and effort to securing business for the Company's benefit while in the Company's employ.  Among other Agreement obligations imposed, Employee shall not place any business, directly or indirectly, with any person or entity other than the Company without the Company's prior written consent, nor be involved financially or otherwise with any active insurance agency or other business of a type conducted by the Company, or similar enterprise.

4.     General Duties.  Employee shall solicit all business types the Company offers and shall render such services to customers as the Company deems reasonably necessary and as the Company may request and coordinate.   Employee shall perform such other duties as the Company assigns to Employee.

5.     Salary, Commissions and Expenses.  Employee's initial compensation will be on the basis as set forth in Exhibit A.   Employee's compensation may be on a salary basis, commission basis, or a combination of both – as the Company determines and/or changes from time to time in its discretion.   Any available commissions will be based on a separate commission schedule for Employee's job responsibilities as the Company determines and/or changes from time to time in its discretion during the course of Employee's employment.  Employee shall not earn any commission until the Company receives payment of such commission from the insurance or product vendor.  Once earned, the commission shall be payable to Employee at the next scheduled commission payment date if the Company received payment of the gross commission from the insurance or product vendor at least five (5) business days before the scheduled commission payment date.  If not, the commission will be payable on the next scheduled commission payment date. Except as may be otherwise specified in Exhibit A, upon and following employment termination for whatever reason, Employee will have earned

(VANGUARD/P/2NSCE/ND)

only those commissions for business Employee obtained during the course of employment and for which the Company received payment on or before the last date of the term of this Agreement. The Company shall reimburse Employee for all reasonable Employee business expenses incurred in the solicitation of business for the Company, provided Employee timely submits receipts to the Company in satisfactory form and in accordance with the Company's expense reimbursement policy.

6.     Benefits. Employee will be eligible to participate in such benefit programs as the Company may make available from time to time to comparable employees as determined by the Company in its discretion.

7.     At-Will Employment. The term of this Agreement shall commence on the Effective Date and shall end as of the date of termination by either the Company or Employee. Employee's employment under this Agreement shall be on an at-will basis, terminable by either party at any time. Employee's eligibility for compensation and benefits will cease on the date of employment termination, except as may be otherwise provided in applicable benefit plan documents.

8.     Nondisclosure of Confidential Information. Employee will have access to confidential information about the Company (the "Confidential Information"), including without limitation, information about the Company's operations, processes, procedures, trade secrets, agent lists, adjuster lists, rating techniques, rates, coverage, accounting rules, employee information, insurance companies, computer techniques, marketing techniques, advertising techniques, know-how, finances, business plans, costs, pricing, sales, customer lists, the needs and demands of customers, and vendor lists, including lists and contacts with insurance companies. In addition, Employee will develop other information that the Company considers to be Confidential Information. Employee will not, directly or indirectly, disclose, furnish, or make available, except in the course of performing Employee's duties of employment under this Agreement, any Confidential Information (regardless of how Employee learned of it or who developed it), without the Company's prior written approval. These restrictions concerning Confidential Information shall remain in effect following termination of this Agreement or termination of Employee's employment with the Company, without limitation.

9.     Duty of Employee upon Termination. Employee shall, immediately upon termination of employment for any reason, return to the Company all client records of any sort and all Company literature, supplies, letters, written or printed forms, diaries, phone lists, documents containing customer lists, customer information, product information, pricing information, information as to sources of services, financial information of the Company and memoranda pertaining to the Company's business. Employee shall also, immediately upon termination of employment, return to the Company all Company property in Employee's possession, including automobiles, telephones, and any other Company-issued equipment.

10.    Restrictive Covenants. The Company and Employee agree that the Company will provide Employee with the opportunity to receive compensation pursuant to this Agreement and the same constitutes valuable consideration. Employee further acknowledges that Employee will be provided with access to customer and other confidential information concerning the Company's business. It is further agreed that it requires special and unique knowledge and

2

(VANGUARD/P/2NSCE/ND)

information to act as a business agent on behalf of the Company and that the Employee shall gain such special and unique knowledge and information from the Company throughout the time of his/her employment by the Company. This knowledge and information are integral parts of the business of the Company and the use of this knowledge and information by a competitor of the Company would cause irreparable harm to the Company. The Company and Employee agree that this knowledge and information constitute legitimate protectable business interests of the Company. The Company and Employee further agree that the business Employee secures, develops or services for the Company shall constitute the exclusive property of the Company. In view of the foregoing, Employee agrees that, for the duration of Employee's employment, and in the event Employee's employment is terminated for any reason, for a period of two (2) years after the termination of employment:

    a.    <u>Non-Solicitation/Non-Interference.</u>    Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

        i.    Contacting or engaging in any communication with any Company customer for whom Employee had responsibility, or contacting or engaging in any communications with any Company customer or prospective Company customer about whom Employee obtained knowledge during employment with the Company, to secure business competitive to the products and services provided by the Company;

        ii.    Requesting, advising, or encouraging any customer of the Company to terminate or curtail its relationship with the Company, or requesting or advising any person to refrain from becoming a customer or supplier of the Company;

        iii.    Requesting, advising, or encouraging any employee, agent, representative or independent contractor of the Company to terminate his, her, or its relationship with the Company, or requesting or advising any person to refrain from becoming an employee, agent, representative or independent contractor of the Company, or otherwise pursuing, employing or retaining (as an employee, an independent contractor or otherwise) any employee, agent, representative or independent contractor of the Company without the written permission of the Company.

    11.    <u>Reasonableness of Restrictions. Injunctive Relief and Tolling.</u> Employee acknowledges that the restrictions contained in Paragraph 10 are reasonable and necessary for the reasonable protection of the Company's business and interests, and that any violation of these restrictions will cause substantial and irreparable injury to the Company, and as a consequence thereof, Employee agrees that the Company is entitled, in addition to any other remedies, to

3

(VANGUARD/P/2NSCE/ND)

preliminary and permanent injunctive relief to secure specific performance and to prevent a breach or contemplated breach of this Agreement. If it is judicially determined that Employee has violated any obligations of Paragraph 10, the period applicable to each obligation Employee has been determined to have violated will be extended by a period of time equal in length to the period during which such violation(s) occurred. The Company reserves all remedies available at law or in equity.

12.    Severability.  In the event any provisions of this Agreement shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provisions thereof, and in the event that such claim of invalidity or unenforceability of any provision shall be predicated upon the length of the term of any covenant therein or the area covered thereby or the type of activity restrained, such provision shall not be deemed invalid or unenforceable but shall be deemed modified to the maximum area and the maximum term of duration and the type of activity as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

13.    Purchase of Business.  The Company and Employee agree that there are many different ways to violate Paragraph 10 due to the variety of covenants contained in this Agreement, each of which could cause irreparable harm to the Company.  The parties specifically agree that any contact Employee makes to the Company's customers will cause injury to the Company even if the contact does not immediately or directly result in Employee writing business for a Company customer.  The parties therefore agree that there is no adequate remedy at law if Employee violates Paragraph 10.  However, in the event that Employee actually writes business for any Company customer after Employee leaves the Company in violation of the covenants in Paragraph 10, whether or not the Company has obtained or has attempted to obtain equitable relief, the Company, at its election, may deem that Employee has elected to purchase from the Company the business with respect to such customer, and upon written demand, Employee shall pay to the Company an amount equal to two (2) times the customer's first year's sales commission payable with respect to any business customer purchases in connection with the business services Employee renders.  The parties intend this provision to be a reasonable estimation of damages which the Company may invoke only if Employee actually writes business for a Company customer.  All remedies contained in this Agreement are cumulative and may be exercised singularly or concurrently, and the exercise of any one shall not be deemed a waiver of any other.

14.    Breach by Employee: Remedies.  Employee shall conduct him/herself at all times according to the terms and conditions of this Agreement and the Employee Handbook. Failure to do so may render Employee liable for any loss or damage the Company may suffer on account of such failure.  Employee agrees that the Company may specifically enforce Employee's performance or recover damages for a breach of this Agreement by civil suit, injunction or otherwise, and Employee shall be liable to the Company for the reasonable costs and attorneys' fees of any such action in which a breach is established. The parties agree that any action at law or equity or any judicial proceedings for enforcement of this Agreement or any provision thereof shall be instituted only in the federal or state courts located in the County of Kent, State of Michigan.

4

(VANGUARD/P/2NSCE/ND)

15.     Acknowledgment.  Employee acknowledges that execution of this Agreement is required by the Company as a condition of becoming or remaining an employee, as the case may be, and that this Agreement supersedes any and all prior employment agreements between Employee and the Company (including any agreement between Employee and the Company's predecessor company), whether verbal or written, expressed or implied.

16.     Benefit.  This Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors, and assigns.

17.     Amendment and Termination.   The parties may amend or terminate this Agreement in a writing signed by both parties.  This Agreement will automatically terminate upon the Company's dissolution, bankruptcy, or insolvency, or Employee's death.

18.     State Law.  The laws of the State of Michigan shall govern this Agreement, excluding choice of law principles.

19.     Survival.  The parties' obligations under Paragraphs 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 20 shall survive the termination of Employee's employment and/or this Agreement.

20.     Entire Agreement.  This Agreement represents the entire Agreement between the parties regarding the terms and conditions of Employee's employment.  The terms of this Agreement may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Company or its agents.  This Agreement may not be modified except by a written agreement signed by all parties that expressly references and purports to modify this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the Effective Date identified above.

EMPLOYEE:

_____  8/4/15
         *(Signature)*

_Matthew Kelly_____
         *Printed name*


THE COMPANY:

ACRISURE, LLC

By: _____

Its: _____

5

## EXHIBIT A

1.  <u>Compensation</u>. Employee's compensation will be on the following basis:

    A.    Commission:

| Product | Rate |
|---|---|
| **Property & Casualty** | REDACTED |
| **SDI and Surety** | |
| **Life & Health** | |
| **SDI for other Producers** | |

If Employee's employment is terminated without "Good Cause," and provided Employee complies with the restrictive covenants set forth in the Producer Agreement or any other agreement with the Company,  Employee will receive half of his or her regularly scheduled renewal commissions for a period of 18 months following the date of employment termination. "Good Cause" for purposes of this provision shall mean:

    i.    Employee's breach of this Agreement and failure to cure such breach within thirty (30) days after The Company notifies Employee in writing of the breach;

    ii.    Employee's failure or neglect to perform Employee's job duties or to comply with written policies, and failure to cure any such matter that is capable of being cured within thirty (30) days after the Company notifies Employee in writing of the material failure or neglect;

    iii.    Employee engaging in fraud, dishonesty, or other gross negligence or willful misconduct in the performance of his duties on behalf of the Company, including misappropriation of the Company's property;

    iv.    Employee engaging in conduct bringing the Company into substantial and material public disgrace;

    v.    Employee's conviction of any crime which is a felony or any crime involving embezzlement or dishonesty;

    vi.    The revocation of Employee's license to sell insurance and the failure by Employee to obtain reinstatement of such license(s) within a period of thirty (30) days following the date of revocation;

    vii.    Employee's attempting to secure or securing any profit or benefit personally in connection with a transaction entered into on the Company's behalf; or

6

(VANGUARD/P/2NSCE/ND)

viii.  The occurrence of a "Control Event," which for purposes hereof, means (1) the sale by the Company of substantially all of its assets; (2) the sale by the Company of the Vanguard Agency Operation or a substantial portion of the Vanguard Agency Operation's assets; or (3) the sale of a majority of the voting equity interests of the parent entity/Affiliate of the Company, or of the Company (including by means of a merger or similar transaction). "Vanguard Agency Operation" shall mean the assets, client accounts and goodwill of the insurance agency business of Vanguard Coverage Corp. ("VCC") purchased by the Company pursuant to that certain asset purchase agreement between the Company and VCC executed contemporaneously with or prior to the execution of this Agreement.

2.  <u>Fringe Benefits</u>.  Employee's fringe benefits will include, without limitation, the following:

A.  Cellular Phone Reimbursement
B.  Automobile Expense Reimbursement:  Up to $500.00 per month.

Reimbursement is conditioned upon submission of satisfactory expense documentation in accordance with Company policies and procedures.

3.  <u>Business Expenses</u>.  Employee's reimbursable business expenses will include, without limitation, the following:

A.  Reasonable business-related travel and entertainment expenses.

Reimbursement is conditioned upon submission of satisfactory expense documentation in accordance with Company policies and procedures.

9626891_1.DOC

7

(VANGUARD/P/2NSCE/ND)

# EXHIBIT B

Y0SS67
– Ə173/Bender

# EMPLOYMENT AGREEMENT (PRODUCER)

This Employment Agreement (the "Agreement") is made effective as of October 11th, 2017 (the "Effective Date"), by and between **ACRISURE, LLC**, a Michigan limited liability company (the "Company"), and Christopher Iovino ("Employee").

In consideration of the promises contained in this Agreement, and Employee's employment or continued employment with the Company, as the case may be, and other valid and adequate consideration, the parties agree as follows:

1.   Employment.  The Company shall employ Employee, and Employee shall work for the Company, subject to the terms and conditions of this Agreement and the Company's Employee Handbook, as may be amended from time to time.  All business Employee develops and secures during the term of this Agreement and all business Employee services during the term of this Agreement shall be the exclusive property of the Company.  In the event of a conflict between the terms of the Agreement and the Employee Handbook, the terms of this Agreement shall control.

2.   Definition of Business.  For purposes of this Agreement, the term "business" shall include all aspects of the Company's insurance business, professional employer organization and/or human resources services business, and any other business in which the Company is currently or may become involved.

3.   Exclusive Agreement.  Employee shall devote his/her full time and effort to securing business for the Company's benefit while in the Company's employ.  Among other Agreement obligations imposed, Employee shall not place any business, directly or indirectly, with any person or entity other than the Company without the Company's prior written consent, nor be involved financially or otherwise with any active insurance agency or other business of a type conducted by the Company, or similar enterprise.

4.   General Duties.  Employee shall solicit all business types the Company offers and shall render such services to customers as the Company deems reasonably necessary and as the Company may request and coordinate.  Employee shall perform such other duties as the Company assigns to Employee.

5.   Salary, Commissions and Expenses. Employee's initial compensation will be on the basis as set forth in Exhibit A.  Employee's compensation may be on a salary basis, commission basis, or a combination of both – as the Company determines and/or changes from time to time in its discretion.  Any available commissions will be based on a separate commission schedule for Employee's job responsibilities as the Company determines and/or changes from time to time in its discretion during the course of Employee's employment. Employee shall not earn any commission until the Company receives payment of such commission from the insurance or product vendor.  Once earned, the commission shall be payable to Employee at the next scheduled commission payment date if the Company received payment of the gross commission from the insurance or product vendor at least five (5) business days before the scheduled commission payment date.  If not, the commission will be payable on the next scheduled commission payment date. Upon and following employment termination for whatever reason, Employee will have earned only those commissions for business Employee

(ST/P/2NSCE/ND)

obtained during the course of employment and for which the Company received payment on or before the last date of the term of this Agreement. The Company shall reimburse Employee for all reasonable Employee business expenses incurred in the solicitation of business for the Company, provided Employee timely submits receipts to the Company in satisfactory form and in accordance with the Company's expense reimbursement policy.

6.  Benefits. Employee will be eligible to participate in such benefit programs as the Company may make available from time to time to comparable employees as determined by the Company in its discretion.

7.  At-Will Employment.  The term of this Agreement shall commence on the Effective Date and shall end as of the date of termination by either the Company or Employee. Employee's employment under this Agreement shall be on an at-will basis, terminable by either party at any time. Employee's eligibility for compensation and benefits will cease on the date of employment termination, except as may be otherwise provided in applicable benefit plan documents.

8.  Nondisclosure of Confidential Information.  Employee will have access to confidential information about the Company (the "Confidential Information"), including without limitation, information about the Company's operations, processes, procedures, trade secrets, agent lists, adjuster lists, rating techniques, rates, coverage, accounting rules, employee information, insurance companies, computer techniques, marketing techniques, advertising techniques, know-how, finances, business plans, costs, pricing, sales, customer lists, the needs and demands of customers, and vendor lists, including lists and contacts with insurance companies. In addition, Employee will develop other information that the Company considers to be Confidential Information. Employee will not, directly or indirectly, disclose, furnish, or make available, except in the course of performing Employee's duties of employment under this Agreement, any Confidential Information (regardless of how Employee learned of it or who developed it), without the Company's prior written approval.  These restrictions concerning Confidential Information shall remain in effect following termination of this Agreement or termination of Employee's employment with the Company, without limitation.

9.  Duty of Employee upon Termination.  Employee shall, immediately upon termination of employment for any reason, return to the Company all client records of any sort and all Company literature, supplies, letters, written or printed forms, diaries, phone lists, documents containing customer lists, customer information, product information, pricing information, information as to sources of services, financial information of the Company and memoranda pertaining to the Company's business. Employee shall also, immediately upon termination of employment, return to the Company all Company property in Employee's possession, including automobiles, telephones, and any other Company-issued equipment.

10.  Restrictive Covenants. The Company and Employee agree that the Company will provide Employee with the opportunity to receive compensation pursuant to this Agreement and the same constitutes valuable consideration. Employee further acknowledges that Employee will be provided with access to customer and other confidential information concerning the Company's business, as well of that of the Company's affiliated entities without limitation ("Affiliated Entities" or individually "Affiliated Entity").  It is further agreed that it requires

2

(ST/P/2NSCE/ND)

special and unique knowledge and information to act as a business agent on behalf of the Company and that the Employee shall gain such special and unique knowledge and information from the Company and/or Affiliated Entities throughout the time of his/her employment. This knowledge and information are integral parts of the business of the Company and/or of the Affiliated Entities, and the use of this knowledge and information by a competitor of the Company would cause irreparable harm to the Company. The Company and Employee agree that this knowledge and information constitute legitimate protectable business interests of the Company and/or of the Affiliated Entities. The Company and Employee further agree that the business Employee secures, develops or services for the Company or for an Affiliated Entity shall constitute the exclusive property of the Company or Affiliated Entity as applicable. In view of the foregoing, Employee agrees that, for the duration of Employee's employment, and in the event Employee's employment is terminated for any reason, for a period of two (2) years after the termination of employment:

a.   Non-Solicitation/Non-Interference.   Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

i.   Contacting or engaging in any communication with any Company or Affiliated Entity customer for whom Employee had responsibility, or contacting or engaging in any communications with any Company or Affiliated Entity customer or prospective Company or Affiliated Entity customer about whom Employee obtained knowledge during employment with the Company, to secure business competitive to the products and services provided by the Company or Affiliated Entity;

ii.   Requesting, advising, or encouraging any customer of the Company or of an Affiliated Entity to terminate or curtail its relationship with the Company or Affiliated Entity, or requesting or advising any person to refrain from becoming a customer or supplier of the Company or an Affiliated Entity;

iii.   Requesting, advising, or encouraging any employee, agent, representative or independent contractor of the Company or an Affiliated Entity to terminate his, her, or its relationship with the Company or Affiliated Entity, or requesting or advising any person to refrain from becoming an employee, agent, representative or independent contractor of the Company or of an Affiliated Entity, or otherwise pursuing, employing or retaining (as an employee, an independent contractor or otherwise) any employee, agent, representative or independent contractor of the Company or of an Affiliated Entity without the written permission of the Company.

3

(ST/P/2NSCE/ND)

11. <u>Reasonableness of Restrictions, Injunctive Relief and Tolling</u>.  Employee acknowledges that the restrictions contained in Paragraph 10 are reasonable and necessary for the reasonable protection of the Company's business and interests, and that any violation of these restrictions will cause substantial and irreparable injury to the Company, and as a consequence thereof, Employee agrees that the Company is entitled, in addition to any other remedies, to preliminary and permanent injunctive relief to secure specific performance and to prevent a breach or contemplated breach of this Agreement.  If it is judicially determined that Employee has violated any obligations of Paragraph 10, the period applicable to each obligation Employee has been determined to have violated will be extended by a period of time equal in length to the period during which such violation(s) occurred.  The Company reserves all remedies available at law or in equity.

12. <u>Severability</u>.  In the event any provisions of this Agreement shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provisions thereof, and in the event that such claim of invalidity or unenforceability of any provision shall be predicated upon the length of the term of any covenant therein or the area covered thereby or the type of activity restrained, such provision shall not be deemed invalid or unenforceable but shall be deemed modified to the maximum area and the maximum term of duration and the type of activity as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

13. <u>Purchase of Business</u>.  The Company and Employee agree that there are many different ways to violate Paragraph 10 due to the variety of covenants contained in this Agreement, each of which could cause irreparable harm to the Company or the Affiliated Entities.  The parties specifically agree that any contact Employee makes to the Company's or an Affiliated Entity's customers will cause injury to the Company even if the contact does not immediately or directly result in Employee writing business for a Company or Affiliated Entity customer.  The parties therefore agree that there is no adequate remedy at law if Employee violates Paragraph 10.  However, in the event that Employee actually writes business for any Company or Affiliated Entity customer after Employee leaves the Company in violation of the covenants in Paragraph 10, whether or not the Company has obtained or has attempted to obtain equitable relief, the Company, at its election, may deem that Employee has elected to purchase from the Company or Affiliated Entity the business with respect to such customer, and upon written demand, Employee shall pay to the Company or Affiliated Entity an amount equal to two (2) times the customer's first year's sales commission payable with respect to any business customer purchases in connection with the business services Employee renders.  The parties intend this provision to be a reasonable estimation of damages which the Company or an Affiliated Entity may invoke only if Employee actually writes business for a Company Affiliated Entity customer.  All remedies contained in this Agreement are cumulative and may be exercised singularly or concurrently, and the exercise of any one shall not be deemed a waiver of any other.

14. <u>Breach by Employee; Remedies</u>.  Employee shall conduct him/herself at all times according to the terms and conditions of this Agreement and the Employee Handbook.  Failure to do so may render Employee liable for any loss or damage the Company may suffer on account of such failure.  Employee agrees that the Company may specifically enforce Employee's performance or recover damages for a breach of this Agreement by civil suit, injunction or

4

(ST/P/2NSCE/ND)

otherwise, and Employee shall be liable to the Company for the reasonable costs and attorneys' fees of any such action in which a breach is established. The parties agree that any action at law or equity or any judicial proceedings for enforcement of this Agreement or any provision thereof shall be instituted only in the federal or state courts located in the County of Kent, State of Michigan.

15.    Acknowledgment.  Employee acknowledges that execution of this Agreement is required by the Company as a condition of becoming or remaining an employee, as the case may be, and that this Agreement supersedes any and all prior employment agreements between Employee and the Company (including any agreement between Employee and the Company's predecessor company), whether verbal or written, expressed or implied.

16.    Benefit.  This Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors, and assigns.

17.    Amendment and Termination.   The parties may amend or terminate this Agreement in a writing signed by both parties.  This Agreement will automatically terminate upon the Company's dissolution, bankruptcy, or insolvency, or Employee's death.

18.    State Law.   The laws of the State of Michigan shall govern this Agreement, excluding choice of law principles.

19.    Survival.  The parties' obligations under Paragraphs 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 20 shall survive the termination of Employee's employment and/or this Agreement.

20.    Entire Agreement.  This Agreement represents the entire Agreement between the parties regarding the terms and conditions of Employee's employment.  The terms of this Agreement may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Company or its agents.  This Agreement may not be modified except by a written agreement signed by all parties that expressly references and purports to modify this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the Effective Date identified above.

EMPLOYEE:

_____
(Signature)

Christopher J Iovino
Printed name


THE COMPANY:

5

(ST/P/2NSCE/ND)

ACRISURE, LLC

By: _____

Its: _____
             Senior Vice President

6

**EXHIBIT A**

Salary:   REDACTED

Commission:   REDACTED

7

## EXHIBIT A

**Salary:**
**Draw:** REDACTED

**Commission:**

|  | New | Renewal |
|---|---|---|
| Commercial Insurance | REDACTED | |
| Personal Lines | | |
| Group Benefits | | |
|  | | |
|  | | |
|  | | |
|  | | |
|  | | |

Effective: 1-1-19

Signed: _____

Name: Christopher Iovino

(ST/P/2NSCE/ND)

**EXHIBIT A**

**Salary:**
**Draw:** REDACTED

**Commission:**

|  | New | Renewal |
|---|---|---|
| Commercial Insurance | REDACTED | |
| Personal Lines | | |
| Group Benefits | | |
|  | | |
|  | | |
|  | | |
|  | | |
|  | | |

Effective: 1-1-20

Signed: _[signature]_

Name: Christopher Iovino

(ST/P/2NSCE/ND)

# EXHIBIT C

## EMPLOYMENT AGREEMENT (PRODUCER)

This Employment Agreement (the "Agreement") is made effective as of August 1, 2015 (the "Effective Date"), by and between **ACRISURE, LLC**, a Michigan limited liability company (the "Company"), and **ROBERT KEMPNER** ("Employee").

In consideration of the promises contained in this Agreement, and Employee's employment or continued employment with the Company, as the case may be, and other valid and adequate consideration, the parties agree as follows:

1.      Employment.  The Company shall employ Employee, and Employee shall work for the Company, subject to the terms and conditions of this Agreement and the Company's Employee Handbook, as may be amended from time to time.  All business Employee develops and secures during the term of this Agreement and all business Employee services during the term of this Agreement shall be the exclusive property of the Company.  In the event of a conflict between the terms of the Agreement and the Employee Handbook, the terms of this Agreement shall control.

2.      Definition of Business.  For purposes of this Agreement, the term "business" shall include all aspects of the Company's insurance business, professional employer organization and/or human resources services business, and any other business in which the Company is currently or may become involved.

3.      Exclusive Agreement.  Employee shall devote his/her full time and effort to securing business for the Company's benefit while in the Company's employ.  Among other Agreement obligations imposed, Employee shall not place any business, directly or indirectly, with any person or entity other than the Company without the Company's prior written consent, nor be involved financially or otherwise with any active insurance agency or other business of a type conducted by the Company, or similar enterprise.

4.      General Duties.  Employee shall solicit all business types the Company offers and shall render such services to customers as the Company deems reasonably necessary and as the Company may request and coordinate.  Employee shall perform such other duties as the Company assigns to Employee.

5.      Salary, Commissions and Expenses.  Employee's initial compensation will be on the basis as set forth in Exhibit A.  Employee's compensation may be on a salary basis, commission basis, or a combination of both – as the Company determines and/or changes from time to time in its discretion.  Any available commissions will be based on a separate commission schedule for Employee's job responsibilities as the Company determines and/or changes from time to time in its discretion during the course of Employee's employment.  Employee shall not earn any commission until the Company receives payment of such commission from the insurance or product vendor.  Once earned, the commission shall be payable to Employee at the next scheduled commission payment date if the Company received payment of the gross commission from the insurance or product vendor at least five (5) business days before the scheduled commission payment date.  If not, the commission will be payable on the next scheduled commission payment date.  Except as may be otherwise specified in Exhibit A, upon and following employment termination for whatever reason, Employee will have earned

(VANGUARD/P-2NSCE/ND)

only those commissions for business Employee obtained during the course of employment and for which the Company received payment on or before the last date of the term of this Agreement. The Company shall reimburse Employee for all reasonable Employee business expenses incurred in the solicitation of business for the Company, provided Employee timely submits receipts to the Company in satisfactory form and in accordance with the Company's expense reimbursement policy.

6.      Benefits. Employee will be eligible to participate in such benefit programs as the Company may make available from time to time to comparable employees as determined by the Company in its discretion.

7.      At-Will Employment.  The term of this Agreement shall commence on the Effective Date and shall end as of the date of termination by either the Company or Employee. Employee's employment under this Agreement shall be on an at-will basis, terminable by either party at any time. Employee's eligibility for compensation and benefits will cease on the date of employment termination, except as may be otherwise provided in applicable benefit plan documents.

8.      Nondisclosure of Confidential Information.  Employee will have access to confidential information about the Company (the "Confidential Information"), including without limitation, information about the Company's operations, processes, procedures, trade secrets, agent lists, adjuster lists, rating techniques, rates, coverage, accounting rules, employee information, insurance companies, computer techniques, marketing techniques, advertising techniques, know-how, finances, business plans, costs, pricing, sales, customer lists, the needs and demands of customers, and vendor lists, including lists and contacts with insurance companies. In addition, Employee will develop other information that the Company considers to be Confidential Information. Employee will not, directly or indirectly, disclose, furnish, or make available, except in the course of performing Employee's duties of employment under this Agreement, any Confidential Information (regardless of how Employee learned of it or who developed it), without the Company's prior written approval. These restrictions concerning Confidential Information shall remain in effect following termination of this Agreement or termination of Employee's employment with the Company, without limitation.

9.      Duty of Employee upon Termination.  Employee shall, immediately upon termination of employment for any reason, return to the Company all client records of any sort and all Company literature, supplies, letters, written or printed forms, diaries, phone lists, documents containing customer lists, customer information, product information, pricing information, information as to sources of services, financial information of the Company and memoranda pertaining to the Company's business. Employee shall also, immediately upon termination of employment, return to the Company all Company property in Employee's possession, including automobiles, telephones, and any other Company-issued equipment.

10.      Restrictive Covenants. The Company and Employee agree that the Company will provide Employee with the opportunity to receive compensation pursuant to this Agreement and the same constitutes valuable consideration. Employee further acknowledges that Employee will be provided with access to customer and other confidential information concerning the Company's business. It is further agreed that it requires special and unique knowledge and

2

(VANGUARD/P 2NSCE/ND)

information to act as a business agent on behalf of the Company and that the Employee shall gain such special and unique knowledge and information from the Company throughout the time of his/her employment by the Company. This knowledge and information are integral parts of the business of the Company and the use of this knowledge and information by a competitor of the Company would cause irreparable harm to the Company. The Company and Employee agree that this knowledge and information constitute legitimate protectable business interests of the Company. The Company and Employee further agree that the business Employee secures, develops or services for the Company shall constitute the exclusive property of the Company. In view of the foregoing, Employee agrees that, for the duration of Employee's employment, and in the event Employee's employment is terminated for any reason, for a period of two (2) years after the termination of employment:

    a.    <u>Non-Solicitation/Non-Interference</u>. Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

        i.    Contacting or engaging in any communication with any Company customer for whom Employee had responsibility, or contacting or engaging in any communications with any Company customer or prospective Company customer about whom Employee obtained knowledge during employment with the Company, to secure business competitive to the products and services provided by the Company;

        ii.    Requesting, advising, or encouraging any customer of the Company to terminate or curtail its relationship with the Company, or requesting or advising any person to refrain from becoming a customer or supplier of the Company;

        iii.    Requesting, advising, or encouraging any employee, agent, representative or independent contractor of the Company to terminate his, her, or its relationship with the Company, or requesting or advising any person to refrain from becoming an employee, agent, representative or independent contractor of the Company, or otherwise pursuing, employing or retaining (as an employee, an independent contractor or otherwise) any employee, agent, representative or independent contractor of the Company without the written permission of the Company.

    11.    <u>Reasonableness of Restrictions, Injunctive Relief and Tolling</u>. Employee acknowledges that the restrictions contained in Paragraph 10 are reasonable and necessary for the reasonable protection of the Company's business and interests, and that any violation of these restrictions will cause substantial and irreparable injury to the Company, and as a consequence thereof, Employee agrees that the Company is entitled, in addition to any other remedies, to

(VANGUARD/P·2NSCE/ND)

3



preliminary and permanent injunctive relief to secure specific performance and to prevent a breach or contemplated breach of this Agreement.  If it is judicially determined that Employee has violated any obligations of Paragraph 10, the period applicable to each obligation Employee has been determined to have violated will be extended by a period of time equal in length to the period during which such violation(s) occurred.  The Company reserves all remedies available at law or in equity.

     12.   <u>Severability</u>.  In the event any provisions of this Agreement shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provisions thereof, and in the event that such claim of invalidity or unenforceability of any provision shall be predicated upon the length of the term of any covenant therein or the area covered thereby or the type of activity restrained, such provision shall not be deemed invalid or unenforceable but shall be deemed modified to the maximum area and the maximum term of duration and the type of activity as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

     13.   <u>Purchase of Business</u>.  The Company and Employee agree that there are many different ways to violate Paragraph 10 due to the variety of covenants contained in this Agreement, each of which could cause irreparable harm to the Company.  The parties specifically agree that any contact Employee makes to the Company's customers will cause injury to the Company even if the contact does not immediately or directly result in Employee writing business for a Company customer.  The parties therefore agree that there is no adequate remedy at law if Employee violates Paragraph 10.  However, in the event that Employee actually writes business for any Company customer after Employee leaves the Company in violation of the covenants in Paragraph 10, whether or not the Company has obtained or has attempted to obtain equitable relief, the Company, at its election, may deem that Employee has elected to purchase from the Company the business with respect to such customer, and upon written demand, Employee shall pay to the Company an amount equal to two (2) times the customer's first year's sales commission payable with respect to any business customer purchases in connection with the business services Employee renders.  The parties intend this provision to be a reasonable estimation of damages which the Company may invoke only if Employee actually writes business for a Company customer.  All remedies contained in this Agreement are cumulative and may be exercised singularly or concurrently, and the exercise of any one shall not be deemed a waiver of any other.

     14.   <u>Breach by Employee; Remedies</u>.  Employee shall conduct him/herself at all times according to the terms and conditions of this Agreement and the Employee Handbook.  Failure to do so may render Employee liable for any loss or damage the Company may suffer on account of such failure.  Employee agrees that the Company may specifically enforce Employee's performance or recover damages for a breach of this Agreement by civil suit, injunction or otherwise, and Employee shall be liable to the Company for the reasonable costs and attorneys' fees of any such action in which a breach is established.  The parties agree that any action at law or equity or any judicial proceedings for enforcement of this Agreement or any provision thereof shall be instituted only in the federal or state courts located in the County of Kent, State of Michigan.

(VANGUARD/P 2NSCE/ND)

4

15.    Acknowledgment.  Employee acknowledges that execution of this Agreement is required by the Company as a condition of becoming or remaining an employee, as the case may be, and that this Agreement supersedes any and all prior employment agreements between Employee and the Company (including any agreement between Employee and the Company's predecessor company), whether verbal or written, expressed or implied.

16.    Benefit.  This Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors, and assigns.

17.    Amendment and Termination.  The parties may amend or terminate this Agreement in a writing signed by both parties.  This Agreement will automatically terminate upon the Company's dissolution, bankruptcy, or insolvency, or Employee's death.

18.    State Law.  The laws of the State of Michigan shall govern this Agreement, excluding choice of law principles.

19.    Survival.  The parties' obligations under Paragraphs 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 20 shall survive the termination of Employee's employment and/or this Agreement.

20.    Entire Agreement.  This Agreement represents the entire Agreement between the parties regarding the terms and conditions of Employee's employment.  The terms of this Agreement may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Company or its agents.  This Agreement may not be modified except by a written agreement signed by all parties that expressly references and purports to modify this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the Effective Date identified above.

EMPLOYEE:

_____
*(Signature)*

_____
*Printed name*

ROBERT KOMPWOR

THE COMPANY:

ACRISURE, LLC

By: _____

Its: _____

(VANGUARD/P 2NSCE/ND)

## EXHIBIT A

1.   <u>Compensation</u>. Employee's compensation will be on the following basis:

     A.    Commission will be paid, according to the schedule below and the terms of this agreement, on all business written and coded to the employee (including business coded to the employee as of the effective date of this agreement) while this agreement is in effect.  Any accounts so coded to the employee will not be unreasonably reassigned.

| Product | Rate |
|---|---|
| **Property & Casualty** | |
| **Surety** | REDACTED |
| **Life & Health** | |
| **Personal Lines** | |
| **SDI** | |

     If Employee's employment is terminated without "Good Cause," and provided Employee complies with the restrictive covenants set forth in the Producer Agreement or any other agreement with the Company, Employee will receive half of his or her regularly scheduled renewal commissions for a period of 18 months following the date of employment termination.  "Good Cause" for purposes of this provision shall mean:

     i.    Employee's breach of this Agreement and failure to cure such breach within thirty (30) days after The Company notifies Employee in writing of the breach;

     ii.    Employee's failure or neglect to perform Employee's job duties or to comply with written policies, and failure to cure any such matter that is capable of being cured within thirty (30) days after the Company notifies Employee in writing of the material failure or neglect;

     iii.    Employee engaging in fraud, dishonesty, or other gross negligence or willful misconduct in the performance of his duties on behalf of the Company, including misappropriation of the Company's property;

     iv.    Employee engaging in conduct bringing the Company into substantial and material public disgrace;

     v.    Employee's conviction of any crime which is a felony or any crime involving embezzlement or dishonesty;

     vi.    The revocation of Employee's license to sell insurance and the failure by Employee to obtain reinstatement of such license(s) within a period of thirty (30) days following the date of revocation;

(VANGUARD/P·2NSCE/ND)



vii.   Employee's attempting to secure or securing any profit or benefit personally in connection with a transaction entered into on the Company's behalf; or

viii.   The occurrence of a "Control Event," which for purposes hereof, means (1) the sale by the Company of substantially all of its assets; (2) the sale by the Company of the Vanguard Agency Operation or a substantial portion of the Vanguard Agency Operation's assets; or (3) the sale of a majority of the voting equity interests of the parent entity·Affiliate of the Company, or of the Company (including by means of a merger or similar transaction). "Vanguard Agency Operation" shall mean the assets, client accounts and goodwill of the insurance agency business of Vanguard Coverage Corp. ("VCC") purchased by the Company pursuant to that certain asset purchase agreement between the Company and VCC executed contemporaneously with or prior to the execution of this Agreement.

2.   <u>Fringe Benefits</u>.  Employee's fringe benefits will include, without limitation, the following:

A.   Cellular Phone Reimbursement
B.   Automobile Expense Reimbursement:  Up to $500.00 per month.

Reimbursement is conditioned upon submission of satisfactory expense documentation in accordance with Company policies and procedures.

3.   <u>Business Expenses</u>.  Employee's reimbursable business expenses will include, without limitation, the following:

A.   Reasonable business-related travel and entertainment expenses.

Reimbursement is conditioned upon submission of satisfactory expense documentation in accordance with Company policies and procedures.

9626900_1.DOC

7

(VANGUARD/P 2NSCE/ND)

# EXHIBIT D

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made effective as of August 1, 2015 (the "Effective Date"), by and between ACRISURE, LLC, a Michigan limited liability company (the "Company"), and MICHAEL RELLA ("Employee").

In consideration of the promises contained in this Agreement, and Employee's employment or continued employment with the Company, as the case may be, and other valid and adequate consideration, the parties agree as follows:

1.     Employment.  The Company shall employ Employee, and Employee shall work for the Company, subject to the terms and conditions of this Agreement and the Company's Employee Handbook, as may be amended from time to time.  All business Employee develops and secures during the term of this Agreement and all business Employee services during the term of this Agreement shall be the exclusive property of the Company.  In the event of a conflict between the terms of the Agreement and the Employee Handbook, the terms of this Agreement shall control.

2.     Definition of Business.  For purposes of this Agreement, the term "business" shall include all aspects of the Company's insurance business, professional employer organization and/or human resources services business, and any other business in which the Company is currently or may become involved.

3.     Exclusive Agreement.  Employee shall devote his/her full time and effort to securing business for the Company's benefit while in the Company's employ.  Among other Agreement obligations imposed, Employee shall not place any business, directly or indirectly, with any person or entity other than the Company without the Company's prior written consent, nor be involved financially or otherwise with any active insurance agency or other business of a type conducted by the Company, or similar enterprise.

4.     General Duties.  Employee shall solicit all business types the Company offers and shall render such services to customers as the Company deems reasonably necessary and as the Company may request and coordinate.  Employee shall perform such other duties as the Company assigns to Employee.

5.     Salary, Commissions and Expenses.  Employee's compensation may be on a salary basis, commission basis, or a combination of both – as the Company determines and/or changes from time to time in its discretion.  Any available commissions will be based on a separate commission schedule for Employee's job responsibilities as the Company determines and/or changes from time to time in its discretion during the course of Employee's employment. See Exhibit A. Employee shall not earn any commission until the Company receives payment of such commission from the insurance or product vendor.  Once earned, the commission shall be payable to Employee at the next scheduled commission payment date if the Company received payment of the gross commission from the insurance or product vendor at least five (5) business days before the scheduled commission payment date.  If not, the commission will be payable on the next scheduled commission payment date.  Upon and following employment termination for whatever reason, Employee will have earned only those commissions for business Employee obtained during the course of employment and for which the Company received payment on or

(VANGUARD/P/2NSCE/ND)

before the last date of the term of this Agreement. The Company shall reimburse Employee for all reasonable Employee business expenses incurred in the solicitation of business for the Company, provided Employee timely submits receipts to the Company in satisfactory form and in accordance with the Company's expense reimbursement policy.

6.    Benefits.  Employee will be eligible to participate in such benefit programs as the Company may make available from time to time to comparable employees as determined by the Company in its discretion.

7.    At-Will Employment.  The term of this Agreement shall commence on the Effective Date and shall end as of the date of termination by either the Company or Employee. Employee's employment under this Agreement shall be on an at-will basis, terminable by either party at any time.  Employee's eligibility for compensation and benefits will cease on the date of employment termination, except as may be otherwise provided in applicable benefit plan documents.

8.    Nondisclosure of Confidential Information.  Employee will have access to confidential information about the Company (the "Confidential Information"), including without limitation, information about the Company's operations, processes, procedures, trade secrets, agent lists, adjuster lists, rating techniques, rates, coverage, accounting rules, employee information, insurance companies, computer techniques, marketing techniques, advertising techniques, know-how, finances, business plans, costs, pricing, sales, customer lists, the needs and demands of customers, and vendor lists, including lists and contacts with insurance companies.  In addition, Employee will develop other information that the Company considers to be Confidential Information.  Employee will not, directly or indirectly, disclose, furnish, or make available, except in the course of performing Employee's duties of employment under this Agreement, any Confidential Information (regardless of how Employee learned of it or who developed it), without the Company's prior written approval.  These restrictions concerning Confidential Information shall remain in effect following termination of this Agreement or termination of Employee's employment with the Company, without limitation.

9.    Duty of Employee upon Termination.  Employee shall, immediately upon termination of employment for any reason, return to the Company all client records of any sort and all Company literature, supplies, letters, written or printed forms, diaries, phone lists, documents containing customer lists, customer information, product information, pricing information, information as to sources of services, financial information of the Company and memoranda pertaining to the Company's business.  Employee shall also, immediately upon termination of employment, return to the Company all Company property in Employee's possession, including automobiles, telephones, and any other Company-issued equipment.

10.    Restrictive Covenants.  The Company and Employee agree that the Company will provide Employee with the opportunity to receive compensation pursuant to this Agreement and the same constitutes valuable consideration.  Employee further acknowledges that Employee will be provided with access to customer and other confidential information concerning the Company's business.  It is further agreed that it requires special and unique knowledge and information to act as a business agent on behalf of the Company and that the Employee shall gain such special and unique knowledge and information from the Company throughout the time

2

(VANGUARD/P/2NSCE/ND)

of his/her employment by the Company. This knowledge and information are integral parts of the business of the Company and the use of this knowledge and information by a competitor of the Company would cause irreparable harm to the Company. The Company and Employee agree that this knowledge and information constitute legitimate protectable business interests of the Company. The Company and Employee further agree that the business Employee secures, develops or services for the Company shall constitute the exclusive property of the Company. In view of the foregoing, Employee agrees that, for the duration of Employee's employment, and in the event Employee's employment is terminated for any reason, for a period of two (2) years after the termination of employment:

a.     <u>Non-Solicitation/Non-Interference</u>.    Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

     i.     Contacting or engaging in any communication with any Company customer for whom Employee had responsibility, or contacting or engaging in any communications with any Company customer or prospective Company customer about whom Employee obtained knowledge during employment with the Company, to secure business competitive to the products and services provided by the Company;

     ii.     Requesting, advising, or encouraging any customer of the Company to terminate or curtail its relationship with the Company, or requesting or advising any person to refrain from becoming a customer or supplier of the Company;

     iii.     Requesting, advising, or encouraging any employee, agent, representative or independent contractor of the Company to terminate his, her, or its relationship with the Company, or requesting or advising any person to refrain from becoming an employee, agent, representative or independent contractor of the Company, or otherwise pursuing, employing or retaining (as an employee, an independent contractor or otherwise) any employee, agent, representative or independent contractor of the Company without the written permission of the Company.

11.     <u>Reasonableness of Restrictions, Injunctive Relief and Tolling</u>. Employee acknowledges that the restrictions contained in Paragraph 10 are reasonable and necessary for the reasonable protection of the Company's business and interests, and that any violation of these restrictions will cause substantial and irreparable injury to the Company, and as a consequence thereof, Employee agrees that the Company is entitled, in addition to any other remedies, to preliminary and permanent injunctive relief to secure specific performance and to prevent a breach or contemplated breach of this Agreement. If it is judicially determined that Employee

3

(VANGUARD/P/2NSCE/ND)

has violated any obligations of Paragraph 10, the period applicable to each obligation Employee has been determined to have violated will be extended by a period of time equal in length to the period during which such violation(s) occurred. The Company reserves all remedies available at law or in equity.

12.     Severability. In the event any provisions of this Agreement shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provisions thereof, and in the event that such claim of invalidity or unenforceability of any provision shall be predicated upon the length of the term of any covenant therein or the area covered thereby or the type of activity restrained, such provision shall not be deemed invalid or unenforceable but shall be deemed modified to the maximum area and the maximum term of duration and the type of activity as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

13.     Purchase of Business. The Company and Employee agree that there are many different ways to violate Paragraph 10 due to the variety of covenants contained in this Agreement, each of which could cause irreparable harm to the Company. The parties specifically agree that any contact Employee makes to the Company's customers will cause injury to the Company even if the contact does not immediately or directly result in Employee writing business for a Company customer. The parties therefore agree that there is no adequate remedy at law if Employee violates Paragraph 10. However, in the event that Employee actually writes business for any Company customer after Employee leaves the Company in violation of the covenants in Paragraph 10, whether or not the Company has obtained or has attempted to obtain equitable relief, the Company, at its election, may deem that Employee has elected to purchase from the Company the business with respect to such customer, and upon written demand, Employee shall pay to the Company an amount equal to two (2) times the customer's first year's sales commission payable with respect to any business customer purchases in connection with the business services Employee renders. The parties intend this provision to be a reasonable estimation of damages which the Company may invoke only if Employee actually writes business for a Company customer. All remedies contained in this Agreement are cumulative and may be exercised singularly or concurrently, and the exercise of any one shall not be deemed a waiver of any other.

14.     Breach by Employee; Remedies. Employee shall conduct him/herself at all times according to the terms and conditions of this Agreement and the Employee Handbook. Failure to do so may render Employee liable for any loss or damage the Company may suffer on account of such failure. Employee agrees that the Company may specifically enforce Employee's performance or recover damages for a breach of this Agreement by civil suit, injunction or otherwise, and Employee shall be liable to the Company for the reasonable costs and attorneys' fees of any such action in which a breach is established. The parties agree that any action at law or equity or any judicial proceedings for enforcement of this Agreement or any provision thereof shall be instituted only in the federal or state courts located in the County of Kent, State of Michigan.

15.     Acknowledgment. Employee acknowledges that execution of this Agreement is required by the Company as a condition of becoming or remaining an employee, as the case may be, and that this Agreement supersedes any and all prior employment agreements between

4

(VANGUARD/P/2NSCE/ND)

Employee and the Company (including any agreement between Employee and the Company's predecessor company), whether verbal or written, expressed or implied.

16.   <u>Benefit</u>.  This Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors, and assigns.

17.   <u>Amendment and Termination</u>.   The parties may amend or terminate this Agreement in a writing signed by both parties.  This Agreement will automatically terminate upon the Company's dissolution, bankruptcy, or insolvency, or Employee's death.

18.   <u>State Law</u>.  The laws of the State of Michigan shall govern this Agreement, excluding choice of law principles.

19.   <u>Survival</u>.  The parties' obligations under Paragraphs 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 20 shall survive the termination of Employee's employment and/or this Agreement.

20.   <u>Entire Agreement</u>.  This Agreement represents the entire Agreement between the parties regarding the terms and conditions of Employee's employment.  The terms of this Agreement may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Company or its agents.  This Agreement may not be modified except by a written agreement signed by all parties that expressly references and purports to modify this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the Effective Date identified above.

**EMPLOYEE:**

_(Signature)_

Michael Rella
_Printed name_

**THE COMPANY:**

**ACRISURE, LLC**

By: _____

Its: _____

5

(VANGUARD:P/2NSCE/ND)

## EXHIBIT A

1.    <u>Compensation</u>.  Employee's compensation will be on the following basis:

    A.    Commission:

| Product | Rate |
|---|---|
| Property & Casualty | |
| Surety | REDACTED |
| Life & Health | |

    B.    Salary:    REDACTED

2.    <u>Fringe Benefits</u>.  Employee's fringe benefits will include, without limitation, the following:

    A.    Cellular Phone Reimbursement
    B.    Automobile Expense Reimbursement:  Up to $400.00 per month.

Reimbursement is conditioned upon submission of satisfactory expense documentation in accordance with Company policies and procedures.

3.    <u>Business Expenses</u>.  Employee's reimbursable business expenses will include, without limitation, the following:

    A.    Reasonable business-related travel and entertainment expenses.

Reimbursement is conditioned upon submission of satisfactory expense documentation in accordance with Company policies and procedures.

9626967_1.DOC

6

(VANGUARD/P/2NSCE/ND)

# EXHIBIT E

Z01920
2054

## EMPLOYMENT AGREEMENT (PRODUCER)

This Employment Agreement (the "Agreement") is made effective as of August 1, 2015 (the "Effective Date"), by and between ACRISURE, LLC, a Michigan limited liability company (the "Company"), and ROBERT TRAGER ("Employee").

In consideration of the promises contained in this Agreement, and Employee's employment or continued employment with the Company, as the case may be, and other valid and adequate consideration, the parties agree as follows:

1.     Employment. The Company shall employ Employee, and Employee shall work for the Company, subject to the terms and conditions of this Agreement and the Company's Employee Handbook, as may be amended from time to time. All business Employee develops and secures during the term of this Agreement and all business Employee services during the term of this Agreement shall be the exclusive property of the Company. In the event of a conflict between the terms of the Agreement and the Employee Handbook, the terms of this Agreement shall control.

2.     Definition of Business. For purposes of this Agreement, the term "business" shall include all aspects of the Company's insurance business, professional employer organization and/or human resources services business, and any other business in which the Company is currently or may become involved.

3.     Exclusive Agreement. Employee shall devote his/her full time and effort to securing business for the Company's benefit while in the Company's employ. Among other Agreement obligations imposed, Employee shall not place any business, directly or indirectly, with any person or entity other than the Company without the Company's prior written consent, nor be involved financially or otherwise with any active insurance agency or other business of a type conducted by the Company, or similar enterprise.

4.     General Duties. Employee shall solicit all business types the Company offers and shall render such services to customers as the Company deems reasonably necessary and as the Company may request and coordinate. Employee shall perform such other duties as the Company assigns to Employee.

5.     Salary, Commissions and Expenses. Employee's initial compensation will be on the basis as set forth in Exhibit A. Employee's compensation may be on a salary basis, commission basis, or a combination of both – as the Company determines and/or changes from time to time in its discretion. Any available commissions will be based on a separate commission schedule for Employee's job responsibilities as the Company determines and/or changes from time to time in its discretion during the course of Employee's employment. Employee shall not earn any commission until the Company receives payment of such commission from the insurance or product vendor. Once earned, the commission shall be payable to Employee at the next scheduled commission payment date if the Company received payment of the gross commission from the insurance or product vendor at least five (5) business days before the scheduled commission payment date. If not, the commission will be payable on the next scheduled commission payment date. Except as may be otherwise specified in Exhibit A, upon and following employment termination for whatever reason, Employee will have earned

(VANGUARD/P/2NSCE/ND)

only those commissions for business Employee obtained during the course of employment and for which the Company received payment on or before the last date of the term of this Agreement. The Company shall reimburse Employee for all reasonable Employee business expenses incurred in the solicitation of business for the Company, provided Employee timely submits receipts to the Company in satisfactory form and in accordance with the Company's expense reimbursement policy.

6. **Benefits**. Employee will be eligible to participate in such benefit programs as the Company may make available from time to time to comparable employees as determined by the Company in its discretion.

7. **At-Will Employment**. The term of this Agreement shall commence on the Effective Date and shall end as of the date of termination by either the Company or Employee. Employee's employment under this Agreement shall be on an at-will basis, terminable by either party at any time. Employee's eligibility for compensation and benefits will cease on the date of employment termination, except as may be otherwise provided in applicable benefit plan documents.

8. **Nondisclosure of Confidential Information**. Employee will have access to confidential information about the Company (the "Confidential Information"), including without limitation, information about the Company's operations, processes, procedures, trade secrets, agent lists, adjuster lists, rating techniques, rates, coverage, accounting rules, employee information, insurance companies, computer techniques, marketing techniques, advertising techniques, know-how, finances, business plans, costs, pricing, sales, customer lists, the needs and demands of customers, and vendor lists, including lists and contacts with insurance companies. In addition, Employee will develop other information that the Company considers to be Confidential Information. Employee will not, directly or indirectly, disclose, furnish, or make available, except in the course of performing Employee's duties of employment under this Agreement, any Confidential Information (regardless of how Employee learned of it or who developed it), without the Company's prior written approval. These restrictions concerning Confidential Information shall remain in effect following termination of this Agreement or termination of Employee's employment with the Company, without limitation.

9. **Duty of Employee upon Termination**. Employee shall, immediately upon termination of employment for any reason, return to the Company all client records of any sort and all Company literature, supplies, letters, written or printed forms, diaries, phone lists, documents containing customer lists, customer information, product information, pricing information, information as to sources of services, financial information of the Company and memoranda pertaining to the Company's business. Employee shall also, immediately upon termination of employment, return to the Company all Company property in Employee's possession, including automobiles, telephones, and any other Company-issued equipment.

10. **Restrictive Covenants**. The Company and Employee agree that the Company will provide Employee with the opportunity to receive compensation pursuant to this Agreement and the same constitutes valuable consideration. Employee further acknowledges that Employee will be provided with access to customer and other confidential information concerning the Company's business. It is further agreed that it requires special and unique knowledge and

2

(VANGUARD/P·2NSCE/ND)

information to act as a business agent on behalf of the Company and that the Employee shall gain such special and unique knowledge and information from the Company throughout the time of his/her employment by the Company. This knowledge and information are integral parts of the business of the Company and the use of this knowledge and information by a competitor of the Company would cause irreparable harm to the Company. The Company and Employee agree that this knowledge and information constitute legitimate protectable business interests of the Company. The Company and Employee further agree that the business Employee secures, develops or services for the Company shall constitute the exclusive property of the Company. In view of the foregoing, Employee agrees that, for the duration of Employee's employment, and in the event Employee's employment is terminated for any reason, for a period of two (2) years after the termination of employment:

a.   <u>Non-Solicitation/Non-Interference.</u>   Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

i.   Contacting or engaging in any communication with any Company customer for whom Employee had responsibility, or contacting or engaging in any communications with any Company customer or prospective Company customer about whom Employee obtained knowledge during employment with the Company, to secure business competitive to the products and services provided by the Company;

ii.   Requesting, advising, or encouraging any customer of the Company to terminate or curtail its relationship with the Company, or requesting or advising any person to refrain from becoming a customer or supplier of the Company;

iii.   Requesting, advising, or encouraging any employee, agent, representative or independent contractor of the Company to terminate his, her, or its relationship with the Company, or requesting or advising any person to refrain from becoming an employee, agent, representative or independent contractor of the Company, or otherwise pursuing, employing or retaining (as an employee, an independent contractor or otherwise) any employee, agent, representative or independent contractor of the Company without the written permission of the Company.

11.   <u>Reasonableness of Restrictions, Injunctive Relief and Tolling.</u> Employee acknowledges that the restrictions contained in Paragraph 10 are reasonable and necessary for the reasonable protection of the Company's business and interests, and that any violation of these restrictions will cause substantial and irreparable injury to the Company, and as a consequence thereof, Employee agrees that the Company is entitled, in addition to any other remedies, to

3

preliminary and permanent injunctive relief to secure specific performance and to prevent a breach or contemplated breach of this Agreement. If it is judicially determined that Employee has violated any obligations of Paragraph 10, the period applicable to each obligation Employee has been determined to have violated will be extended by a period of time equal in length to the period during which such violation(s) occurred. The Company reserves all remedies available at law or in equity.

12.   Severability.  In the event any provisions of this Agreement shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provisions thereof, and in the event that such claim of invalidity or unenforceability of any provision shall be predicated upon the length of the term of any covenant therein or the area covered thereby or the type of activity restrained, such provision shall not be deemed invalid or unenforceable but shall be deemed modified to the maximum area and the maximum term of duration and the type of activity as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

13.   Purchase of Business.  The Company and Employee agree that there are many different ways to violate Paragraph 10 due to the variety of covenants contained in this Agreement, each of which could cause irreparable harm to the Company. The parties specifically agree that any contact Employee makes to the Company's customers will cause injury to the Company even if the contact does not immediately or directly result in Employee writing business for a Company customer. The parties therefore agree that there is no adequate remedy at law if Employee violates Paragraph 10. However, in the event that Employee actually writes business for any Company customer after Employee leaves the Company in violation of the covenants in Paragraph 10, whether or not the Company has obtained or has attempted to obtain equitable relief, the Company, at its election, may deem that Employee has elected to purchase from the Company the business with respect to such customer, and upon written demand, Employee shall pay to the Company an amount equal to two (2) times the customer's first year's sales commission payable with respect to any business customer purchases in connection with the business services Employee renders. The parties intend this provision to be a reasonable estimation of damages which the Company may invoke only if Employee actually writes business for a Company customer. All remedies contained in this Agreement are cumulative and may be exercised singularly or concurrently, and the exercise of any one shall not be deemed a waiver of any other.

14.   Breach by Employee; Remedies.  Employee shall conduct him/herself at all times according to the terms and conditions of this Agreement and the Employee Handbook. Failure to do so may render Employee liable for any loss or damage the Company may suffer on account of such failure. Employee agrees that the Company may specifically enforce Employee's performance or recover damages for a breach of this Agreement by civil suit, injunction or otherwise, and Employee shall be liable to the Company for the reasonable costs and attorneys' fees of any such action in which a breach is established. The parties agree that any action at law or equity or any judicial proceedings for enforcement of this Agreement or any provision thereof shall be instituted only in the federal or state courts located in the County of Kent, State of Michigan.

4

(VANGUARD/P/2NSCE/ND)

15.     Acknowledgment.  Employee acknowledges that execution of this Agreement is required by the Company as a condition of becoming or remaining an employee, as the case may be, and that this Agreement supersedes any and all prior employment agreements between Employee and the Company (including any agreement between Employee and the Company's predecessor company), whether verbal or written, expressed or implied.

16.     Benefit.  This Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors, and assigns.

17.     Amendment and Termination.   The parties may amend or terminate this Agreement in a writing signed by both parties.  This Agreement will automatically terminate upon the Company's dissolution, bankruptcy, or insolvency, or Employee's death.

18.     State Law.  The laws of the State of Michigan shall govern this Agreement, excluding choice of law principles.

19.     Survival.  The parties' obligations under Paragraphs 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 20 shall survive the termination of Employee's employment and/or this Agreement.

20.     Entire Agreement.  This Agreement represents the entire Agreement between the parties regarding the terms and conditions of Employee's employment.  The terms of this Agreement may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Company or its agents.  This Agreement may not be modified except by a written agreement signed by all parties that expressly references and purports to modify this Agreement

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the Effective Date identified above.

EMPLOYEE:

_____
(Signature)

Robert Trager
_____
Printed Name

THE COMPANY:

ACRISURE, LLC

By: _____

Its: _____

(VANGUARD P 2NSCE/ND)

## EXHIBIT A

1.  Compensation. Employee's compensation will be on the following basis:

A   Commission:

| Product | Rate |
|---|---|
| Property & Casualty | REDACTED |
| Surety | |
| Life & Health | |

If Employee's employment is terminated without "Good Cause," and provided Employee complies with the restrictive covenants set forth in the Producer Agreement or any other agreement with the Company.  Employee will receive half of his or her regularly scheduled renewal commissions for a period of 18 months following the date of employment termination.  "Good Cause" for purposes of this provision shall mean:

i.  Employee's breach of this Agreement and failure to cure such breach within thirty (30) days after The Company notifies Employee in writing of the breach;

ii.  Employee's failure or neglect to perform Employee's job duties or to comply with written policies, and failure to cure any such matter that is capable of being cured within thirty (30) days after the Company notifies Employee in writing of the material failure or neglect;

iii.  Employee engaging in fraud, dishonesty, or other gross negligence or willful misconduct in the performance of his duties on behalf of the Company, including misappropriation of the Company's property;

iv.  Employee engaging in conduct bringing the Company into substantial and material public disgrace;

v.  Employee's conviction of any crime which is a felony or any crime involving embezzlement or dishonesty;

vi.  The revocation of Employee's license to sell insurance and the failure by Employee to obtain reinstatement of such license(s) within a period of thirty (30) days following the date of revocation;

vii  Employee's attempting to secure or securing any profit or benefit personally in connection with a transaction entered into on the Company's behalf; or

6

(VANGUARD PLNSCE/ND)

       viii.   The occurrence of a "Control Event," which for purposes hereof, means (1) the sale by the Company of substantially all of its assets; (2) the sale by the Company of the Vanguard Agency Operation or a substantial portion of the Vanguard Agency Operation's assets; or (3) the sale of a majority of the voting equity interests of the parent entity/Affiliate of the Company, or of the Company (including by means of a merger or similar transaction). "Vanguard Agency Operation" shall mean the assets, client accounts and goodwill of the insurance agency business of Vanguard Coverage Corp. ("VCC") purchased by the Company pursuant to that certain asset purchase agreement between the Company and VCC executed contemporaneously with or prior to the execution of this Agreement.

2.    <u>Fringe Benefits</u>.  Employee's fringe benefits will include, without limitation, the following:

    A.    Cellular Phone Reimbursement
    B.    Automobile Expense Reimbursement:  Up to $500.00 per month.

Reimbursement is conditioned upon submission of satisfactory expense documentation in accordance with Company policies and procedures.

3.    <u>Business Expenses</u>.  Employee's reimbursable business expenses will include, without limitation, the following:

    A.    Reasonable business-related travel and entertainment expenses.

Reimbursement is conditioned upon submission of satisfactory expense documentation in accordance with Company policies and procedures.

9626932_1.DOC

(VANGUARD/P 2NSCE/ND)

Amendment to Robert Trager's Commission Schedule

In order to calculate gross commission for the purposes of calculating producer Commission:

To deduct from the Gross Commission on the account of DiFazio and Pedulla for expenses incurred on behalf of these two accounts.

Deduct service costs paid to Flanders

Example :
FYO Gross Commission is [REDACTED]
Vanguard incurred expenses of [REDACTED]
Net Gross Commission that Robert Trager would be entitled to receive a commission on would be [REDACTED]

# EXHIBIT F

NOS462
273

## EMPLOYMENT AGREEMENT (PRODUCER)

This Employment Agreement (the "Agreement") is made effective as of September 1st, 2017 (the "Effective Date"), by and between ACRISURE, LLC, a Michigan limited liability company (the "Company"), and Eric Wagner ("Employee").

In consideration of the promises contained in this Agreement, and Employee's employment or continued employment with the Company, as the case may be, and other valid and adequate consideration, the parties agree as follows:

1.    Employment.  The Company shall employ Employee, and Employee shall work for the Company, subject to the terms and conditions of this Agreement and the Company's Employee Handbook, as may be amended from time to time.  All business Employee develops and secures during the term of this Agreement and all business Employee services during the term of this Agreement shall be the exclusive property of the Company.  In the event of a conflict between the terms of the Agreement and the Employee Handbook, the terms of this Agreement shall control.

2    Definition of Business.  For purposes of this Agreement, the term "business" shall include all aspects of the Company's insurance business, professional employer organization and/or human resources services business, and any other business in which the Company is currently or may become involved.

3.    Exclusive Agreement.  Employee shall devote his/her full time and effort to securing business for the Company's benefit while in the Company's employ.  Among other Agreement obligations imposed, Employee shall not place any business, directly or indirectly, with any person or entity other than the Company without the Company's prior written consent, nor be involved financially or otherwise with any active insurance agency or other business of a type conducted by the Company, or similar enterprise.

4    General Duties.  Employee shall solicit all business types the Company offers and shall render such services to customers as the Company deems reasonably necessary and as the Company may request and coordinate.  Employee shall perform such other duties as the Company assigns to Employee.

5.    Salary, Commissions and Expenses.  Employee's initial compensation will be on the basis as set forth in Exhibit A.  Employee's compensation may be on a salary basis, commission basis, or a combination of both – as the Company determines and/or changes from time to time in its discretion.  Any available commissions will be based on a separate commission schedule for Employee's job responsibilities as the Company determines and/or changes from time to time in its discretion during the course of Employee's employment.  Employee shall not earn any commission until the Company receives payment of such commission from the insurance or product vendor.  Once earned, the commission shall be payable to Employee at the next scheduled commission payment date if the Company received payment of the gross commission from the insurance or product vendor at least five (5) business days before the scheduled commission payment date.  If not, the commission will be payable on the next scheduled commission payment date.  Upon and following employment termination for whatever reason, Employee will have earned only those commissions for business Employee

(ST/P/2NSCE/ND)

obtained during the course of employment and for which the Company received payment on or before the last date of the term of this Agreement. The Company shall reimburse Employee for all reasonable Employee business expenses incurred in the solicitation of business for the Company, provided Employee timely submits receipts to the Company in satisfactory form and in accordance with the Company's expense reimbursement policy.

6.  **Benefits.**  Employee will be eligible to participate in such benefit programs as the Company may make available from time to time to comparable employees as determined by the Company in its discretion.

7.  **At-Will Employment.**  The term of this Agreement shall commence on the Effective Date and shall end as of the date of termination by either the Company or Employee. Employee's employment under this Agreement shall be on an at-will basis, terminable by either party at any time.  Employee's eligibility for compensation and benefits will cease on the date of employment termination, except as may be otherwise provided in applicable benefit plan documents.

8.  **Nondisclosure of Confidential Information.**  Employee will have access to confidential information about the Company (the "Confidential Information"), including without limitation, information about the Company's operations, processes, procedures, trade secrets, agent lists, adjuster lists, rating techniques, rates, coverage, accounting rules, employee information, insurance companies, computer techniques, marketing techniques, advertising techniques, know-how, finances, business plans, costs, pricing, sales, customer lists, the needs and demands of customers, and vendor lists, including lists and contacts with insurance companies. In addition, Employee will develop other information that the Company considers to be Confidential Information. Employee will not, directly or indirectly, disclose, furnish, or make available, except in the course of performing Employee's duties of employment under this Agreement, any Confidential Information (regardless of how Employee learned of it or who developed it), without the Company's prior written approval. These restrictions concerning Confidential Information shall remain in effect following termination of this Agreement or termination of Employee's employment with the Company, without limitation.

9.  **Duty of Employee upon Termination.**  Employee shall, immediately upon termination of employment for any reason, return to the Company all client records of any sort and all Company literature, supplies, letters, written or printed forms, diaries, phone lists, documents containing customer lists, customer information, product information, pricing information, information as to sources of services, financial information of the Company and memoranda pertaining to the Company's business. Employee shall also, immediately upon termination of employment, return to the Company all Company property in Employee's possession, including automobiles, telephones, and any other Company-issued equipment.

10.  **Restrictive Covenants.**  The Company and Employee agree that the Company will provide Employee with the opportunity to receive compensation pursuant to this Agreement and the same constitutes valuable consideration. Employee further acknowledges that Employee will be provided with access to customer and other confidential information concerning the Company's business, as well of that of the Company's affiliated entities without limitation ("Affiliated Entities" or individually "Affiliated Entity").  It is further agreed that it requires

2

(ST/P/2NSCE/ND)

special and unique knowledge and information to act as a business agent on behalf of the Company and that the Employee shall gain such special and unique knowledge and information from the Company and/or Affiliated Entities throughout the time of his/her employment. This knowledge and information are integral parts of the business of the Company and/or of the Affiliated Entities, and the use of this knowledge and information by a competitor of the Company would cause irreparable harm to the Company. The Company and Employee agree that this knowledge and information constitute legitimate protectable business interests of the Company and/or of the Affiliated Entities. The Company and Employee further agree that the business Employee secures, develops or services for the Company or for an Affiliated Entity shall constitute the exclusive property of the Company or Affiliated Entity as applicable. In view of the foregoing, Employee agrees that, for the duration of Employee's employment, and in the event Employee's employment is terminated for any reason, for a period of two (2) years after the termination of employment:

a.  Non-Solicitation/Non-Interference.   Employee will not directly or indirectly, for himself/herself or for any other person, corporation, firm or entity, either as a principal, shareholder, member, agent, manager, employee, contractor, owner, partner, director, officer or in any other capacity, engage in any of the following activities, without regard to geographic location:

i.  Contacting or engaging in any communication with any Company or Affiliated Entity customer for whom Employee had responsibility, or contacting or engaging in any communications with any Company or Affiliated Entity customer or prospective Company or Affiliated Entity customer about whom Employee obtained knowledge during employment with the Company, to secure business competitive to the products and services provided by the Company or Affiliated Entity;

ii.  Requesting, advising, or encouraging any customer of the Company or of an Affiliated Entity to terminate or curtail its relationship with the Company or Affiliated Entity, or requesting or advising any person to refrain from becoming a customer or supplier of the Company or an Affiliated Entity;

iii.  Requesting, advising, or encouraging any employee, agent, representative or independent contractor of the Company or an Affiliated Entity to terminate his, her, or its relationship with the Company or Affiliated Entity, or requesting or advising any person to refrain from becoming an employee, agent, representative or independent contractor of the Company or of an Affiliated Entity, or otherwise pursuing, employing or retaining (as an employee, an independent contractor or otherwise) any employee, agent, representative or independent contractor of the Company or of an Affiliated Entity without the written permission of the Company.

3

(ST/P/2NSCE/ND)

11.   Reasonableness of Restrictions, Injunctive Relief and Tolling. Employee acknowledges that the restrictions contained in Paragraph 10 are reasonable and necessary for the reasonable protection of the Company's business and interests, and that any violation of these restrictions will cause substantial and irreparable injury to the Company, and as a consequence thereof, Employee agrees that the Company is entitled, in addition to any other remedies, to preliminary and permanent injunctive relief to secure specific performance and to prevent a breach or contemplated breach of this Agreement.  If it is judicially determined that Employee has violated any obligations of Paragraph 10, the period applicable to each obligation Employee has been determined to have violated will be extended by a period of time equal in length to the period during which such violation(s) occurred.  The Company reserves all remedies available at law or in equity.

12.   Severability.  In the event any provisions of this Agreement shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provisions thereof, and in the event that such claim of invalidity or unenforceability of any provision shall be predicated upon the length of the term of any covenant therein or the area covered thereby or the type of activity restrained, such provision shall not be deemed invalid or unenforceable but shall be deemed modified to the maximum area and the maximum term of duration and the type of activity as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

13.   Purchase of Business.  The Company and Employee agree that there are many different ways to violate Paragraph 10 due to the variety of covenants contained in this Agreement, each of which could cause injury to the Company or the Affiliated Entities.  The parties specifically agree that any contact Employee makes to the Company's or an Affiliated Entity's customers will cause injury to the Company even if the contact does not immediately or directly result in Employee writing business for a Company or Affiliated Entity customer.  The parties therefore agree that there is no adequate remedy at law if Employee violates Paragraph 10.  However, in the event that Employee actually writes business for any Company of Affiliated Entity customer after Employee leaves the Company in violation of the covenants in Paragraph 10, whether or not the Company has obtained or has attempted to obtain equitable relief, the Company, at its election, may deem that Employee has elected to purchase from the Company or Affiliated Entity the business with respect to such customer, and upon written demand, Employee shall pay to the Company or Affiliated Entity an amount equal to two (2) times the customer's first year's sales commission payable with respect to any business customer purchases in connection with the business services Employee renders.  The parties intend this provision to be a reasonable estimation of damages which the Company or an Affiliated Entity may invoke only if Employee actually writes business for a Company Affiliated Entity customer. All remedies contained in this Agreement are cumulative and may be exercised singularly or concurrently, and the exercise of any one shall not be deemed a waiver of any other.

14.   Breach by Employee; Remedies.  Employee shall conduct him/herself at all times according to the terms and conditions of this Agreement and the Employee Handbook.  Failure to do so may render Employee liable for any loss or damage the Company may suffer on account of such failure.   Employee agrees that the Company may specifically enforce Employee's performance or recover damages for a breach of this Agreement by civil suit, injunction or

4

(ST/P/2NSCE/ND)

otherwise, and Employee shall be liable to the Company for the reasonable costs and attorneys' fees of any such action in which a breach is established. The parties agree that any action at law or equity or any judicial proceedings for enforcement of this Agreement or any provision thereof shall be instituted only in the federal or state courts located in the County of Kent, State of Michigan.

15.    Acknowledgment. Employee acknowledges that execution of this Agreement is required by the Company as a condition of becoming or remaining an employee, as the case may be, and that this Agreement supersedes any and all prior employment agreements between Employee and the Company (including any agreement between Employee and the Company's predecessor company), whether verbal or written, expressed or implied.

16.    Benefit. This Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors, and assigns.

17.    Amendment and Termination. The parties may amend or terminate this Agreement in a writing signed by both parties. This Agreement will automatically terminate upon the Company's dissolution, bankruptcy, or insolvency, or Employee's death.

18    State Law. The laws of the State of Michigan shall govern this Agreement, excluding choice of law principles.

19.    Survival. The parties' obligations under Paragraphs 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 20 shall survive the termination of Employee's employment and/or this Agreement.

20.    Entire Agreement. This Agreement represents the entire Agreement between the parties regarding the terms and conditions of Employee's employment. The terms of this Agreement may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Company or its agents. This Agreement may not be modified except by a written agreement signed by all parties that expressly references and purports to modify this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the Effective Date identified above.

EMPLOYEE:

_____
*(Signature)*

ERIC R. WAGNER
_____
*Printed name*

THE COMPANY:

5

(ST/P/2NSCE/ND)

ACRISURE, LLC

By: _William C. Reed_____

Its: _____
         Senior Vice President

6

**EXHIBIT A – COMPENSATION AND BENEFITS**

**Commercial Lines**

The Producer will be entitled to [REDACTED] Agency's Net Annual Commission on any Renewals, plus any New Business brought into the Agency through the efforts of the Producer.

The Producer's draw shall be [REDACTED] Producer's prior year's reconciled commissions. The draw will be paid based on the Agency's normal pay periods.

At the end of every calendar year reconciliation will be done to determine whether the Producer or Agency is owed any money based on the amount of commission earned versus the draw paid. Any amount owed will be settled before the end of January of the subsequent year.

**Personal Lines**

In addition to the Commercial Lines Producers Draw, on the Producers Personal Lines Accounts the Producer will be paid [REDACTED] of the Agency's Net Annual Earned Commission on New Business and [REDACTED] Agency's Net Annual Earned Commission on Renewals.

Health, Life and Benefit Lines

In addition to the Producers Commercial Lines Producers Draw, on the Producers Health, Life and Benefits Accounts placed with Bender Employee Solutions, Inc. the Producer will be paid [REDACTED] of Bender Employee Solutions, Inc. Net Annual Earned Commission on New Business and [REDACTED] Bender Employee Solutions, Inc. Net Annual Earned Commission on Renewals.

**Benefits**

Producer shall be entitled to any other benefits in line with the Agency's employment practices, procedures and policies, as set forth in Agency's Employee Manual, including, but not limited to, group health, life, accident, disability or other insurance as may be offered.

**EXHIBIT A – COMPENSATION AND BENEFITS (Cont'd)**

**Expenses**

Producer will submit a monthly expense report that is subject to Agency approval. The Producer will be reimbursed for reasonable business expenses on a monthly basis. Examples of reasonable business expenses are business miles, parking, trains, tolls and entertainment. Items not considered to be normal recurring business expenses, such as journal ads, donations, and golf outings, need prior approval.

**Definitions**

"Net Annual Commission" is defined to be the gross annual commissions, less any return commissions, the premium for which has been paid in full, without regard to any insurance carrier override, contingent, bonus or profit-sharing and/or guaranteed supplemental commission agreements.

"Renewals" is defined as existing business, which was originally brought into the Agency as New Business by the Producer.

"New Business" is defined to be an insurance policy sold to a person, organization or other legal entity which has not been previously written by the Agency, unless otherwise agreed to in writing between the Agency and the Producer.

**EXHIBIT A**

**Eric Wagner**

<u>**Salary**</u>:

<u>**Draw**</u>:

REDACTED

<u>**Commission**</u>:

|  | New | Renewal |
|---|---|---|
| Commercial Insurance | REDACTED | |
| Personal Lines | | |
| Group Benefits | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Effective: 1-1-19

Signed: _____

Name: Eric Wagner

(ST/P/2NSCE/ND)

## AMENDMENT TO EMPLOYMENT AGREEMENT

This Amendment to Employment Agreement (this "Amendment") is made effective as of January 1, 2021 (the "Amendment Date"), by and between **ACRISURE, LLC**, a Michigan limited liability company (the "Employer"), and **ERIC WAGNER** ("Employee"). All capitalized terms used but not defined in this Amendment shall have the meanings given such terms in the Employment Agreement (as defined below).

### BACKGROUND

A.     The Employer and Employee entered into that certain Employment Agreement, effective as of September 1, 2017 (the "Employment Agreement").

B.     The parties desire to amend the Employment Agreement as set forth herein.

### AGREEMENT

**NOW, THEREFORE,** for good and valuable consideration, the parties agree as follows:

1.     Exhibit A of the Agreement shall be removed and replaced with the following terms:

Base Salary/Commission. For the Term of this Agreement, the Employer shall pay Employee a base salary ("Base Salary") of [REDACTED] [REDACTED] The Base Salary shall be subject to normal payroll deductions and shall be payable in accordance with the Employer's normal payroll practices.

Employee's commission schedule [REDACTED] agency commission received for new Bender Commercial Business related to sales, excluding book or agency purchases.

2.     Except for those provisions of the Agreement which have been changed as a result of this Amendment, all other provisions of the Agreement shall remain the same.  In addition, the Agreement and this Amendment shall hereinafter be considered as part of and collectively referred to as the Agreement.

3.     **Representations and Warranties.**  Each party hereto represents and warrants to the other party hereto as follows:

(a)     The execution and delivery of this Amendment and the performance by such party of its or his obligations hereunder have been duly authorized by all necessary action on the part of such party; and

(b)     This Amendment constitutes the valid and binding obligation of each party in accordance with its terms.

4.    **Conflict; Ratification.**  In the event of any conflict or inconsistency between the terms and conditions of this Amendment and the terms and conditions of the Employment Agreement, the terms and conditions of this Amendment shall control. Except to the extent modified by this Amendment, the Employment Agreement is hereby ratified and affirmed.

5.    **Counterparts; Facsimile/PDF Signatures.**  This Amendment may be executed in separate counterparts, each of which shall be deemed to be an original, and all such separate counterparts shall constitute but one instrument. Signatures of the parties transmitted by facsimile, portable document format or other electronic means shall be deemed to be their original signatures for all legal and other purposes.

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Employment Agreement as of the Amendment Date.

EMPLOYEE: ERIC WAGNER

_____
(Signature)

EMPLOYER: ACRISURE, LLC

By: _____
Sozon Vatikiotis

Its: Chief Operating Officer

A-2

**STATE OF MICHIGAN**
**KENT COUNTY CIRCUIT COURT**

.02866

ACRISURE, LLC,                                    Case No.  24-_____-CB

        Plaintiff,                               Honorable

v.

MATTHEW KELLY, CHRISTOPHER          **MOTION FOR *EX PARTE***
IOVINO, ROBERT KEMPNER,             **TEMPORARY RESTRAINING**
MICHAEL RELLA, ROBERT TRAGER,       **ORDER, PRELIMINARY INJUNCTION**
and ERIC WAGNER,                     **AND BRIEF IN SUPPORT**

        Defendants.

---

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,                            **Rec'd & Filed**
   MEAGHER & FLOM LLP
James R. Carroll (*pro hac vice* forthcoming)     **MAR 28 2024**
Christopher G. Clark (*pro hac vice* forthcoming)  **KENT COUNTY**
500 Boylston Street                                **CIRCUIT COURT**
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

---

        Pursuant to MCR 3.310, Acrisure, LLC ("Acrisure") hereby moves this Court, pursuant to

MCR 3.310, for a Temporary Restraining Order ("TRO") and Preliminary Injunction in the form

attached as **Attachment A**. This Motion is supported by the accompanying Brief in Support and the Verified Complaint filed in this matter.

Pursuant to MCR 3.310(B)(1)(b), Counsel for Acrisure states that notice should not be required because, as is further described below and in the Verified Complaint, Defendants knowingly are refusing to abide by the non-solicitation provisions of their Employment Agreements and their actions have already resulted in several Acrisure employees and customers leaving to join a competitor. They have also unlawfully converted Acrisure's property and used Acrisure's confidential information to achieve these goals. To prevent further loss of employees and customers, and damages to Acrisure's reputation and customer goodwill, this Court should grant this Motion without notice.

## PLAINTIFF ACRISURE'S BRIEF IN SUPPORT OF ITS EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### INTRODUCTION

Acrisure is a global fintech leader that provides intelligence-driven financial services solutions across many industries, including the highly competitive insurance brokerage industry. Acrisure makes significant investments to acquire, build and retain its customer base, relationships, and goodwill, and to maintain its business reputation, brand awareness and employee workforce. Acrisure also protects its confidential information by, among other things, having key personnel who are privy to such highly sensitive and valuable information agree to reasonable restrictions intended to protect Acrisure's legitimate business interests.

Last Friday evening, on March 15, 2024, Defendants Matthew Kelly, Christopher Iovino, Robert Kempner, Michael Rella, Robert Trager and Eric Wagner ("Defendants") – six former highly-compensated Acrisure insurance sales and account executives – abruptly resigned and defected to a direct competitor, Woodruff Sawyer & Co. ("Woodruff Sawyer"). The following

business day, the first of many Acrisure customers, who the Defendants serviced, left Acrisure to move their business to Woodruff Sawyer.  Over just the past few days, at least 20 significant customers have left Acrisure.  Upon information and belief, Defendants Rella, Trager, Kelly, Iovino and Kempner used Acrisure's proprietary and confidential information to solicit those customers to terminate their business with Acrisure.

Defendants' conduct plainly violates the reasonable restrictive covenants in their employment agreements for which Acrisure bargained in exchange for the valuable compensation paid to Defendants.  Acrisure seeks to protect its rights and prevent Defendants from further exploiting Acrisure's confidential information, unlawfully soliciting Acrisure employees and poaching Acrisure's customers.  Acrisure has been and will continue to be irreparably harmed by the Defendants' unlawful conduct as a result of the Defendants' violation of their contractual obligations to Acrisure.  For these reasons, Acrisure respectfully requests that this Court enter the Temporary Restraining Order attached herein as **Attachment A**, which seeks to maintain the status quo and prohibit Defendants from (i) deleting, accessing, using or disclosing Acrisure's proprietary and confidential information, (ii) contacting, engaging or soliciting Acrisure's employees to leave Acrisure and (iii) contacting, engaging or soliciting Acrisure's customers to secure competitive business in violation of their Employment Agreements.

## FACTUAL BACKGROUND[1]

### 1.   Acrisure

Acrisure is a global fintech leader based in Grand Rapids, Michigan with offices throughout the United States.  (Compl. ¶ 17.)  Acrisure provides intelligence-driven financial

---

[1]   The facts relevant to this Motion are set forth in detail in Acrisure's Verified Complaint and are incorporated herein by reference.  Capitalized terms not defined herein have the same meanings as in the Verified Complaint.

services solutions across many industries, including the insurance brokerage industry, which is highly competitive to soliciting and maintaining customers, accounts, and employees. (Compl. ¶¶ 17-18.) As part of its business, Acrisure spends significant time and money developing its customer relationships as well as its talent and employees who help Acrisure's customers address their unique needs and further their business relationship with Acrisure. (Compl. ¶ 19.) Acrisure also invests substantial time and resources protecting its proprietary and confidential information through a variety of processes and procedures. (Compl. ¶ 22.) For example, Acrisure protects its proprietary and confidential information and business relationships by obtaining from employees who have important roles non-solicitation agreements that reasonably restrict the solicitation of Acrisure customers and employees under certain circumstances for up to two-years post-separation. (Compl. ¶ 23.)

## 2. Defendants Agree To Confidentiality And Non-Solicitation Covenants In Exchange For Significant Compensation

Acrisure hired Defendants and they worked in the company's construction insurance and commercial risk practice. (Compl. ¶¶ 6-11, 72-73.) As former account executives and sales producers for Acrisure, Defendants were responsible for soliciting, selling and servicing Acrisure's customers. (Compl. ¶¶ 24-37.) In these roles, Defendants had access to, and made use of, Acrisure's proprietary and confidential information including, but not limited to, employee information, costs, pricing, customer and vendor lists, customer contracts, sales strategies, marketing strategies and employee relationships. (Compl. ¶¶ 24-37.) The confidential and competitive business information to which Defendants had access throughout their employment is critical to Acrisure's competitive position and would be of substantial value to a direct competitor. (Compl. ¶ 41.)

At Acrisure, almost all Defendants earned hundreds of thousands of dollars annually. (Compl. ¶ 39.)  In exchange for this lucrative compensation, Defendants entered into Employment Agreements that contained certain reasonable restrictive covenants that survived for a period of two-years post employment.   (Compl.  ¶¶ 24-40.)   In Paragraph 8 of their Employment Agreements, Defendants agreed to protect Acrisure's confidential information from unauthorized disclosure.  In particular, Defendants agreed that they would not:

> [D]irectly or indirectly, disclose, furnish, or make available, except in the course of performing Employee's duties of employment under this Agreement, any Confidential Information (regardless of how Employee learned of it or who developed it), without the Company's prior written approval.

(Compl. ¶ 42.)  Paragraph 8 defines "Confidential Information" to include information about Acrisure's "operations, processes, procedures, trade secrets, agent lists, adjuster lists, rating techniques, rates, coverage, accounting rules, employee information, insurance companies, computer techniques, marketing techniques, advertising techniques, know-how, finances, business plans, costs, pricing, sales, customer lists, the needs and demands of customers, and vendor lists, including lists and contacts with insurance companies." (Compl. ¶ 42.) Defendants further agreed in Paragraph 9 of the Employment Agreements to return all Acrisure property immediately upon termination of employment.  (Compl. ¶ 43.)

In Paragraph 10 of their Employment Agreements, Defendants agreed to certain restrictive covenants regarding the solicitation of employees and customers.  Put simply, Defendants agreed that, during their employment and for two years after the termination of their employment, they will not, among other things:

- directly or indirectly contact any Acrisure customers that they engaged with or had obtained knowledge of during their employment (Compl. ¶ 45);

- directly or indirectly solicit any Acrisure customer to "terminate or curtail its relationship" with Acrisure (Compl. ¶ 46); and

5

- directly or indirectly solicit any Acrisure employee to "terminate" its relationship with Acrisure or pursue any Acrisure employee for employment without permission from Acrisure (Compl. ¶ 47).

Defendants further agreed that the restrictions contained in Paragraph 10 are reasonable and necessary to protect Acrisure's business including Acrisure's goodwill and confidential information, and further agreed that any violation of Paragraph 10 would cause Acrisure to suffer substantial and irreparable injury and entitle it to injunctive relief. (Compl. ¶¶ 48, 115.)

### 3. Last Friday, Defendants Successfully Execute A Covert And Coordinated Resignation From Acrisure

On the evening of Friday, March 15, 2024, without warning, all of the Defendants resigned from their positions at Acrisure. (Compl. ¶ 52.) All of the Defendants worked at the same office in New York and sent nearly identical resignation emails. (Compl. ¶¶ 53-59.) Upon information and belief, Defendants had already accepted offers to work at Woodruff Sawyer, a direct competitor, and solicited, recruited or encouraged each other to leave Acrisure. (Compl. ¶¶ 62-63.)

### 4. Defendants Accessed, Deleted, And Downloaded Acrisure Files Without Consent

Acrisure's preliminary and ongoing investigation has revealed that at least five of the Defendants, without Acrisure's consent, accessed and deleted Acrisure information, and two of the Defendants downloaded Acrisure information – and did so from non-Acrisure managed devices – just hours before resigning. (Compl. ¶¶ 64-70.) Defendant Kelly alone deleted more than 550 files and accessed more than 40 files on Acrisure's system, and the remaining Defendants either downloaded, deleted or accessed numerous files on Acrisure's system. (Compl. ¶¶ 65-66.) The Defendants did not and do not have permission to retain copies of Acrisure's information or transfer it outside of Acrisure and they have not returned these files to Acrisure as of the date

6

herein.  (Compl. ¶ 67.)

5.      **Last Saturday, Woodruff Sawyer Immediately Begins Advertising The**
        **Defendants' Arrival And Acrisure Sends Written Letters**

Less than 24 hours after the Defendants' coordinated resignations, Woodruff Sawyer began advertising the hiring of the Defendants as part of Woodruff Sawyer's "Newest Market Expansion."  (Compl. ¶ 71)  Two days later, on Monday, March 18, 2024, Woodruff Sawyer announced that it was "expanding their East Coast footprint with the addition of six members formerly with Acrisure's Construction and Commercial Risk Practice."  (Compl. ¶¶ 72-73.)  On that same day, Acrisure sent letters to Defendants advising them of the restrictive covenants in their Employment Agreements and that any further breach of their Employment Agreements may result in instituting litigation to protect Acrisure's rights.  (Compl. ¶ 75.)  Acrisure also sent a similar letter to Woodruff Sawyer.  (Compl. ¶ 77.)

6.      **Defendants Rella, Trager, Kelly, Iovino And**
        **Kempner Almost Certainly Unlawfully Solicited At Least 20 Significant Acrisure**
        **Customers**

In the days after Defendants' resignation and Woodruff Sawyer's announcement, Acrisure learned that at least 20 Acrisure customers who generated significant revenue for the company had switched their insurance programs.  (Compl. ¶¶ 78-114.)  These twenty customers were primarily managed by, and had relationships with, Defendants Rella, Trager, Kelly, Iovino and Kempner while they were at Acrisure.  (Compl. ¶¶ 83-84, 91, 97.)  Upon information and belief, Defendants Rella, Trager, Kelly, Iovino and Kempner almost certainly unlawfully solicited, encouraged or induced these customers to terminate their business with Acrisure and move it to Woodruff Sawyer, and used or disclosed Acrisure's proprietary and confidential information to do so. (Compl. ¶¶ 86-87, 92-93, 98-99.)   Upon and information and belief, these Defendants are continuing to solicit other Acrisure customers to move their business.  (Compl. ¶¶ 88, 94, 100.)

I.   **ACRISURE'S REQUESTS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE GRANTED**

Under Michigan Court Rule 3.310, the Court may issue an *ex parte* temporary restraining order when "immediate and irreparable injury, loss, or damage will result to" the requesting party. M.C.R. 3.310(B)(1)(a). The factors for deciding whether to grant injunctive relief are: "(1) the likelihood that the party seeking the injunction will prevail on the merits; (2) the danger that the party seeking the injunction will suffer irreparable injury if the injunction is not issued; (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief; and (4) the harm to the public interest if the injunction is issued." *Campau v McMath*, 185 Mich App 724, 728–29; 463 NW2d 186 (Mich App 1990). Each of these factors support granting Acrisure's requested injunctive relief.

A.   **Acrisure Is Likely To Succeed On The Merits Of Its Breach Of Contract And Conversion Claims**

Defendants concocted a coordinated scheme to solicit Acrisure's employees and customers for their own economic benefit (and the benefit of Acrisure's direct competitor Woodruff Sawyer) in violation of their Employment Agreements and the common law protections of conversion. As demonstrated below, Acrisure is likely to succeed on its claims.

1.   **Acrisure Is Likely To Prevail On Its Claim Against Defendants For Breach Of The Confidentiality Restriction**

Acrisure is likely to prevail on its claim against Defendants for breach of the confidentiality restriction for using and disclosing Acrisure's proprietary and confidential information. Under Michigan law, which governs the Employment Agreements at issue,[2] "[a] party claiming breach

---

[2]   The Michigan choice of law provision in the Employment Agreements (Compl. ¶ 13) is binding and enforceable here. *Acrisure, LLC v Smith*, No 21-09688-CBB (Opinion and Order dated Nov 4, 2021) (Ackert, J.) (enforcing Michigan choice of law provision in case involving breach of a non-solicitation clause and recognizing that Michigan public policy favors "the

of contract must show '(1) that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach.'" *Total Quality, Inc v Fewless*, 332 Mich App 681, 694; 958 NW2d 294 (Mich App 2020), *appeal denied*, 956 NW2d 190 (Mich 2021).

An employment agreement that prevents the anticompetitive use of confidential information (like the one at issue here) is a legitimate and protectable business interest under Michigan law and enforceable. *See, e.g.*, *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 158; 742 NW2d 409 (Mich App 2007). The confidentiality provision in Paragraph 8 of Defendants' Employment Agreements seeks to protect Acrisure's proprietary and confidential information from unauthorized disclosure in order to prevent misuse of that information for anticompetitive reasons. In particular, the proprietary and confidential information, which includes competitive business and customer information to which Defendants had access, is critical to Acrisure's competitive position in the insurance brokerage industry and would be of substantial value to a direct competitor such as Woodruff Sawyer. (Compl. ¶ 41.) The confidentiality restriction in the Employment Agreements is enforceable. *Rooyakker*, 276 Mich App 146 at 158.

Here, Defendants agreed in Paragraph 8 of their Employment Agreements that they would not directly or indirectly "disclose, furnish, or make available" Acrisure's proprietary and confidential information, which includes pricing, sales, customer lists, and the needs and demands of customers, without the prior consent of Acrisure. (Compl. ¶ 42.) Defendants agreed that this confidentiality restriction would remain in effect following their termination of employment. *Id.*

---

enforcement of contractual choice of law provisions" and "reasonable restrictive covenants negotiated by employers and employees") (attached as Attachment B).

9

Despite agreeing to these unambiguous confidentiality obligations, upon information and belief, Defendants violated their Employment Agreements by disclosing, using and making available Acrisure's proprietary and confidential information without Acrisure's permission, presumably to gain an unfair competitive advantage with their new employer.  (Compl. ¶¶ 64-70.)  Defendants also deleted, accessed or downloaded Acrisure's confidential documents and files located on Acrisure's system, including by using non-Acrisure managed devices.  *Id.*

Defendants were not authorized to disclose or use Acrisure's proprietary confidential information for reasons other than furthering Acrisure's business interests, and the fact that Defendants did so close in time to their impending coordinated resignation and move to Woodruff Sawyer makes it more than likely that Defendants violated the confidentiality restriction to gain an unfair competitive advantage.  Acrisure has been damaged and irreparably harmed by this breach because its proprietary and confidential information is no longer secure and, upon information and belief, Defendants continue to actively use and disclose Acrisure's proprietary and confidential information for the benefit of a direct competitor.  (Compl. ¶¶ 88, 94, 100.)

### 2. Acrisure Is Likely To Prevail On Its Claim Against Defendants For Breach Of The Non-Solicitation Covenants

#### a. The Non-Solicitation Covenants In The Employment Agreements Are Enforceable

The non-solicitation restrictive covenants in Defendants' Employment Agreements prohibiting the solicitation of Acrisure's employees and customers for unfair anticompetitive reasons are enforceable under Michigan law.

Courts routinely enforce restrictive covenants preventing the solicitation of employees and customers similar to those at issue here because employers like Acrisure who operate in highly competitive industries have a legitimate protectable interest in the relationships between its employees and customers.  *See, e.g., Total Quality*, 332 Mich App 681 at 700 (upholding

10

non-solicitation provision that prevented employee from soliciting company's customers and employees for a two-year period because "employers have legitimate business interests in restricting former employees from soliciting their customers"); *Rooyakker*, 276 Mich App at 158 (upholding non-solicitation clause that prevented soliciting or providing services to company's clients for a two-year period without a geographic limitation); *Neocare Health Sys, Inc v Teodoro*, No 255558, 2006 WL 198329, at **2-3 (Mich Ct App Jan 26, 2006) (upholding non-solicitation clause in highly competitive industry with five-year period and no geographic limitation because restriction did not prevent employees from generally seeking employment or engaging in any line of business) (attached as Attachment C).

Here, Defendants are sophisticated and long-tenured insurance industry executives who purposefully and voluntarily entered into valid and enforceable Employment Agreements in exchange for substantial compensation. (Compl. ¶¶ 24-40.) In exchange for that valuable consideration, Defendants expressly agreed that the non-solicitation provisions were reasonable and necessary to protect Acrisure's business and interests. (Compl. ¶ 48.) And like the non-solicitation provisions in *Rooyakker*, *Total Quality* and *Neocare*, the non-solicitation provisions at issue here are reasonable and narrowly tailored to protect Acrisure's legitimate business interests in preserving the Company's relationships with its employees and customers and its goodwill. The non-solicitation provision regarding Acrisure's employees prevents Defendants for a two-year post-employment period from soliciting any Acrisure employee to terminate its relationship with Acrisure. (Compl. ¶ 47.) Similarly, the non-solicitation provisions regarding Acrisure's customers prevent Defendants for a two-year period post-employment period from (i) requesting, advising or encouraging any Acrisure customer to "terminate or curtail its relationship" with Acrisure or (ii) contacting or communicating with any Acrisure customer for

11

which Defendants engaged with or had knowledge of during their employment for purposes of securing business competitive to Acrisure (Compl. ¶¶ 45-46.)  These non-solicitation provisions, which are reasonably limited in duration and scope, do not prohibit Defendants from working in their chosen line of work (or any line of business) or from directly competing with Acrisure "*as long as they do not solicit [Acrisure's] customers, employees, and business relationships.*" *Total Quality*, 332 Mich App 681 at 700.[3]  Accordingly, the non-solicitation restrictions should be enforced here to protect Acrisure's legitimate business interests.

### b.   Defendants Breached The Covenant To Not Solicit Acrisure's Employees

Acrisure is likely to prevail on its claim against Defendants for breach of the employee non-solicitation covenant by encouraging and soliciting Acrisure employees to resign and join Woodruff Sawyer, a direct competitor, all while still employed at Acrisure.   Under the Employment Agreements, Defendants were prohibited -- both during and for a two-year period post-employment -- from "[r]equesting, advising, or encouraging" Acrisure employees to terminate their relationship with Acrisure, and "pursuing, employing or retaining (as an employee, an independent contractor or otherwise) any Acrisure employee without the written permission of the company." (Compl. ¶ 47.)  Upon information and belief, Defendants violated this covenant by recruiting, coordinating and encouraging each other to join Woodruff Sawyer while still employed by Acrisure. (Compl. ¶¶ 53-63.)  Upon information and belief, Defendants had all already received

---

[3]      For this reason, even if the non-solicitation provisions were subject to statutory restrictions for non-competes under MCL 445.774a(a)(1), which applies to covenants that restrict an employee from "engaging in employment or a line of business" (which is not the case here), they are reasonable in scope and duration and intended to protect Acrisure's reasonable competitive business interests and thus enforceable. *Acrisure, LLC v Smith* (Attachment B at 9) (18-month non-solicitation provision that restricted former employee from soliciting customers and employees with no geographic boundary but did not limit where employee could work was reasonable even under MCL 445.774a(a)(1); *Neocare*, 2006 WL 198329, at *2 (Attachment C).

and accepted offers to work at Woodruff Sawyer for the purpose of expanding Woodruff Sawyer's business to New York before they all resigned on the same day from Acrisure. (Compl. ¶¶ 62-63.) Defendants' unlawful and coordinated solicitation of Acrisure employees caused significant harm to Acrisure, including loss of proprietary and confidential information, goodwill, ability to retain its workforce, business interruption, loss of talent, reputational harm, and several valuable customers with significant revenues. Accordingly, Acrisure has established a likelihood of success on the merits of its breach of contract claim concerning the non-solicitation of Acrisure employees.

### c. Defendants Rella, Trager, Kelly, Iovino and Kempner Breached The Covenant To Not Solicit Acrisure's Customers

Acrisure is likely to prevail on its claim against Defendants Rella, Trager, Kelly, Iovino and Kempner for breach of the customer non-solicitation covenant by contacting Acrisure's customers and encouraging them to terminate their insurance business with Acrisure and move it to Woodruff Sawyer. Paragraphs 10(a)(i) and (ii) of the Employment Agreements prohibit Defendants, while employed at Acrisure and for a period of two years post-employment, from, directly or indirectly, for themselves or for any other entity:

- "[c]ontacting or engaging in any communication" with any Acrisure customer for whom Defendants had responsibility or obtained knowledge of during their employment with Acrisure to secure business competitive to the products and services offered by Acrisure (Compl. ¶ 45); and

- "requesting, advising or encouraging" any Acrisure customer to "terminate or curtail its relationship" with Acrisure (Compl. ¶ 46).

Here, immediately after the resignations of Defendants Rella, Trager, Kelly, Iovino and Kempner, at least 20 important Acrisure customers with significant revenues for which those Defendants had significant responsibility (or knowledge of during their time at Acrisure) terminated their business with Acrisure (Compl. ¶¶ 78-114.) Indeed, just days after their resignation and after Woodruff Sawyer announced Defendants' hiring, Acrisure received notices

that at least 20 customers had chosen to replace Acrisure as their insurance broker, many of whom left for Woodruff Sawyer. *Id.* The short temporal proximity between Defendants Rella, Trager, Kelly, Iovino and Kempner's coordinated resignation and Acrisure's customers' decision to terminate their relationship with Acrisure supports the inference that Defendants Rella, Trager, Kelly, Iovino and Kempner unlawfully solicited or encouraged Acrisure's customers in breach of Paragraphs 10(a)(i) and (ii) of the Employment Agreements, causing Acrisure to lose its customers.

Upon information and belief, Defendants Rella, Trager, Kelly, Iovino and Kempner took this course of action by using and disclosing Acrisure's proprietary and confidential information, including customer lists, pricing and customer demands and needs (Compl. ¶¶ 86-87, 92-93, 98-99.) Defendants Rella, Trager, Kelly, Iovino and Kempner's conduct has materially harmed Acrisure. Accordingly, Acrisure has established a likely of success on the merits of its breach of contract claim concerning the non-solicitation of Acrisure customers.

### 3.     Acrisure Is Likely To Prevail On Its Claim For Conversion

Acrisure is likely to prevail on its claim against Defendants for conversion. To establish a claim for conversion, a plaintiff need only demonstrate a "distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Univ of Mich Regents v Valentino*, No 349942, 2020 WL 7759669, at *3 (Mich Ct App Dec 29, 2020) (attached as Attachment D). For the same reasons that Defendants have breached their confidentiality restrictions, Defendants have unlawfully converted Acrisure's property. Defendants' unauthorized access, deletion, downloads and use or disclosure of Acrisure's property amounts to conversion as Defendants have dispossessed Acrisure of its property or retained Acrisure's property or retained Acrisure's property without permission. Defendants' conversion of Acrisure property will cause Acrisure irreparable damage and injury, including to its

14

competitive place in the insurance and risk management market and to its relationship with its customers.

**B.     Acrisure Will Be Immediately And**
**        Irreparably Harmed Without Injunctive Relief**

Acrisure will suffer immediate irreparable injury if Defendants are not enjoined from further using Acrisure's proprietary and confidential information to gain an unfair competitive advantage and unlawfully raiding Acrisure's employees and poaching its customers.

*First*, as this Court recognized in *Acrisure, LLC v Smith*, "the unlawful solicitation of employees has been recognized as a harm for which monetary damages are difficult to calculate and support the entry of an injunction." (Attachment B.) So too here: Defendants' coordinated departure from Acrisure to a direct competitor resulting in the loss of six highly-compensated sales and account executives in the New York region has directly resulted in loss of goodwill, employee knowledge and talent, and business interruption, all of which cannot be remedied at law.

*Second*, courts repeatedly hold that relationships formed between the representatives of a business and its customers are protectable business interest of the company, and equitable relief is appropriate as a matter of law to preserve a business's goodwill with its customers. *See St Clair Med, PC v Borgiel*, 270 Mich App 260, 268-69; 715 NW2d 914 (Mich App 2006) (protecting against loss of customer goodwill is a reasonable competitive business interest); *Superior Consulting Co v Walling*, 851 F Supp 839, 847 (ED Mich 1994) (loss of customer goodwill supports a finding of irreparable harm); *Basicomputer Corp v Scott*, 973 F2d 507, 512 (CA 6, 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."); *Certified Restoration Dry Cleaning Network, LLC v Tenke Corp*, 511 F3d 535, 550 (CA 6, 2007) (granting injunctive relief and reasoning that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing

from such losses are difficult to compute" and "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer").

*Third*, courts also hold that the unlawful use or disclosure of confidential information causes irreparable harm to the owner of the confidential information. For example, in *Kelly Servs, Inc v Noretto*, 495 F Supp 2d 645, 659 (ED Mich 2007), the court reasoned that "it is entirely unreasonable to expect [the employee] to work for a direct competitor in a position similar to that which he held with [the former employer], and forego the use of the intimate knowledge of [the former employer's] business operations." *Id.* at 659. Recognizing the certainty of irreparable harm that the employer would suffer through the loss of its confidential information and customer goodwill, the court determined that the employer had satisfied the irreparable harm prong and granted the preliminary injunction. *See id.* at 660-61; *see also Stryker Corp v Bruty*, No 1:13-CV-288, 2013 WL 1962391, at *7 (WD Mich May 10, 2013) (recognizing that "the unauthorized use—actual or threatened—of confidential information constitutes irreparable harm sufficient for issuance of an injunction") (attached as Attachment E). The same result is appropriate here.

As demonstrated above, Acrisure has already lost at least 20 important customers with significant revenues because of Defendants' wrongful actions. If not enjoined, Acrisure reasonably expects that Defendants will solicit additional customers to switch brokerage services to Woodruff Sawyer in further violation of their restrictive covenants despite Acrisure's written warnings that doing so would be unlawful. Damages resulting from Defendants' continued interference with Acrisure's customers, including the loss of goodwill, the loss of fair competition, and the cost and uncertainty of cultivating new customer relationships to replace any lost customers, "are so indefinite" such that the "harm is irreparable." *Kelly*, 495 F Supp 2d at 659

16

(granting motion for injunctive relief against former employee seeking protection of company's customer and prospective customer lists where employee sought to work for direct competitor).

*Fourth*, Defendants agreed in their Employment Agreements that violation of Defendants' non-solicitation covenants would cause Acrisure to suffer substantial and irreparable injury:

- Acrisure "is entitled, in addition to any other remedies, to preliminary and permanent injunctive relief to secure specific performance and to prevent a breach or contemplated breach" of the restrictions in Paragraph 10 Employment Agreements (Compl. ¶ 48);

- The use and knowledge of information Defendants gained acting as business agents for Acrisure by a competitor "would cause irreparable harm to the Company." (Compl. ¶ 44); and

- Any contact Defendants made with Acrisure's customers will cause Acrisure harm even if such contacts do not immediately or directly result in Defendants writing business for an Acrisure customer and therefore "there is no adequate remedy at law if Employee violates Paragraph 10" (Compl. ¶ 48).

These contractual agreements further support a finding of irreparable harm. *See, e.g., Mktg Displays Int'l v Shaw*, 646 F Supp 3d 897, 907 (ED Mich 2022) (relying on former employee's agreement that a breach of her agreement would cause irreparable injury to the employer), *appeal dismissed and remanded*, 93 F4th 967 (CA 6, 2024); *Two Men & a Truck Int'l, Inc v Rupright*, No. 1:16-CV-23, 2016 WL 8808790, at *2 (WD Mich Jan. 14, 2016) (relying on defendant's agreement that a violation of agreement would constitute irreparable harm in concluding that plaintiff had established irreparable injury) (attached as Attachment F). Accordingly, without a temporary restraining order and preliminary injunction, Acrisure will suffer immediate and irreparable injury. *Acrisure v Ranney*, No 23-05828-CBB (Mich Cir Ct) (Order dated June 21, 2023) (Ackert, J.) (granting temporary restraining order for breach of employee and customer non-solicitation provisions where former Acrisure employee moved to competitor and solicited customers) (attached as Attachment G).

17

**C.**     <u>**The Balance of Equities Favor Acrisure**</u>

The balance of equities weighs heavily in favor of Acrisure and issuing a temporary restraining order and preliminary injunction enjoining Defendants from (i) using or disclosing Acrisure's proprietary and confidential information, (ii) soliciting Acrisure employees to join one of its direct competitors, and (iii) soliciting Acrisure's customers to move their business to Woodruff Sawyer or elsewhere. Injunctive relief preventing Defendants from violating their Employment Agreements will not cause any harm to Defendants; it will simply hold Defendants to their contractual promises under the Employment Agreements for which they were sufficiently compensated. Nor would any injunctive relief somehow jeopardize Defendants' livelihood: they are free to work wherever they see fit so long as they do not solicit Acrisure's employees or customers during the two-year period after their resignation. Acrisure, on the other hand, will be irreparably harmed by the continued loss of customers, goodwill, competitive advantage and the improper use and disclosure of its proprietary and confidential information.

Granting injunctive relief also serves the public interest. Courts hold that "employers have legitimate business interests in restricting former employees from soliciting their customers." *Total Quality*, 332 Mich App at 700, and the legislature determined that employers' confidential information should be protected against unauthorized disclosure. *See* MCL 445.1901 et seq. Public policy also supports "the enforcement of voluntarily assumed contract obligations." *Certified Restoration*, 511 F3d at 551. Requiring Defendants to honor their contractual obligations, particularly where Defendants agreed to the restrictive covenants "in exchange for valuable consideration" they received, furthers that policy. *Neocare*, 2006 WL 198329, at *3 (public policy supported injunction where defendant freely agreed to non-competition clause in exchange for valuable consideration) (Attachment C).

18

## II.   **ACRISURE SHOULD BE GRANTED LIMITED EXPEDITED DISCOVERY**

Acrisure seeks targeted expedited discovery to ensure the preservation of highly relevant evidence that is uniquely in the control of Defendants and non-party Woodruff Sawyer and to develop the record in support of its request for a preliminary injunction. *Acrisure v Ranney*, No 23-05828-CBB (Mich Cir Ct) (Attachment G).  Acrisure's limited requests are: (1) from December 1, 2023 to present, all documents and communications relating to attempts to solicit, encourage, or recruit current or former employees of Acrisure to another entity, including but not limited to Woodruff Sawyer; (2) from December 1, 2023, to present, all documents and communications with Woodruff Sawyer relating to each Defendants', individually or collectively, potential employment and/or employment with Woodruff Sawyer; (3) from December 1, 2023, to present, all documents and communications relating to attempts to solicit, encourage, or recruit current or former customers of Acrisure to another entity, including but not limited to Woodruff Sawyer; (4) all documents and communications relating to any confidential or proprietary information of Acrisure.  These requests are also specified in **Attachment A**.[4]

### **CONCLUSION**

Acrisure respectfully requests that this Court grant its motion for a temporary restraining order in the form attached as **Attachment A**, as well as authorizing expedited discovery in this matter, and thereafter a preliminary and permanent injunction.

---

[4]      The Court should not require Acrisure to post a bond under MCR 3.310(D)(1) because Acrisure has shown a clear entitlement to the requested, narrow injunction and no circumstance of this case necessitates a bond.

Dated: March 22, 2024

WARNER NORCROSS + JUDD LLP

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
James R. Carroll (*pro hac vice forthcoming*)
Christopher G. Clark (*pro hac vice forthcoming*)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

# ATTACHMENT A

**STATE OF MICHIGAN**
**KENT COUNTY CIRCUIT COURT**

ACRISURE, LLC,

        Plaintiff,

v.

MATTHEW KELLY, CHRISTOPHER
IOVINO, ROBERT KEMPNER,
MICHAEL RELLA, ROBERT TRAGER, &
ERIC WAGNER,

        Defendant.

Case No. 24-_____ -CB

Honorable

---

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
James R. Carroll (*pro hac vice* forthcoming)
Christopher G. Clark (*pro hac vice* forthcoming)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

---

**TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**

At a session of said Court, held in the City of Grand Rapids,
County of Kent, State of Michigan, this
_____ day of _____, 2024

PRESENT HONORABLE _____
Circuit Court Judge

This Court has read the Verified Complaint and the Motion for *Ex Parte* Temporary
Restraining Order, Preliminary Injunction and Brief in Support. Based on the foregoing, Plaintiff
does not have an adequate remedy at law and that the actions of Matthew Kelly, Christopher
Iovino, Robert Kempner, Michael Rella, Robert Trager, and Eric Wagner (collectively, the
"Defendants") will cause immediate and irreparable injury to Plaintiff by injuring Plaintiff's
goodwill with customers and employees and by using or disclosing Plaintiff's confidential
information. It is recognized that this Order is entered without notice to prevent immediate and
irreparable harm which would result from the delay required to affect such notice. Therefore,

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

A.    This Order will expire, absent modification or extension by this Court or
stipulation of the Parties, fourteen (14) days from the date of this Order;

B.    Defendants are restrained and enjoined from, directly or indirectly, using,
disclosing, furnishing, or making available Acrisure, LLC's ("Acrisure")
Confidential Information as the term is defined and used in Paragraph 8 of
the Employment Agreements among the Parties;

C.    Defendants are ordered to immediately return all of Acrisure's property and
Confidential Information, as the term is used and defined in Paragraphs 8
and 9 of the Employment Agreements, in Defendants' possession, custody
or control to Acrisure, including all such documents stored electronically;

D.    Defendants are restrained and enjoined from altering, deleting, or otherwise
destroying any information relevant to these proceedings, including without
limitation communications with any individual or entity, correspondence to
Defendants' personal email accounts and/or text message or other
messaging platforms, communications concerning Acrisure's Confidential
Information, as that term is defined in Paragraph 8 of the Employment
Agreements, or communications with Acrisure's employees;

2

E.    Defendants are restrained and enjoined from, directly or indirectly, for themselves or for any other person or entity, contacting or engaging in any communication with any Acrisure or an Affiliated Entity customer or prospective customer for whom Defendants had responsibility before leaving Acrisure to secure business competitive to the products and services provided by Acrisure or Affiliated Entity, as those terms are defined and used in Paragraph 10 of the Employment Agreements;

F.    Defendants are restrained and enjoined from, directly or indirectly, for themselves or for any other person or entity, requesting, advising, or encouraging any customer of Acrisure or of an Affiliated Entity to terminate or curtail its relationship with Acrisure or an Affiliated Entity, or requesting or advising any person or entity to refrain from becoming a customer or supplier of Acrisure or an Affiliated Entity, as those terms are defined and used in Paragraph 10 of the Employment Agreement;

G.    Defendants are restrained and enjoined from, directly or indirectly, for themselves or for any other person or entity, requesting, advising, or encouraging any employee, agent, representative or independent contractor of Acrisure or an Affiliated Entity to terminate his, her, or its relationship with Acrisure or an Affiliated Entity, or requesting or advising any person or entity to refrain from becoming an employee, agent, representative or independent contractor of Acrisure or of an Affiliated Entity or otherwise pursuing, employing or retaining (as an employee, agent, representative or independent contractor or otherwise) any employee, agent, representative or independent contract of Acrisure or of an Affiliated Entity, as those terms are defined and used in Paragraph 10 of the Employment Agreements;

H.    Plaintiff is granted limited expedited discovery and Defendants are directed to produce, no later than seven (7) days after the date of this Order, the following documents: (1) from December 1, 2023, to present, all documents and communications relating to attempts to solicit, encourage, or recruit current or former employees of Acrisure to another entity, including but not limited to Woodruff Sawyer & Co. ("Woodruff Sawyer"); (2) from December 1, 2023, to present, all documents and communications with Woodruff Sawyer relating to each Defendants', individually or collectively, potential employment and/or employment with Woodruff Sawyer; (3) from December 1, 2023, to present, all documents and communications relating to attempts to solicit, encourage, or recruit current or former customers of Acrisure to another entity, including but not limited to Woodruff Sawyer; (4) all documents and communications relating to any proprietary or confidential information of Acrisure.

3

I.     Plaintiff is hereby granted limited expedited discovery and Plaintiff is authorized to serve a document subpoena on Woodruff Sawyer seeking the production of the documents identified in the immediately preceding paragraph; and

J.     Defendants shall appear before this Court on _____, 2024, at _____, or as soon thereafter as counsel may be heard, and show cause, if any there be, why a preliminary injunction shall not issue.

**THIS ORDER DOES NOT RESOLVE THE LAST PENDING CLAIM AND DOES NOT CLOSE THIS CASE.**

IT IS SO ORDERED.

_____

Hon. _____
              Circuit Court Judge

4

# ATTACHMENT B

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

-----------------------------------------------------------------

ACRISURE, LLC,

   Plaintiff,       Case No. 21-09688-CBB

            HON. T.J. ACKERT

vs

ROBERT SMITH and PCF INSURANCE
SERVICES OF THE WEST, LLC
d/b/a PCF INSURANCE SERVICES,

   Defendants.

_____/

OPINION AND ORDER

<u>GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER</u>

   This case involves a Michigan company enforcing contractual provisions precluding a former regional executive vice-president from poaching current employees of the company and using confidential information to engage in targeting acquisition opportunities to expand its agency partners. The former executive, a resident of California, claims he is not bound by the company's contractual provisions because the California labor code prohibits restrictive covenants in employee agreements. The applicable law in Michigan, and not California, applies and the Plaintiff, Acrisure, LLC ("Acrisure") is entitled to the requested temporary restraining order.

   Acrisure is a national insurance broker offering insurance and risk management services to personal and commercial clients. (Plaintiff's Verified Complaint ("PVC"), ¶11). Acrisure is based in Grand Rapids, Michigan with offices throughout the United States. (PVC, ¶12). Like similarly situated companies, Acrisure develops and maintains confidential information and trade secrets, including client lists, acquisition and growth strategies, and employee lists and information. (PVC, ¶¶12-13).

I

Defendant Robert Smith ("Smith") entered into an employment agreement with Acrisure effective May 22, 2015 (the "Employment Agreement") (PVC, ¶20; Affidavit of Robert Smith ("Smith Affidavit"), ¶7). He was employed as a Regional Executive Vice President responsible for supervision over 106 agency partners of Acrisure located throughout Washington, Oregon, California, Alaska, Hawaii, Arizona, Nevada, Utah, Idaho, Montana, Wyoming, and New Mexico. (PVC, ¶¶21-23; Smith Affidavit, ¶¶3-4). The Employment Agreement included, among other provisions, Smith's promise that for a period of 18-months following his leaving the employment of Acrisure he would not, directly or indirectly, solicit for employment any then current employee of Acrisure nor solicit Acrisure acquisition targets existing in the two year period immediately preceding Mr. Smith's resignation from Acrisure (Employment Agreement, Section 8(a); see also, Corrected Acrisure's Brief in Support of Its Motion for Temporary Restraining Order and Preliminary Injunction, pp. 5-6).

Smith resigned from Acrisure on May 7, 2021 (PVC, ¶32; Smith Affidavit, ¶¶11-12). He accepted an offer of employment from Defendant PCF Insurance Services ("PCF") as its President of Agency Operations in which he supervises the PCF operations across the United States (Smith Affidavit, ¶12). Smith admits that shortly after he left Acrisure he began discussing potential job opportunities at PCF with Acrisure employees Charlie Banyai, Colleen O'Hara, and Kristi Landis (Smith Affidavit, ¶13).

In September 2021, Smith travelled to Grand Rapids, Michigan with PCF executives to interview Mr. Banyai, Ms. O'Hara, and Ms. Landis for employment with PCF (Smith Affidavit, ¶15). Mr. Smith and the PCF executives had dinner and drinks with the three target Acrisure employees on September 29, and the formal interviews were conducted on September 30 by the PCF executives (Smith Affidavit, ¶15; Affidavit of Kristi Landis ("Landis Affidavit"), ¶¶13-16). Mr. Smith is careful to point out that he did not directly interview the three employees, and left that task to the PCF executives and PCF's investment partner, HGCC (Smith Affidavit, ¶15).

Mr. Banyai and Ms. O'Hara confirm that Mr. Smith was their introduction to the interview process with PCF, encouraged them to pursue employment with PCF, but indicate that they did not interview directly with Mr. Smith during the PCF interview trip to Grand Rapids on September 29 and 30, 2021 (Affidavit of Charles Banyai ("Banyai Affidavit"), ¶¶10-11; Affidavit of Colleen O'Hara ("O'Hara Affidavit"), ¶¶11-13). However, unlike Mr. Smith and

2

Ms. Landis, neither Mr. Banyai nor Ms. O'Hara disclosed their dinner and drinks with Mr. Smith and the PCF executives on September 29 during the PCF interview trip. PCF successfully hired Mr. Banyai and Ms. O'Hara away from Acrisure following the PCF interview trip to Grand Rapids, Michigan with Mr. Smith but did not secure the transition of Ms. Landis who remains employed by Acrisure.

Mr. Smith's pleadings acknowledge that he was aware of the non-solicitation provisions of his Employment Agreement with Acrisure, that he was not concerned about the applicability of those provisions to him because he believed those provisions were not enforceable against him, and that he engaged in discussions with the three targeted Acrisure employees to secure their employment with PCF. Based on these facts, Acrisure requests the Court to enter a temporary restraining order consistent with the non-solicitation provisions of Section 8 of Mr. Smith's Employment Agreement.

The parties were represented by counsel at the October 27, 2021 hearing on Acrisure's motion for temporary restraining order. After argument, the Court granted Defendants additional time to file responsive pleadings on October 29, 2021, and Acrisure to file a reply brief on November 2, 2021. In addition, the parties filed supplemental notices on November 3, 2021 alerting the Court to an action filed by Defendants against Acrisure in California involving the same claims requesting injunctive protection from the non-solicitation provisions of the Employment Agreement.₁ The parties have thoroughly briefed the issues and submitted evidence by affidavit along with the Employment Agreement.

An injunction is an equitable remedy, not an independent cause of action. *Tarlecki v Stewart*, 278 Mich App 644, 663 (2008). As such, an injunction "represents an extraordinary and drastic act of judicial power that should be employed sparingly and only with full conviction of its urgent necessity." *Davis v Detroit Financial Review Team*, 296 Mich App 568, 613 (2012). Because Plaintiff seeks injunctive relief in the form of a temporary restraining order, it must bear the burden of establishing the relief should be issued. MCR 3.310(A)(4). There are four factors the Court must consider in determining whether to grant injunctive relief:

> "(1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the

---

1 The notices indicate the California court denied the Defendants' requested relief. The Defendants also filed a Motion to Dismiss the Michigan action, and the Court will address this request in a separate opinion and order.

3

> injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued."

*Davis,* 296 Mich App at 614. In analyzing these factors, the Court is reminded that injunctive relief is only appropriate when "there is no adequate remedy at law, and there exists real and imminent danger of irreparable injury." *Id.* at 613-614.

Before engaging in this analysis, the Court must first address the choice of law provision under the Employment Agreement. Section 14(e) of the Employment Agreement provides that all issues and questions concerning the enforcement of the agreement shall be governed by, and construed in accordance with, the laws of the State of Michigan, without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any jurisdiction other than the State of Michigan. Smith argues that California law, and not Michigan law, applies to this action because the California Labor Code, Section 925 ("Section 925") bars employers such as Acrisure from imposing out-of-state choice of law provisions on California employees and gives California employees an "absolute, statutory right" to void an out-of-state choice of law provision. (Brief in Support of Defendants' Opposition to Acrisure's Motion for Temporary Restraining Order and Preliminary Injunction, p. 1).

Michigan public policy favors the enforcement of contractual choice of law provisions. *See generally, Turcheck v Amerifund Financial, Inc,* 272 Mich App 341, 345 (2006). Both parties recognize the Court must balance the expectations of the parties with the interests of the states. In doing so, Michigan looks to Restatement (Second) of Conflicts of Laws §187 in determining whether a contractual choice of law is binding on the parties. *Chrysler Corp v Skyline Induc. Serv.,* 448 Mich 113, 126-127 (1995). The parties' contractual choice of law is binding on the parties unless either: §187(a) "the chosen state has no substantial relationship to the parties or transaction, or when there is no reasonable basis for choosing the state's law," or §187(b) enforcement "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of §188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* In short, the Court must give effect to Section 14(e) of the Employment Agreement unless one of the exceptions applies.

4

Michigan has a substantial relationship with both the parties and the transaction. Acrisure is a Michigan limited liability company with its principal place of business located in Grand Rapids, Michigan. Mr. Smith was part of the executive leadership of Acrisure and throughout his employment reported to the Grand Rapids' executives (PVC, ¶¶21-22). Moreover, Mr. Smith's work was supported by Acrisure's Michigan-based home office support services including accounting, human resources, marketing, information technology, and license and compliance (PVC, ¶27). While Mr. Smith was remotely located in California, he supervised the Michigan company's largest region requiring travel throughout 12 states – not just California - together with travel to Michigan nearly every month for executive meetings. (PVC, ¶¶7, 23-25; Smith Affidavit, ¶4).2 Moreover, Mr. Smith's efforts to solicit the three target employees took place in Michigan with the assistance of the PCF executives.

Mr. Smith and PCF do not seriously challenge Michigan's substantial relationship to the parties and the transaction under Restatement §187(a). Rather, the Defendants' primary focus is on Restatement §187(b), asserting Section 925 embodies a fundamental public policy of the State of California against the enforcement of restrictive covenants against California residents. Defendants direct the Court to *Focus Fin. Partners, LLC v Holsopple*, 241 A.3d 784 (2020) to conclude Section 925 precludes the application of Michigan's choice of law provision because it explicitly voids the Michigan choice of law and establishes that California has a materially greater interest than Michigan with respect to application of its law to this dispute. The facts of *Focus Fin. Partners* are distinguishable.

Unlike the facts in this case, Mr. Holsopple worked primarily in California, the services he performed were primarily in California, and while Mr. Holsopple's former employer was a Delaware company attempting to enforce a Delaware choice of law provision, Mr. Holsopple never worked in Delaware and none of the events giving rise to the dispute took place in Delaware. *Id.* at 792-793, 795-796. More importantly, none of the exceptions to the application of Section 925 applied to Mr. Holsopple, therefore Section 925 controlled the agreement, and the

---

2 Mr. Smith indicates that from February 2020 until his resignation in May 2021, Acrisure had not directed him to travel to Michigan; a reference seemingly meant to imply his ties to the Michigan home office were diminishing as his years of employment with Acrisure increased (Smith Affidavit, ¶6). It also suggests Mr. Smith believes this Court is not aware that a global pandemic initially precluded, and then significantly limited, corporate travel in the United States from March 2020 until early 2021. Mr. Smith's assertions are not rational given our country's shared experience during the pandemic.

5

case was dismissed because Delaware's choice of law did not apply. *Id.* at 814-820.

Although Mr. Smith resides in and has significant contact with California, this does not mean California has a materially greater interest. Mr. Smith performed services in Michigan, was supported by services from the Acrisure's Michigan home office, travelled to Michigan nearly every month, reported to his Michigan based executive team, and the Defendants' efforts to recruit, interview, and offer employment initiated in and took place in Michigan. The Defendants cannot establish that "there is no reasonable basis for choosing Michigan's choice of law." See generally, *Hudson v Mathers*, 283 Mich App 91, 96-97 (2009).

Michigan has expressed a clear policy in favor of reasonable restrictive covenants negotiated by employers and employees, and California has taken an equally clear stance against the application of such policies through choice of law provisions or direct agreements. As such, Acrisure and Mr. Smith had many logical reasons for choosing Michigan law to govern their disputes. Acrisure conducts its business throughout the country and has a strong interest in a "uniform interpretation of employment contracts" to protect its business from "breaches of employment agreements and consequent losses of goodwill." See generally, *Lowry Computer Products, Inc v Head*, 984 F Supp 1111, 113-114 (1997).

This conclusion supporting Michigan choice of law under the Restatement analysis is further supported by the fact that Section 925 does not apply to Mr. Smith by its own terms. First, Section 925 does not apply to a "contract entered into, modified, or extended on or after January 1, 2017. Section 925(2)(f). The effective date of the Employment Agreement was June 22, 2015, and the Employment Period would begin on the Effective Date and end as provided in Section 3 of the Employment Agreement. (Employment Agreement, Section 1). Section 3 creates an indefinite term of the Employment Agreement that will terminate only after a party gives written notice of termination:

> "Employment Period and this Agreement shall terminate on June 22, 2016 (the "Initial Term") and shall automatically renew for successive one (1) year periods (each a "Successive Term") unless either party gives written notice to the other at least 60 calendar days prior to the end of the Initial Term, or at least 60 calendar days prior to the end of any Successive Term, the Employment Period and this Agreement shall not be further extended."

Defendants argue that this language confirms that the Employment Agreement was

6

"extended" each anniversary date from 2015 through 2020, therefore the Agreement was extended after January 1, 2017 and is enforceable. This argument is not persuasive. The Employment Agreement created a continuing and automatic renewal of the agreement, known as an "evergreen clause" that did not require either party to take action to continue the term of agreement, but only to terminate provided the party gives notice to terminate within a prescribed time. *36th District Court v AFSCME Local 917*, 295 Mich App 502, n 4 (2012), *rev'd in part on other grounds*, 493 Mich 879 (2012). Under California law, Section 925 does not apply to agreements that automatically renew and, therefore, "extend indefinitely." *Rockefeller v Perkins Coie, LLP*, 2019 U.S. Dist. LEXIS 42275, *10-11 (C.D. Cal., Jan. 31, 2019). The *Rockefeller* court explained that to "extend a contract is to cause it to be longer or to prolong it; in other words, extending the contract would require the parties to take some action on or after January 1, 2017 to extend it." *Id.* (cleaned up). Because as in this case, the parties were not required to take action to extend the agreement on or after January 1, 2017, Section 925 did not apply. *Id.*

Second, Section 925(a)(1) only prohibits an employment requirement that requires a California employee to "adjudicate outside of California a claim arising in California." Section 925 does not control claims, as in this case, that arise outside of California. *Bromlow v D & M Carriers, LLC*, 438 F. Supp 3d 1021, 1030 (N.D. Cal. 2020); *see also Howmedica Osteonics Corp v Howard*, No. CV1919254SDWLDW, 2020 WL 1102494, at *3 (D.N.J. Jan. 17, 2020). The claim at issue in this case, as noted, arose from activities that took place in Michigan. Accordingly, Section 925 does not apply.

Finally, Section 925(2)(e) does not apply to a contract with an employee who is "individually represented by legal counsel in negotiating the terms of an agreement to designate either the venue or forum in which a controversy arising from the employment contract may be adjudicated or the choice of law applied." The Employment Agreement, under the section entitled "Executive's Representations and Acknowledgements," clearly and unambiguously states, among other things, that Mr. Smith "consulted with independent legal counsel regarding his rights and obligations under this Agreement and that he fully understands the terms and conditions herein and intends for such terms and conditions to be binding and enforceable" against him. (Employment Agreement, Section 10(iv)).

Mr. Smith now claims his representations and acknowledgements were not accurate. In

7

his affidavit offered in support of his opposition to Acrisure's motion, Mr. Smith explains that he did not have an attorney to review the Employment Agreement or provide him advice regarding the Employment Agreement. (Smith Affidavit, ¶7). Mr. Smith is offering parol evidence to indicate that his representations in the Employment Agreement did not accurately represent the understanding of the parties that, in fact, he was not represented by counsel prior to and at the time of execution of the agreement. Such an offer is impermissible under Michigan law.

The Employment Agreement includes an integration clause that confirmed the agreement embodied "the complete agreement and understanding among the parties and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter" of the Employment Agreement. (Employment Agreement, Section 14(b)). Parol evidence is not admissible to contradict an explicit integration clause. *UAW-GM v KSL Recreation Corp*, 238 Mich App 486, 507-508 (1998). Defendants have not alleged fraud which would invalidate the integration clause itself. *See generally, Tocco v Tocco*, 409 F. Supp 816, 828 (2005). Accordingly, by its own terms, the Employment Agreement invalidates the applicability of Section 925 because Mr. Smith represented that he was represented by counsel.

The Defendants' arguments that Michigan's choice of law provision does not apply to this contract is not supported by the facts and law. The Court will now analyze the four factors identified above that must be considered in determining whether to grant a temporary restraining order.

Likelihood of Success on the Merits:

Plaintiff's fundamental claim against Mr. Smith is breach of contract. That claim requires proof that "(1) there was a contract, (2) which the other party breached, (3) thereby resulting in damages to the party claiming the breach." *Miller-Davis Co v Ahrens Construction, Inc*, 495 Mich 161, 178 (2014). Mr. Smith admits that he breached the terms of the non-solicitation provision of the Employment Agreement. He resigned from Acrisure in May 2021, accepted an offer of employment from PCF and almost immediately began targeting Mr. Banyai, Ms. O'Hara, and Ms. Landis regarding their interest in leaving Acrisure and joining PCF. Ms. Landis ultimately did not "jump ship" and is the proverbial "fox in the hen house" describing how Mr. Smith encouraged Ms. Landis to contact PCF's recruiter who worked with HGGC, an investment

8

partner of PCF. And that Ms. Landis did not reach out to the recruiter but the recruiter contacted her to discuss her opportunities with the company which ultimately led to the interviews on September 29 and 30, 2021 in Grand Rapids, Michigan (Landis Affidavit, ¶¶8-28).

Mr. Smith coordinated the contacts with the three target Acrisure employees, encouraged discussions with the three employees, and accompanied PCF and the recruiters to Grand Rapids for the interviews on September 29 and 30, 2021. Mr. Smith, Mr. Banyai, and Ms. O'Hara state that Mr. Smith did not interview on behalf of PCF but there is no doubt that Mr. Smith attended the dinner and drinks involving the three target employees and PCF. The Court can reasonably infer that dinner and drinks during a recruiting trip is part and parcel of the interview process, and the suggestion otherwise by Mr. Smith and PCF is not credible.

This conduct by Mr. Smith is in direct violation of his non-solicitation provision. The fact Mr. Smith succeeded, in conjunction with the efforts of PCF, to lure Mr. Banyai and Ms. O'Hara away from Acrisure causes damage to Acrisure's goodwill and ability to retain its workforce, and establishes an intent to solicit other employees of Acrisure.

The non-solicitation provision is enforceable. Even under MCL 445.774a(a)(1) the provision is reasonable as to duration, geographical area, and the line of business, and is intended to protect Acrisure's reasonable competitive business interests. The non-solicitation is for 18 months from when Mr. Smith left Acrisure. Mr. Smith was an executive level vice-president supervising the largest regional division of Acrisure and worked with many employees throughout the Acrisure organization. Restrictive covenants for highly placed executives up to three years have been found reasonable. *See generally, Whirlpool Corp v Burns*, 457 F. Supp 2d 806, 813 (W.D. Mich. 2006); *Total Quality, Inc v Fewless*, 332 Mich App 681, 700 (2020), *appeal denied* 956 N.W. 2d 190 (2021) (affirming trial court's finding that a two-year non-solicitation provision was reasonable as to former founders/executives of the company). The 18-month period is reasonable given Mr. Smith's executive level of supervision and exposure to the breadth of Acrisure's insurance services employees.

The non-solicitation provision is tailored to protect the reasonable interests of Acrisure in the competitive insurance industry but not preclude Mr. Smith from working within the industry. Mr. Smith can hire former employees of Acrisure but not employees that were employed at the time of his resignation. *Coates v Bastian Bros, Inc*, 276 Mich. App. 498, 506-507 (2007). The

9

fact that the non-solicitation does not include a geographical duration does not defeat the reasonableness of this provision because while Mr. Smith can work, he is not allowed to solicit employees that were employed at the time of his departure. *See Safeharbor Mgt Group, LLC v Huston*, No. 1:20-CV-924, 2020 WL7641822, at *5 (W.D. Mich, October 26, 2020).

Similarly, Mr. Smith is enjoined from soliciting acquisition prospects when acting in concert with PCF. Mr. Smith has shown a propensity to ignore the restrictive covenants of his Employment Agreement relating to soliciting employees, and the Court need not wait to protect Acrisure's business interests until there is a specific instance of solicitation by Mr. Smith in concert with PCF. Mr. Smith and PCF's actions indicate they can reasonably be considered willing and capable of breaching the non-solicitation of acquisition prospects.

However, the Employment Agreement proscribes solicitation of acquisition targets that arose during the two years immediately preceding Mr. Smith's retirement. The Court can modify a provision to limit the agreement when it is otherwise found to be unreasonable. MCL 445.774a(1). The Court believes an 18-month period is reasonable for the same reasons as stated above. Additionally, 18 months would be less than a third of the period Mr. Smith served as an executive vice president and this is sufficient to protect the business interests of Acrisure based on the most recent acquisition discussions that presumably could still be of interest to Acrisure. After 18-months the Court believes the acquisition interest would have subsided or the target is in the process of closing a transaction with Acrisure and would not likely change directions.

Acrisure is also likely to succeed on the merits of its tortious interference claim against PCF. The elements of tortious interference with contract require existence of a contract, a breach, and unjustified instigation of the breach by the defendant. *Badiee v Brighton Area Schools*, 265 Mich App 343, 366 (2005). On the first two elements, the Court's analysis has confirmed a likely breach of the Employment Agreement.

The third element requires an "intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights of another. *Id.* at 367. Malice may be inferred from the wrongful act of inducing a breach of the contract, and it is no defense to claim that the offending party did not act out of ill-will but solely to improve its own economic position at the expense of a competitor. *See generally, Tata Consultancy Services v Sys Intern, Inc*, 31 F. 3d 416, 425 (6th Cir. 1994). PCF worked in concert

10

with Mr. Smith and knew that the three targeted employees were current employees that were not to be solicited under the Employment Agreement. PCF does not allege it was not aware of the non-solicitation provisions in Mr. Smith's Employment Agreement. In fact, the affidavits of the PCF employees suggest that Mr. Smith did not formally interview the employees during the trip to Grand Rapids in an effort to distance PCF from concerted action with Mr. Smith. The facts preponderate to PCF acting in concert with Mr. Smith and it is likely that Acrisure will succeed on the merits of its tortious interference claim against PCF.

Likelihood of Irreparable Harm:

Michigan law regards the likelihood of irreparable harm as an indispensable element of any request for injunctive relief. *Michigan Coalition of State Employee Unions v Civil Service Comm'n*, 465 Mich 212, 225 (2001). Moreover, a "mere apprehension of future injury or damage cannot be the basis for injunctive relief." *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 9 (2008). Mr. Smith admits that his job duties and responsibilities at PCF are to attract, recruit, and hire talent, and if he is restrained from doing these tasks successfully, it will "negatively impact" his job performance and the performance of PCF. (Smith Affidavit, ¶18). Both Mr. Smith and PCF are motivated to secure new talent and Acrisure is aware of other solicitations through Linkedin of other current Acrisure employees. (PVC, ¶¶41-42). The unlawful solicitation of employees has been recognized as a harm for which monetary damages are difficult to calculate and support the entry of an injunction. *See Certified Restoration Dry Cleaning Network, LLC v Tenke Corp*, 511 F.3d 535, 550 (6th Cir 2007). This factor favors the Plaintiff.

Balancing of the Harms:

In considering injunctive relief, the Court must balance the potential harm to each side in the presence or absence of an injunction. *Davis*, 296 Mich at 613. While PCF and Mr. Smith will not be harmed in their current market by waiting 18-months to solicit Acrisure employees, Acrisure will be harmed from the inability to retain talent. Maintaining the current status quo through an injunction protects the current interests of the parties as contemplated by the Employment Agreement. This factor favors the Plaintiff.

Harm to the Public Interest:

The Court must consider the possibility of harm to the public interest that may result from

11

an injunction. The Court sees no significant threat to anyone other than the parties by entering the injunction or denying the injunction. Acrisure suggests that employee mobility will be harmed but this is a highly competitive industry and employees are not precluded from seeking employment with insurance services companies other than PCF. The public interest in enforcing agreements as written is preserved, and there is no public interest that will be unreasonably injured by this injunction. This factor is neutral.

Based on the preponderance of the evidence set forth in this opinion, the Court orders a temporary restraining order in favor of Acrisure and against Mr. Smith and PCF, and any person or entity acting with or in participation with Mr. Smith. *See*, MCR 3.310(c)(4).  The Court has entered the proposed Temporary Restraining Order prior to completion of, and consistent with, this Opinion and Order to quickly inform the parties of the temporary restraining order without delay of the preparation of this final opinion. The Court will schedule a status conference with counsel for the parties to discuss the scope of discovery and schedule the preliminary injunction hearing. The Court intends to provide a limited time for discovery prior to the hearing to ensure a prompt resolution of this matter. The Court shall issue a separate order with the date of the preliminary injunction hearing. The Court has not been presented with any basis to require Acrisure to post a bond in this matter, and the Court will not require the posting of a bond. MCR 3.310(D)(1).

**IT IS SO ORDERED.**

November 4, 2021

Hon. T. J. Ackert, Circuit Judge

# ATTACHMENT C

Neocare Health Systems, Inc. v. Teodoro, Not Reported in N.W.2d (2006)

2006 WL 198329, 2006-1 Trade Cases P 75,136

2006 WL 198329

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

NEOCARE HEALTH SYSTEMS, INC, Plaintiff-Appellees,

v.

Mercedes TEODORO, Defendant-Appellant.

No. 255558.
|
Jan. 26, 2006.

Before: MURRAY, P.J., and JANSEN and KELLY, JJ.

[UNPUBLISHED]

PER CURIAM.

*1 Defendant appeals as of right from the denial of her motion for summary disposition pursuant to MCR 2.116(C)(8) and subsequent jury verdict in favor of plaintiff. We affirm.

Plaintiff filed the instant action alleging that defendant, a registered nurse previously employed by plaintiff, agreed to a noncompetition provision as a condition of her employment with plaintiff, which she breached by soliciting plaintiff's patients and/or rendering treatment to them on behalf of her own home health care company. The noncompetition provision at issue provides:

The employee understands that the patients he/she will be rendering services to are patients of [plaintiff]. The employee understands that [plaintiff] has a legitimate business reason for maintaining relationships with patients. As such, in the event that the employee's employment with [plaintiff] ends or is terminated (for any or no reason), employee agrees that for a period of 5 years (measured from the employee's last date of actual employment with [plaintiff] ) that the employee will

not solicit any patients of [plaintiff] (including, but not limited to patients treated by the employee), nor will the employee render any home health or related health care services to any patients or former patients of [plaintiff] (as an employee of another agency, as an independent contractor, as a self employed person, or through a corporation, partnership or any other business enterprise). Given the unique nature of the home health business, the employee agrees that this is a reasonable restriction.

Defendant filed a motion for summary disposition pursuant to MCR 2.116(C)(8) asserting, among other things, that this provision was precluded by 42 USC 1395(a), which provides that a Medicare beneficiary may seek services from any Medicare qualified provider; that it was overbroad and, therefore, was unenforceable under Michigan law; and that enforcement of the provision was precluded by public policy. In response, plaintiff argued that the noncompetition provision was not precluded by 42 USC 1395(a), which allows a Medicare provider the discretion to decline to treat a recipient and was not overly broad or void as against public policy; plaintiff attached documents and deposition testimony to this response, to establish that defendant solicited and treated several of plaintiff's patients in violation of the noncompetition provision. The trial court denied defendant's motion, concluding that the agreement was not precluded by 42 USC 1395(a), and that it had no information that the noncompetition provision was out of line with reasonable noncompete clauses in the industry or otherwise indicating that the agreement would prevent defendant from continued employment as a home health care nurse.

On appeal, defendant argues that the trial court erred in denying her motion for summary disposition pursuant to MCR 2.116(C)(8). We disagree.

This Court reviews the trial court's denial of defendants' motion for summary disposition de novo. *Adair v. State,* 470 Mich. 105, 119; 680 NW2d 386 (2004). A motion for summary disposition pursuant to MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the pleadings alone to determine whether the plaintiff has stated a claim on which

Neocare Health Systems, Inc. v. Teodoro, Not Reported in N.W.2d (2006)

2006 WL 198329, 2006-1 Trade Cases P 75,136

relief can be granted. *Beaudrie v. Henderson*, 465 Mich. 124, 129; 631 NW2d 308 (2001); *Alan Custom Homes, Inc v. Krol*, 256 Mich.App 505, 507; 667 NW2d 379 (2003). All factual allegations in support of the claim are accepted as true and, together with any reasonable inferences or conclusions which can be drawn from them, they are construed in a light most favorable to the nonmoving party. *Adair, supra* at 119; *Alan Custom Homes, supra* at 508. The motion should be granted only when the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. *Adair, supra* at 119.

**\*2** MCL 445.774a(1) provides that:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent that any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

Thus, "[a]n employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business." MCL 445.774a(1); *Bristol Window and Door, Inc v Hoogenstyn*, 250 Mich.App 478, 485-486; 650 NW2d 670 (2002). Agreements not to compete in employment situations are permissible as long as they are reasonable. *Thermatool Corp v. Borzym*, 227 Mich.App 366, 372; 575 NW2d 334 (1998). As noted in *Superior Consulting, Co, Inc v. Walling*, 851 F Supp 839, 847 (ED Mich.1994), to be enforceable under Michigan law, a noncompetition provision must be tailored such that the scope of the agreement, considering duration, geographical area and type

of employment or line of business restricted, is no greater than reasonably necessary to protect the employer's reasonable business interests. Thus, we must determine whether a provision that restricts defendant from soliciting or providing "home health or related health care services" to plaintiff's current or former patients for a period of five years reasonably protects plaintiff's legitimate business interest in protecting its patient base.

Defendant argues that the noncompete agreement is overbroad as to duration, line of business, and geographic area. Contrary to defendant's characterization, however, the provision does not restrict her ability to seek employment or to engage in any line of business; defendant is free to engage in any line of business she so chooses, including a full range of home health care services so long as she does not solicit or treat plaintiff's patients and former patients. The agreement clearly permitted defendant to work as a home health care nurse, and allowed her to provide any non-health care services to anyone of her choosing, including plaintiff's patients and former patients. Therefore, we conclude that for purposes of MCR 2.116(C)(8) review the provision is not overbroad with regard to type of employment or line of work.

Further, the fact that the provision contains no geographic limitation does not render it unreasonable under the circumstances. Because defendant was not prevented from any employment or from engaging in any line of business, no geographic limitation was necessary. The noncompetition provision requires that defendant not treat plaintiff's patients; defendant remains free to treat anyone else, any where at any time, and was permitted to, and did, open her own competing company in proximity to plaintiff's place of business. Thus, as noted by the trial court, absent a showing that plaintiff occupied such a large share of the home health care market so as to greatly reduce the number of patients available to defendant, we find no basis for concluding that the agreement was unreasonable as a matter of law because it did not provide a specific geographic limitation.

**\*3** Defendant also challenges the duration of the agreement, asserting that five years is unreasonable as a matter of law. However, defendant does not provide this Court with any authority indicating that a five-year duration is patently unreasonable. Rather, whether the duration of the provision was reasonable is to be determined based on the nature of the industry and the scope of the restraint on plaintiff's activities. MCL 445.774a Given the nature of the home healthcare industry, plaintiff's employees are necessarily in the position

**Neocare Health Systems, Inc. v. Teodoro, Not Reported in N.W.2d (2006)**

2006 WL 198329, 2006-1 Trade Cases P 75,136

to develop personal relationships with plaintiff's patients when treating them on plaintiff's behalf and, as apparently was done in this case, can easily solicit plaintiff's patients for a competing entity while still employed by plaintiff. In this context, we find that the noncompetition provision at issue was appropriately limited to reasonably protect plaintiff's interest in its patient base. The provision allowed defendant to continue employment as a home health care nurse and even permitted her to open her own home health care business in the same geographic vicinity as plaintiff. Defendant has presented nothing indicating that this noncompete provision was out of line with reasonable noncompete clauses within the home health care industry, nor that it would preclude defendant from otherwise practicing as a home health care nurse. Thus, we concur with the trial court that the agreement was not unreasonable as a matter of law. [1]

[1]    We note that defendant also argues that the trial court improperly found that the noncompete agreement was reasonable as a matter of law. However, defendant did not properly raise this issue. At trial, the trial court noted that there was no question as to whether the noncompete provision constituted an unfair restraint on trade because the issue had already been decided during the motion for summary disposition. Thus, the trial court limited the question on this claim to damages. Defendant did not dispute this at trial, but raised it for the first time in a motion for reconsideration after the verdict. Reversible error must be that of the trial court, and not error to which the aggrieved party contributed by plan or negligence. *Smith v. Musgrove,* 372 Mich. 329, 337; 125 NW2d 869 (1964); *Muci v State Farm Mutual Automobile Ins Co,* 267 Mich.App 431, 442-443; 705 NW2d 151 (2005). To preserve most issues, a party must object below. *Tringali v. Lal,* 164 Mich.App 299, 306; 416 NW2d 117 (1987). Objections must be timely, and specify the same ground for challenge as the party seeks to assert on appeal. *Klapp v United Ins*

*Group Agency (On Remand),* 259 Mich.App 467, 475; 674 NW2d 736 (2003). Because defendant by either plan or negligence failed to object at a proper time, we find no reversible error. Further, we find that the trial court did not abuse its discretion in denying defendant's motion for reconsideration when defendant presented no reasons as to why she waited until after the verdict to raise this issue. See *Detroit Chief Financial Officer v Detroit Policemen & Firemen Retirement Sys Bd of Trs,__ Mich.App __; __ NW2d __* (Docket No. 254516, issued January 12, 2006) at slip op, pp 15-16.

Defendant also argues that the noncompete provision is invalid as a matter of public policy because it infringes upon a patient's right to choose a provider as set forth in 42 USC 1395(a). We disagree. 42 USC 1395(a) allows a patient to choose their health care provider, so long as that provider agrees to provide service to the patient; it does not give the patient an absolute right to the provider of their choosing, but allows providers to decline to undertake the provision of services. Thus, 42 USC 1395(a), does not conflict with state law that allows for reasonable noncompetition agreements. Further, we agree with the trial court that 42 USC 1395(a) addresses a patient's right to choice-not a provider's freedom to treat-and any complaints resulting from restrictions imposed by the noncompetition agreement belong to the patients and not to defendant. That is, having agreed to the noncompetition agreement in exchange for valuable consideration, defendant should not now be heard to claim that the agreement is void as between the parties because it restricts the rights of other, nonparties to choose defendant as their home health care provider.

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2006 WL 198329, 2006-1 Trade Cases P 75,136

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT D

University of Michigan Regents v. Valentino, Not Reported in N.W. Rptr. (2020)
2020 WL 7759669

2020 WL 7759669
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

UNIVERSITY OF MICHIGAN
REGENTS, Plaintiff-Appellant,
v.
Victor P. VALENTINO, Defendant-Appellee.

No. 349942
|
December 29, 2020

Washtenaw Circuit Court, LC No. 16-001122-CK

Before: Letica, P.J., and Fort Hood and Gleicher, JJ.

**Opinion**

Per Curiam.

*1 Plaintiff appeals as of right the judgment of the trial court permitting defendant to retain money as an attorney fee from no-fault insurance benefits paid on behalf of his client, Larry Reed. Plaintiff contends on appeal that the trial court misunderstood the Michigan Supreme Court's remand order in this case, that the trial court erred in summarily dismissing plaintiff's claim of conversion against defendant, and that the trial court erred in concluding that defendant had a valid charging lien that attached to the funds at issue. We reverse and remand for proceedings consistent with this opinion.

I. FACTUAL AND PROCEDURAL BACKGROUND

In a former appeal, we briefly summarized the relevant facts as follows:

Larry Reed was catastrophically injured in an automobile accident. He was transported to the University of Michigan hospital, where he stayed for a lengthy period and was given medical treatment. Reed had a valid no-fault insurance policy with the American Automobile Association (AAA).

Victor Valentino, a personal-injury attorney and the principal of defendant, met with Reed in the hospital. Reed retained defendant to assist him with his no-fault insurance claim. Defendant's retainer for representation included a one-third contingency fee "of the net recovery ... received through suit, settlement, or in any other manner." Defendant wrote to AAA asserting an attorney's lien on the proceeds of the no-fault insurance claim.

Plaintiff began sending medical bills to AAA, and AAA initially sent payment for those bills directly to plaintiff. Upon being reminded of defendant's attorney's lien, AAA then began forwarding payments for healthcare expenses to defendant, using two-party checks listing both plaintiff and defendant as payees. One check in particular was for $280,953.99 (Check 18). Defendant tried to negotiate with plaintiff for a reduced amount for payment of Reed's medical bills, with the intention that defendant would retain the remainder as its attorney fee pursuant to its contingency-fee agreement with Reed. Plaintiff indicated that it expected full payment of its bills.

Plaintiff then filed a five-count complaint alleging conversion, tortious interference with a contract, claim and delivery, declaratory relief, and injunctive relief. After plaintiff initiated the lawsuit, defendant sent plaintiff a check for two-thirds of Check 18, retaining one-third of the amount as its attorney fee.

Defendant then filed a motion for summary disposition. The trial court granted defendant's motion, finding that plaintiff had no right to the payments from AAA and had no cause of action against defendant. [*Univ. of Mich. Regents v. Valentino*, unpublished per curiam opinion of the Court of Appeals, issued May 29, 2018 (Docket No. 339198), pp. 1-2, rev'd 503 Mich. 986 (2019).]

Plaintiff appealed to this Court arguing "that defendant had no right to the no-fault payments made by AAA because plaintiff was entitled to the insurance proceeds." *Id.* at 2. This Court concluded that *Covenant Med. Ctr., Inc. v. State Farm*, 500 Mich. 191; 895 N.W.2d 490 (2017), was dispositive, and that according to *Covenant*, "the no-fault act does not refer to, or even contemplate, allowing a healthcare provider to have a statutory entitlement to no-fault insurance proceeds." *Id.* This Court noted that plaintiff had no actual claim to the insurance proceeds under the no-fault act, that Reed was the only person entitled to the proceeds as the injured party, and that plaintiff

University of Michigan Regents v. Valentino, Not Reported in N.W. Rptr. (2020)

2020 WL 7759669

could still pursue the remainder of Reed's medical bills from him directly. *Id.*

**\*2** Shortly thereafter, plaintiff appealed to our Supreme Court, who vacated this Court's opinion. *Univ. of Mich. Regents v. Valentino*, 503 Mich. 986, 986 (2019). Our Supreme Court noted:

> The Court of Appeals found this Court's decision in *Covenant* ... "dispositive." *Covenant* held that a healthcare provider possesses no statutory cause of action against an insurer for recovery of PIP benefits. Plaintiff is a healthcare provider. But the plaintiff is not seeking payment from an insurance provider for no-fault benefits under a statutory no-fault theory. Rather, the plaintiff's complaint alleges a common-law tort—conversion—against the defendant, an attorney, based on the defendant's retention of one-third of the funds from a check that was made directly to *both* plaintiff and defendant. Although a healthcare provider has no statutory cause of action against an insurer to compel payment under the no-fault act, the act permits insurers to directly pay healthcare providers on the insured person's behalf. MCL 500.3112. The insurer did so here. "[I]f an instrument is payable to 2 or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced *only by all of them.*" MCL 440.3110(4) (emphasis added). Thus, the plaintiff, as joint payee, had a right to control the funds. *Covenant* is not dispositive on the question presented here. We REMAND this case to the Washtenaw Circuit Court for further proceedings not inconsistent with this order. [*Valentino*, 503 Mich. at 986 (second alteration in original).]

On remand, the trial court again dismissed plaintiff's claim of conversion, noting that, by placing the funds in his IOLTA account, there was no evidence that defendant ever intended to wrongfully retain any portion of the funds at issue. The court also held, however, that the remand order from the Supreme Court required it to issue a judgment in favor of plaintiff. The court thus entered an order requiring defendant pay the $98,443.07 that remained in his IOLTA account. However, following motions for reconsideration from both parties, the trial court affirmed its dismissal of plaintiff's claim of conversion [1] but reversed its decision to award the disputed money to plaintiff on the basis of a finding that defendant had a valid and enforceable charging lien that attached to the money. The trial court then ordered that defendant could keep the money as an attorney fee for his services. This appeal followed.

The court noted that it may have created confusion by referring to defendant's intent in its initial order because intent is not an element of conversion. Notwithstanding, the court maintained that none of defendant's actions were wrongful, and thus plaintiff did not have a valid claim.

## II. STANDARDS OF REVIEW

The trial court dismissed plaintiff's conversion claim on the basis of defendant's original motion for summary disposition made under MCR 2.116(C)(10). "We review de novo a circuit court's resolution of a summary disposition motion." *Spectrum Health Hosps. v. Mich. Assigned Claims Plan*, 330 Mich. App. 21, 30; 944 N.W.2d 412 (2019). "Summary disposition is appropriate under Subrule (C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quotation marks and citation omitted). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v. Taylor*, 263 Mich. App. 618, 621; 689 N.W.2d 506 (2004). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Spectrum*, 330 Mich. App. at 31 (quotation marks and citation omitted).

**\*3** The trial court's additional determinations regarding the charging lien and priority of claim to the funds at issue were made on the basis of the parties' motions for reconsideration. "We review a trial court's decision on a motion for reconsideration for an abuse of discretion." *Woods v. SLB Prop. Mgt., LLC*, 277 Mich. App. 622, 629; 750 N.W.2d 228 (2008). "An abuse of discretion occurs if the trial court's decision falls outside the range of principled outcomes." *Macomb Co. Dep't of Human Servs. v. Anderson*, 304 Mich. App. 750, 754; 849 N.W.2d 408 (2014). We also review the trial court's decision to impose an attorney's lien for an abuse of discretion. *Reynolds v. Polen*, 222 Mich. App. 20, 24; 564 N.W.2d 467 (1997). However, "[w]hether a lien is authorized in a particular case is a question of law" that we review de novo. *Ypsilanti Charter Twp. v. Kircher*, 281 Mich. App. 251, 281; 761 N.W.2d 761 (2008).

### III. THE REMAND ORDER

As a preliminary matter, plaintiff first contends that the trial court's decision to award the funds at issue to defendant was inconsistent with the Michigan Supreme Court's remand order. We disagree.

Plaintiff contends that the trial court violated the order by basing its decision on *Covenant Med. Ctr., Inc. v. State Farm*, 500 Mich. 191; 895 N.W.2d 490 (2017), which the Supreme Court expressly held was inapplicable to the case. However, it is clear from the trial court's opinion and order that its decision was not based on *Covenant*, but rather on the trial court having determined that defendant had a valid charging lien that had attached to the funds. Plaintiff also asserts that, by vacating this Court's decision affirming the trial court, the Supreme Court necessarily intended to grant a judgment in favor of plaintiff. This reasoning lacks merit. If the Supreme Court felt that plaintiff was legally entitled to the funds at issue, the Court would have said so. Instead, the Court remanded to the trial court for further proceedings. *Valentino*, 503 Mich. at 986.

### IV. CONVERSION

Plaintiff contends that the trial court erred in dismissing its claims of common law and statutory conversion against defendant. We agree.

"Under the common law, conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 497 Mich. 337, 346; 871 N.W.2d 136 (2015) (quotation marks and citation omitted). "While the tort of conversion originally required a separate showing that the converter made some use of the property that amounted to a total deprivation of that property to its owner, by the twentieth century common-law conversion more broadly encompassed *any* conduct inconsistent with the owner's property rights." *Id.* at 353 (emphasis added). In Michigan, our Supreme Court adopted the Restatement of Torts, which exemplified when common law conversion can be said to have occurred:

"A conversion may be committed by

(a) intentionally dispossessing another of a chattel,

(b) intentionally destroying or altering a chattel in the actor's possession,

(c) using a chattel in the actor's possession without authority so to use it,

(d) receiving a chattel pursuant to a sale, lease, pledge, gift or other transaction intending to acquire for himself or for another a proprietary interest in it,

(e) disposing of a chattel by sale, lease, pledge, gift or other transaction intending to transfer a proprietary interest in it,

(f) misdelivering a chattel, or

(g) refusing to surrender a chattel on demand." [*Id.* at 352, quoting *Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 438; 104 N.W.2d 360 (1960).]

**\*4** "The common law secures th[e] right to personal property by allowing someone wrongfully deprived of his or her own property to recover either that property or monetary damages, or both, for the wrongful deprivation." *Aroma Wines*, 497 Mich. at 348. Notably, however, "[t]o support an action for conversion of *money*, the defendant must have an obligation to return the specific money entrusted to his care." *Head v. Phillips Camper Sales & Rental, Inc.*, 234 Mich. App. 94, 111; 593 N.W.2d 595 (1999) (emphasis added). This Court has determined that cashing a check can satisfy the "specific money" requirement. "An action for conversion lies where an individual cashes a *check* and retains the full amount of the check when he is entitled to only a portion of that amount." *Citizens Ins. Co. of America v. Delcamp Truck Ctr., Inc.*, 178 Mich. App. 570, 576; 444 N.W.2d 210 (1989).[2]

2    MCL 440.3420(1) provides:

The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (*i*) the issuer or acceptor of the instrument or (*ii*) a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.

University of Michigan Regents v. Valentino, Not Reported in N.W. Rptr. (2020)

2020 WL 7759669

With specific regard to subsection *(ii)*, we note the Uniform Commercial Code Comment, which provides that "[i]f a check is payable to more than one payee, delivery to one of the payees is deemed to be delivery to all of the payees." MCL 440.3420, UCC Comment 1.

Statutory conversion is codified at MCL 600.2919a, which provides:

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

(b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

Unlike modern, common-law conversion, statutory conversion always requires "that the conversion was to defendant's 'own use,' " which in turn means that the property "must be used for a purpose personal to the converter." *Aroma Wines,* 497 Mich. at 356-358. " '[T]o the other person's own use' requires a showing that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Id.* at 358-359.

In this case, the trial court initially held on remand that plaintiff's conversion claim lacked merit because there was no evidence that defendant ever intended to wrongfully retain any portion of the funds at issue. Following plaintiff's motion for reconsideration, wherein plaintiff noted that intent was not an element of conversion, the trial court restated its conclusion as having been that both common law and statutory conversion require a "wrongful" act of dominion over the property of another, and that defendant committed no such wrongful act. Irrespective of defendant's intent, the court found nothing wrongful about his action of depositing the check at issue into his IOLTA account.

**\*5** First, with respect to statutory conversion, the parties dispute whether defendant's deposit of the check into his IOLTA account satisfies the requirement that a defendant convert the check proceeds to its "own use." Our Supreme Court has explained that to fulfil this element of statutory conversion under MCL 600.2919a(1)(a), a plaintiff "must show that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines,* 497 Mich. at 359. This is a "broad" definition. *Id.* In *Aroma Wines,* the Supreme Court noted that a jury could reasonably determine that the defendant used the converted property—wine, in that case—as "leverage" against the plaintiff in the parties' underlying feud regarding the payment of storage fees. *Id.* at 361.

So too here. Although we reject plaintiff's suggestion that defendant intended an "extortion," the evidence supports that by placing the money in his IOLTA account, defendant intended to gain an advantage over plaintiff. Another way of putting this is that plaintiff has created a fact question regarding whether defendant intended to use the money in the IOLTA account as leverage to gain a share for himself. [3] We take no position in this regard other than to find that a question for the jury exists. As in *Aroma Wines,* plaintiff has alleged facts that if accepted by a jury, could confirm that defendant converted the proceeds of the check to his own use.

3   A bird in the hand is said to be worth two in the bush. With the proceeds in his account, defendant positioned himself to claim an entitlement to at least some of the money as the result of what he claimed was a valid attorney fee lien. And although the account into which defendant deposited the finds is a form of trust account, defendant directed and controlled the disposition of the funds within it.

Material issues of fact also exist regarding whether defendant's act of depositing the check itself into his IOLTA account constituted an act of common-law conversion. The Supreme Court has directed us to MCL 440.3110(4), which provides:

If an instrument is payable to 2 or more persons alternatively, it is payable to any of them and may be negotiated, discharged, or enforced by any or all of

Case 1:24-cv-00318-JMB-PJG   ECF No. 1,  PageID.152   Filed 03/27/24   Page 152 of 214

University of Michigan Regents v. Valentino, Not Reported in N.W. Rptr. (2020)
2020 WL 7759669

them in possession of the instrument.
If an instrument is payable to 2 or more
persons not alternatively, it is payable
to all of them and may be negotiated,
discharged, or enforced only by all of
them. If an instrument payable to 2
or more persons is ambiguous as to
whether it is payable to the persons
alternatively, the instrument is payable
to the persons alternatively.

Defendant's own testimony provides that the check at issue
was payable to both plaintiff *and* defendant, not alternatively.
Michigan caselaw provides that "[w]hen the word 'and'
separates the names of two payees on an instrument, the
instrument is payable jointly and not alternatively." *Pamar
Enterprises, Inc. v. Huntington Banks of Mich.*, 228 Mich.
App. 727, 732; 580 N.W.2d 11 (1998). Defendant further
conceded that he had neither permission nor an endorsement
from plaintiff to deposit the check because defendant did
not feel either were needed. Accordingly, defendant's own
testimony suggests that he violated MCL 440.3110(4) when
he deposited the check into his IOLTA account without
plaintiff's authorization, and thus an argument could be made
that defendant wrongfully exerted his dominion over the
property to the exclusion of plaintiff's rights.

Notably, had plaintiff only alleged that defendant converted
the *money* at issue, we are admittedly less confident a claim
of common-law conversion could stand. See *Head*, 234 Mich.
App. at 111 (explaining that an action for common-law
conversion of money requires the defendant to have had "an
obligation to return the specific money entrusted to his care").
However, defendant engaged in a different act: he apparently
negotiated a check that he was legally not authorized to
negotiate on his own, as the check was made out to two payees
and required two signatures. See MCL 440.3420. In *Trail
Clinic, P.C. v. Bloch*, 114 Mich. App. 700, 705; 319 N.W.2d
638 (1982), we observed that "[c]hecks are considered to be
the property of the designated payee and may be the subject
of a suit for conversion." Where there are two payees, a check
is the property of both, and is converted if only one payee
endorses and deposits it.

*6 Moreover, even had defendant properly deposited the
check in his IOLTA account, we discern no right on
defendant's part to *deliver* the money to himself. Absent
a valid attorney's lien, which we conclude below was not

present in this case, defendant was not entitled to keep any of
the funds in this case in an account under his sole control. As is
further detailed below, there was no real dispute between the
insurer and the medical provider in this case, and to that end,
there appears to have been no dispute between those entities
as to the purpose and intended beneficiary of the check at
issue. Defendant was added as a co-payee on the check only
after he demanded it based on his fiduciary relationship with
Reed. AAA complied because doing so when a patient is
represented by an attorney is customary. After becoming a co-
payee with plaintiff, defendant proceeded to keep the money
in his IOLTA account based on a highly suspect attorney's
lien.

Lastly, we note defendant's argument that his actions were
not only permissible, but required by the Michigan Rules of
Professional Conduct. The argument is without merit. MRPC
1.15 provides, in pertinent part:

(c) When two or more persons (one of whom may be
the lawyer) claim interest in the property, it shall be kept
separate by the lawyer until the dispute is resolved. The
lawyer shall promptly distribute all portions of the property
as to which the interests are not in dispute.

(d) A lawyer shall hold property of clients or third persons
in connection with a representation separate from the
lawyer's own property. All client or third person funds
shall be deposited in an IOLTA or non-IOLTA account.
Other property shall be identified as such and appropriately
safeguarded. [MRPC 1.15(c) and (d).]

Defendant has not pointed to any caselaw—nor were we
able to find any caselaw—to suggest that MCL 440.3110(4)
is not implicated by an attorney depositing funds into an
IOLTA account. Nor would it seem logical that an attorney
could overcome the requirements of MCL 440.3110(4) by
simply depositing any check bearing his name into an IOLTA
account. That is, simply because defendant believed he was
entitled to some of the funds at issue did not permit him to
improperly negotiate the check in order to place those funds
into his IOLTA account.

For the above reasons, it would seem clear that questions
of fact sufficient to overcome summary disposition exist as
to whether defendant's act of depositing the jointly-issued
check into his IOLTA account constituted acts of statutory and
common-law conversion. Accordingly, the trial court erred by
dismissing those counts of plaintiff's complaint.

## V. THE CHARGING LIEN

Plaintiff also contends that the trial court erred in concluding that a charging lien was authorized under the facts of this case. We agree.

A "charging lien is an equitable right to have the fees and costs due for services secured out of the judgment or recovery in a particular suit." *Souden v. Souden*, 303 Mich. App. 406, 411; 844 N.W.2d 151 (2013) (quotation marks and citation omitted). A charging lien "creates a lien on a judgment, settlement, or other money recovered as a result of the attorney's services." *George v. Sandor M. Gelman, P.C.*, 201 Mich. App. 474, 476; 506 N.W.2d 583 (1993).

> The attorney's charging lien exists as part of the court's inherent power to oversee the relationship of attorneys, as officers of the court, with their clients. It does provide a means of securing the legitimate interest of the attorney in payment for his services and expenses on behalf of the client, but it is subject to the control of the court for the protection of the client and third parties as well. [*Souden*, 303 Mich. App. at 411 (quotation marks and citation omitted).]

Plaintiff primarily relies on *Miller v. Citizens Ins. Co.*, 288 Mich. App. 424, 426; 794 N.W.2d 622 (2010), aff'd in part and reversed in part 490 Mich. 905 (2011), and *Garcia v. Butterwoth Hosp.*, 226 Mich. App. 254, 256; 573 N.W.2d 627 (1997), for the contention that there was no valid charging lien in this case.

*7 In *Miller*, the Detroit Medical Center (DMC) appealed "an order granting attorney fees to [the] plaintiff's attorneys that had the effect of proportionately reducing the amount the DMC recovered for billed services" under the no-fault act. *Miller*, 288 Mich. App. at 426. Quite similarly to this case, the DMC contended that it had provided medical, surgical and rehabilitative services to the plaintiff, and that the plaintiff's attorneys were seeking from the DMC 1/3 of the money owed as attorney fees. *Id.* at 429. The DMC contended that the "plaintiff's attorneys were not entitled

to fees from no-fault benefits earned by the DMC when no attorney-client relationship existed between them." *Id.* at 433. This Court held, however, that the "dispositive attorney-client relationship that entitled [the] plaintiff's attorneys to fees for representing [the] plaintiff ... was the attorney-client relationship that existed between [the] plaintiff and her attorneys." *Id.* This Court reasoned:

> [The] plaintiff's attorneys had a right to be paid for their services from the amount recovered from [the insurer] pursuant to their contingency fee agreement with [the] plaintiff. This may appear at first blush to be unfair to the medical providers, who provided medical care only to be asked —almost required—to reduce their bills to pay, in part, for the expense of litigation. It is not unfair. As a consequence of plaintiff's attorneys' actions, [the insurer], which had denied the application for benefits entirely, agreed to pay personal protection insurance benefits on [the plaintiff's] behalf. If [the insurer] had not agreed to do so, it is doubtful that [the plaintiff's] medical providers would have received as much in settlement of their bills because Medicaid, [or the plaintiff], would have been the payer. And if [the] plaintiff had not retained attorneys to litigate this case, it might have been incumbent on each medical provider to retain counsel to litigate its claim on [the plaintiff's] behalf against [the insurer], which would also cause them to incur the expense of litigation. [*Id.* at 436-437.]

This Court noted: "An insured plaintiff who prevails in a litigation against the plaintiff's insurer secures payment not only for the plaintiff's benefit, but for the benefits of the plaintiff's medical providers, which were at risk of either not being paid or receiving a smaller fraction of their billed amounts for their services." *Id.* at 438.

On appeal to our Supreme Court, the Court reversed in part and affirmed in part. The Court affirmed that the plaintiff's attorneys had asserted an attorney's charging lien over the settlement proceeds, the effect of which was to settle claims as between the insurer, the plaintiff, and her attorney. *Miller v. Citizens Ins. Co.*, 490 Mich. 905, 905 (2011). The Court made clear, however, that this did not extinguish the DMC's contractual right to payment for its services, and noted that "[t]he circuit court's order of dismissal pursuant to the settlement agreement did not have the effect of extinguishing the DMC's right to collect the remainder of its bill from [the] plaintiff. Such a result could not have been achieved without an explicit waiver, or at least unequivocal acquiescence, by the DMC, which was not obtained." *Id.* Of course, it cannot be ignored that the factual basis for the Supreme Court's approval of the charging lien at issue in *Miller* is not present in this case. In *Miller*, the plaintiff's attorney was entitled to fees from the insurance proceeds because the same was consistent with the settlement agreement reached between the insurer and the plaintiff. See *Hurley Med. Ctr. v. George R. Hamo, P.C.*, unpublished per curiam opinion of the Court of Appeals, issued July 24, 2012 (Docket No. 304235), p. 4. The purpose of the Supreme Court's clarification was simply to say that the charging lien did not extinguish any right the DMC otherwise had to collect on its bills from plaintiff.

**\*8** No settlement agreement existed in this case, nor was any litigation necessary. For that reason, plaintiff mostly relies on *Garcia*, wherein a medical provider appealed an award of attorney fees to a plaintiff's attorney from the no-fault benefits paid to the medical provider. *Garcia*, 226 Mich. App. at 256. Central to *Garcia* was that the insurer "agreed beforehand to pay for any treatment connected to plaintiff's accident," and subsequently "paid benefits without contesting them." *Id.* at 257. This Court noted that it appeared "that [the insurer and the medical provider] worked th[e] matter out between themselves, without the intervention of [the] plaintiff's attorney." *Id.* Under those circumstances, "no attorney fee was chargeable against the benefits payable to [the medical provider]." *Id.* Thus, *Garcia* stands for the proposition that a valid charging lien cannot exist where no-fault benefits were paid "without contest, the plaintiff brought [a] no-fault lawsuit only as a precautionary measure, the lawsuit was dismissed before the complaint was even served, and the insurer and health-care provider actually resolved the matter without the assistance of the plaintiff's attorney." *Miller*, 288 Mich. App. at 439. Again, there was no lawsuit in this case, and both plaintiff and the testifying representative

of AAA agree that payment of Reed's benefits was resolved without defendant's assistance.

Defendant distinguishes *Garcia* by arguing that, in that case, the check was made payable only to the medical provider and not the attorney. While this fact implicates MCL 440.3110(4) as noted above, we fail to see and defendant does not explain how it impacts whether defendant performed services that would warrant a charging lien on the funds. Moreover, defendant's assertion appears to be incorrect, as the *Garcia* opinion notes that the insurer "issued three-party checks payable to [the] plaintiff, his attorney," and the medical provider. *Garcia*, 226 Mich. App. at 256. Defendant also argues, however, that unlike *Garcia*, defendant provided services in this case that were necessary to bring about AAA's payments.

Defendant contends that he spent between 100 and 150 hours on Reed's insurance claim culminating in a fee of "98 thousand dollars and some change." Defendant testified at his deposition that his work on the case consisted of making telephone calls, sending e-mails, obtaining and reviewing medical records, helping Reed fill out his initial paperwork for AAA, and explaining the law and no-fault benefits to Reed. Defendant also testified, however, that the documents he helped to procure—including an application for benefits, an affidavit of no health insurance, and an authorization for medical records—are documents often exchanged in the ordinary course of an insurance claim without the assistance of an attorney.

Perhaps most importantly, a representative of AAA testified at his deposition that plaintiff began submitting medical bills to AAA and the case was assigned to that particular AAA representative before defendant was ever involved in the case. Thereafter, AAA began voluntarily paying Reed's medical bills directly to plaintiff. AAA later began issuing joint checks to plaintiff and defendant only on the basis of defendant notifying AAA of his attorney's lien and subsequently requesting that the bills be sent to defendant's office, which AAA honored because the practice of doing so is common for attorneys representing injured people. The testifying AAA representative clarified that the joint checks were issued "not in recognition of legal services [defendant provided], but because he placed a lien."

The representative of AAA also testified that Reed's application for benefits had been completed prior to defendant's involvement, and that the authorization for

University of Michigan Regents v. Valentino, Not Reported in N.W. Rptr. (2020)

2020 WL 7759669

medical records was not necessary because AAA had already been receiving the records from plaintiff directly with plaintiff's bills. With specific respect to Check 18, the AAA representative explicitly testified at multiple points throughout his deposition that defendant's involvement neither sped up nor delayed the processing of the check, and that defendant's services did not facilitate the payment of the bill. To summarize, the representative testified that Reed's claims were never disputed, that plaintiff submitted its bills and relevant medical records directly to AAA, and that AAA paid the no-fault benefits voluntarily without defendant's involvement. [4]

[4] It is also worth noting that this Court has held before that the mere "filing of a no-fault application with the insurance company" was not sufficient for the purposes of asserting "a binding attorney's lien on ... no-fault medical benefits." *In re L'Esperance Estate*, 131 Mich. App. 496, 502-503; 346 N.W.2d 578 (1984).

*9 With all of that in mind, the trial court's reasoning for imposing the charging lien, including that defendant's services spared plaintiff the expense of litigation, and that it would be unfair to allow medical providers to benefit from such legal services when necessary to secure proceeds, does not comport with the available record. That is, the record does not support the trial court's conclusion that a charging lien attached to the funds at issue where the funds were payed voluntarily and independent of the services defendant offered. The trial court thus erred in finding that a lien was authorized under the facts of this case. [5]

[5] As an aside, we note defendant's suggestion that plaintiff acted either fraudulently or unethically in obtaining an assignment of benefits in this case. The insinuation is not supported by the record, and in any event, AAA's representative testified that he never reviewed the document. We also agree with plaintiff's interpretation of the remand order, wherein the Supreme Court noted that AAA paid benefits voluntarily. *Valentino*, 503 Mich. at 986. As it was not necessary for plaintiff to file any suit against AAA to obtain benefits on Reed's behalf, whether the assignment of benefits was enforceable was irrelevant to plaintiff's claim in this case.

## VI. CONCLUSION

The trial court erred in dismissing plaintiff's statutory and common-law conversion claims because taking the facts in a light most favorable to plaintiff suggests that defendant may have wrongfully deposited the check at issue into his IOLTA account without plaintiff's authorization. A jury will have to resolve whether the evidence satisfies the elements of either variety of conversion. Relatedly, the trial court also erred in concluding that a charging lien was legally authorized under the facts of this case.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

**All Citations**

Not Reported in N.W. Rptr., 2020 WL 7759669

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT E

Stryker Corp. v. Bruty, Not Reported in F.Supp.2d (2013)
2013 WL 1962391, 35 IER Cases 1161

KeyCite Yellow Flag - Negative Treatment
Distinguished by Sorrento Therapeutics, Inc. v. Mack,   Del.Ch.,
September 1, 2023

2013 WL 1962391
United States District Court,
W.D. Michigan,
Southern Division.

STRYKER CORPORATION et al., Plaintiffs,
v.
James BRUTY et al., Defendants.

No. 1:13–cv–288.
|
May 10, 2013.

**Attorneys and Law Firms**

David J. Gass, Miller Johnson PLC, Grand Rapids, MI,
Jeffrey P. Swatzell, Justin K. Beyer, Michael Dale Wexler,
Seyfarth Shaw LLP, Chicago, IL, Craig H. Lubben, Miller
Johnson PLC, Kalamazoo, MI, for Plaintiffs.

Bret A. Cohen, Mintz Levin Cohn Ferris Glovsky & Popeo
PC, Boston, MA, Steven L. Underwood, Price Heneveld LLP,
Grand Rapids, MI, for Defendants.

*OPINION*

JANET T. NEFF, District Judge.

**\*1** Pending before the Court is a motion for preliminary
injunction filed by Plaintiffs Stryker Corporation and Stryker
Sales Corporation ("Stryker"), seeking to enjoin Defendant
James Bruty, a former Stryker senior manager, from
alleged competitive employment with Defendant Blue Belt
Technologies, Inc. ("Blue Belt") in violation of an agreement
Bruty signed with Stryker. Pursuant to FED. R. CIV. P.
65, the Court previously entered a Temporary Restraining
Order (TRO). Following the parties' subsequent stipulation
for discovery, and extensive briefing, on May 6, 2013, the
Court conducted a hearing on the motion for preliminary
injunction. Having now considered the parties' arguments
in light of the record, the Court determines that Stryker's request
for a preliminary injunction is properly granted.

## I. BACKGROUND

Stryker, through its Instruments Division, is a global leader
in the development, manufacture and sale of navigation
software, equipment, and hardware, offering products in
the arenas of orthopedic, neurologic, spinal, ear/nose/throat
("ENT"), and cranial surgery. Stryker invents, designs,
manufactures and sells a full range of instruments and
devices used in a wide variety of surgical procedures. Stryker
Navigation is the market leader in orthopedic navigation
software, hardware, and equipment; its line of products
assists doctors to perform surgeries by utilizing image-guided
systems to more precisely insert implants or perform surgery.
These products use patient-specific mapping to register
portions of the patient's body during surgical procedures.
[Compl. ¶¶ 22–24]

Bruty joined Stryker in 2004 as a sales representative in
the Stryker Imaging business unit. He was subsequently
promoted to Regional Sales Manager, and in September 2008,
joined Stryker Navigation, where he was employed as Senior
Director of Marketing [1] at the time of his departure and hiring
by Blue Belt in January 2013 as its Vice–President of Sales
and Marketing.

1       Bruty identifies his position as "Senior Director of
        Marketing" while Stryker asserts Bruty's position
        was "Senior Global Director of Marketing."

During his tenure at Stryker, on April 2, 2007, Bruty
signed a "Stryker Confidentiality, Intellectual Property,
Non–Competition and Non–Solicitation Agreement" (herein,
"Non–Compete Agreement"). In exchange, he was
given stock options, which he exercised for approximately $50,000
in cash.

On December 28, 2012, Bruty gave Stryker his two-week
notice that he would be leaving because he had accepted a
position with 4WEB, a start-up company owned by a family
friend and noncompetitive with Stryker. However, since early
December 2012, Bruty had also been in contact with Blue Belt
as a candidate for the Vice–President of Sales and Marketing
position. Blue Belt is a company also in the medical/surgical
business and recently brought to market a robotic surgical
tool that assists a surgeon in cutting and sculpting bone in
partial knee replacement surgeries, marketed as NavioPF S.
Although Bruty had informed Stryker he was leaving to take
a position with 4WEB, he ultimately, prior to his January 18,

2013 departure from Stryker, on January 17, 2013, signed a written offer from Blue Belt, and unbeknownst to Stryker, on January 28, 2013, Bruty began working as Blue Belt's Vice-President of Sales and Marketing.

*2 After Stryker learned on January 31, 2013 that Bruty was working for Blue Belt, Stryker sought to enforce Bruty's Non–Compete Agreement, since it was Stryker's view that Blue Belt was a competitor of Stryker, and Bruty's employment violated the Agreement. On February 8, 2013, counsel for Stryker notified Bruty and Blue Belt via letter/e-mail of its concerns that Bruty's employment violated his Non–Compete Agreement and of Stryker's intent to enforce the Agreement. Counsel for Blue Belt and Bruty responded correspondingly by letter/e-mail that Bruty's position with Blue Belt substantially differed from his position at Stryker, and Blue Belt provided assurances that Bruty would otherwise abide by his obligations against using or disclosing Stryker's confidential and proprietary information or soliciting Stryker's clients and employees.

After several communications between the parties failed to resolve this matter, on March 18, 2013, Stryker filed a three-count Complaint and Motion for Temporary Restraining Order (TRO) and Preliminary Injunction (Dkt 3) against Bruty and Blue Belt. Stryker's Complaint alleges three counts: Count 1—Breach of Contract against Bruty; Count 2—Actual and/or Threatened Misappropriation of Trade Secrets (Michigan Uniform Trade Secret Act, MICH. COMP. LAWS § 445.1901); and Count 3—Tortious Interference with Contract against Blue Belt.

On March 19, 2013, this Court granted in part and denied in part Stryker's motion for a TRO, and entered a TRO prohibiting Bruty's attendance at the American Academy of Orthopaedic Surgeons March 2013 Annual Meeting in Chicago that same week; temporarily enjoining Defendants from disclosing confidential information and soliciting Stryker customers or employees; and ordering the return of all computer or other files and documents relating to Stryker's confidential and proprietary information. The Court subsequently granted the parties' stipulation for limited, expedited discovery pertaining to the preliminary injunction motion prior to responsive briefing and a hearing on the motion. The Court has now before it a voluminous and detailed record, along with the parties' substantial argument, to determine whether a preliminary injunction is warranted.

## II. LEGAL STANDARD

In *Mason Cnty. Med. Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977), the Sixth Circuit enunciated four factors to be considered in deciding whether to issue a preliminary injunction:

1. whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2. whether the plaintiffs have shown irreparable injury;

3. whether the issuance of an injunction would cause substantial harm to others; and

4. whether the public interest would be served by issuing an injunction.

See also *Certified Restoration Dry Cleaning Network, L.L. C. v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir.2007).

These factors are not prerequisites that must be met, but must be balanced together. *Certified Restoration Dry Cleaning,* 511 F.3d at 542; *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell,* 467 F.3d 999, 1009 (6th Cir.2006). The Sixth Circuit has recognized that the factors are to be balanced and that the degree of likelihood of success required may depend on the strength of the other factors. *J. Rettenmaier USA LP v. Bodner,* 1:08–cv–575, 2008 WL 2704862, at *7 (W.D.Mich. July 9, 2008) (citing *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985)). "[T]he likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent an injunction." *Id.* The Court is not required to make specific findings on each of the four factors if fewer factors are dispositive of the issue, although it is generally useful to analyze all factors, particularly as an aid on subsequent review. *Certified Restoration Dry Cleaning,* 511 F.3d at 542.

*3 As the party seeking the injunctive relief, the plaintiff bears the burden of persuasion on each of these factors. *American Standard, Inc. v. Meehan,* 517 F.Supp.2d 976, 982 (N.D.Ohio 2007) (citing *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir.1978)).

## III. FINDINGS AND CONCLUSIONS

**Stryker Corp. v. Bruty, Not Reported in F.Supp.2d (2013)**

2013 WL 1962391, 35 IER Cases 1161

As the Court indicated at oral argument, the threshold question in this matter is whether Bruty's Non–Compete Agreement applies to his employment with Blue Belt, a question at the core of the parties' dispute. Bruty's Agreement acknowledges that the business in which Stryker is engaged is "extremely competitive" and that the materials and information Bruty had access to during his employment "regarding Stryker's technologies, know-how, products, services and sales" are proprietary and confidential to Stryker. The Agreement also acknowledges that Stryker has a legitimate interest in protecting the confidential and proprietary nature of such material and information, including relationships with existing and potential customers. The pertinent provisions of the Non–Compete Agreement at issue prohibit competitive employment for one year, the disclosure of confidential information, and the solicitation of Stryker employees or customers:

6.3 Non–Compete

(a) During my employment with Stryker and for a period of twelve (12) months after the termination of my employment with Stryker for any reason, I will not work (as an employee, consultant, contractor, agent, or otherwise) for, or render services directly or indirectly to, any **Conflicting Organization** in which the services I may provide could enhance the use or marketability of a Conflicting Product or Service by application of Confidential Information which I have had access to during my employment. A "Conflicting Organization" means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing or selling of a Conflicting Product or Service (as defined in Section 6.1 above).

The Agreement defines a **"Conflicting Product or Service"** as:

any product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which resembles, competes with or is intended to resemble or compete with a product, process, technology, machine, invention or service upon which I have worked or about which I was knowledgeable during the last twenty-four (24) months of my employment with Stryker.

Non–Compete Agreement, § 6.1.

The Agreement defines "Confidential Information" as:

2.2 **"Confidential Information"** means: know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by me during my employment with Stryker, including, but not limited to (a) prices, renewal dates and other detailed terms of customer or supplier contracts and proposals; (b) information concerning Stryker's customers, clients, referral sources and vendors, and potential customers, clients, referral sources and vendors, including, but not limited to, names of these entities or their employees or representatives, preferences, needs or requirements, purchasing or sales histories, or other customer or client-specific information; (c) supplier and distributor lists; (d) pricing policies, methods of delivering services and products, and marketing and sales plans or strategies; (e) products, product know-how, product technology and product development strategies and plans; (f) employees, personnel or payroll records or information; (g) forecasts, budgets and other non-public financial information; (h) expansion plans, management policies and other business strategies; (i) inventions, research, development, manufacturing, purchasing, finance processes, technologies, machines, computer software, computer hardware, automated systems, engineering, marketing, merchandising, and selling. Confidential Information shall not include information that is or becomes part of the public domain, such that it is readily available to the public, through no fault of me.

Stryker Corp. v. Bruty, Not Reported in F.Supp.2d (2013)

2013 WL 1962391, 35 IER Cases 1161

*4  *Id.* at § 2.2.

With regard to Confidential Information, the Agreement further states that disclosure of such information would cause immediate irreparable injury to Stryker:

> 5.1 **Non-disclosure of Confidential Information.** I recognize that Confidential Information is of great value to Stryker, that Stryker has legitimate business interests in protecting its Confidential Information, and that the disclosure to anyone not authorized to receive such information, including any entity that competes with Stryker, will cause immediate irreparable injury to Stryker.... I understand and agree that my obligations not to disclose, use, disseminate, identify by subject or topic, lecture upon or publish Confidential Information shall continue after the termination of my employment for any reason.

With regard to soliciting customers, the Agreement provides:

> 6.2 **Non-Solicitation of Customers.** I agree that during my employment with Stryker and for twelve (12) months after the termination of my employment for any reason, I will not solicit business from, contact or sell any Conflicting Product or Service to, or directly or indirectly help others to solicit business from, contact or sell any Conflicting Product or Service to, any of the accounts, customers or clients, or prospective accounts, customers or clients, with whom I have had contact during the last twenty-four (24) months of my employment with Stryker, for any purpose related to the sale of any Conflicting Product or Service, including but not limited

to: (a) any customer that purchased Stryker products or services, (b) any prospect that received or requested a proposal to purchase Stryker products or services, (c) any affiliate of any such customer or prospect, or (d) any of the individual customers or prospect contacts that I established.

*Id.* at § 6.2.

The Agreement likewise prohibits soliciting employees of Stryker:

> 6.4 **Non-Solicitation of Employees.** I agree that for a period of twelve (12) months after the termination of my employment with Stryker for any reason, I will not solicit, induce or influence, or attempt to solicit, induce or influence, any person engaged as an employee, independent contractor or agent of Stryker to terminate his, her or its employment and/or business relationship with Stryker or do any act which may result in the impairment of the relationship between Stryker and its employees, independent contractors or agents.

*Id.* at § 6.4.

As noted above, in executing the Non-Compete Agreement, Bruty acknowledged the purpose and reasonableness of the Agreement and the presumption of irreparable harm to Stryker:

> 7.5 I acknowledge and agree that it is reasonable and necessary for the protection of the goodwill and continued business of Stryker that I abide by the covenants and agreements contained in this Agreement during and following my employment with Stryker and that Stryker will suffer

Stryker Corp. v. Bruty, Not Reported in F.Supp.2d (2013)
2013 WL 1962391, 35 IER Cases 1161

irreparable injury, loss, harm and damage if I engage in conduct prohibited in this Agreement. My experience and abilities are such that compliance with this Agreement will not cause any undue hardship or unreasonable restriction on my ability to earn a livelihood and that the restrictions on my activities during and after employment do not prevent me from using skills in any business or activity that is not in competition with Stryker.

**\*5** *Id.* at § 7.5.

Given the provisions of the Non–Compete Agreement and the ample evidence that Blue Belt's business and products fall within the realm of a "Conflicting Organization" and "Conflicting Product or Service," the Court rejects Defendants' argument that Blue Belt is not a "competitor" of Stryker. Both companies target the same customers, including specifically orthopaedic surgeons, and any distinction relied on by Defendants that Blue Belt's product is limited to partial knee replacement surgery is a distinction without a difference. The evidence establishes that the technologies at issue are common to both companies, and moreover, that Stryker markets a partial knee replacement product and competes in that market. Numerous documents identify robotics products such as Blue Belt's as in the competitive market served by Stryker. Particularly conclusive is that Blue Belt viewed Stryker as a competitor. Blue Belt's 2013 Business Plan devotes specific attention to the target market for Blue Belt and identifies Stryker as a company in the "competitive landscape" (Pls. Reply, Ex. 2 at 4–5, BlueBelt 634–635).

Any argument that Stryker is merely in a non-competitive, "adjacent" market to Blue Belt is also unavailing. Stryker's market analysis documents invariably identify robotics companies as adjacent market competition, and a December 28, 2012 e-mail by Bruty acknowledges that "Stryker Navigation has adjacent market expansion as part of our strategic plan ...″[2] (Defs.Resp., Ex. 14).

2    At the time he sent this e-mail, Bruty was still employed by Stryker.

Further, the Court is not persuaded by Defendants' argument that Blue Belt escapes definition as a competitor because (1) Stryker's product is simply a navigation product and Blue Belt's product includes navigation plus robotics, and (2) Stryker's robotics product is still in the development/approval stage and thus, is a future, not an existing, product. No support exists for such a narrow and arbitrary definition of the competitive market. Blue Belt's product contains a navigation component and thus competes with Stryker's product directly-the parties admit that the sale of Blue Belt's NavioPFS would invariably preclude the sale of Stryker's Navigation system to that same customer. Bruty was well-aware that Stryker has a robotics product under development, and he was privy to at least some of Stryker's plans for bringing that product to market. Blue Belt conceded at oral argument that if Stryker had a robotics product for partial knee replacements on the market, then Stryker and Blue Belt would be competitors. However, the Non–Compete Agreement is not so restricted in time, or to existing products.

The evidence fully establishes that Stryker and Blue Belt are competitors as relates to the products in question, and the Non–Compete Agreement applies to Bruty's employment with Blue Belt. Having determined that the Agreement applies, the Court turns more specifically to the factors to be considered in issuing a preliminary injunction.

*A. Likelihood of Success on the Merits*
**\*6** The Non–Compete Agreement lies at the core of this legal action. The Agreement provides, and Defendants do not contest, that Michigan law applies with regard to the alleged breach of contract.

> Under Michigan law, a non competition agreement is enforceable as long as: (1) it is reasonably drawn as to its duration, geographical scope, and line of business; and (2) it protects the legitimate business interests of the party seeking enforcement. *Lowry Computer Products v. Head,* 984 F.Supp. 1111, 1116 (E.D.Mich.1997) (Gadola, J.). Legitimate business interests must include much more than a prohibition on competition; reasonableness is based on several factors such as consideration

supporting the contract, economic hardship on the employee, and whether the employer has reasonable competitive interests that need protection.

*Kelly Servs. v. Eidnes*, 530 F.Supp.2d 940, 950 (E.D.Mich.2008); *see also J. Rettenmaier USA*, 2008 WL 2704862, at *7.

The Court has reviewed the voluminous evidence and considered the parties' respective positions on the likelihood of success on the merits of the claims presented. The Court has determined as a threshold matter that the Non–Compete Agreement applies to Bruty's employment at Blue Belt, which addresses in large part Defendants' arguments that Stryker cannot establish the requisite showing on this factor.

With regard to the likelihood of success, " 'it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.' " *J. Rettenmaier USA*, 2008 WL 2704862, at *7 (citations omitted). Stryker has prevailed with respect to an initial showing that a likelihood of success exists with respect to the counts alleged. The evidence with respect to the Bruty's Blue Belt employment, Stryker's confidential information, and the solicitation of customers and employees, establishes an ample basis for Stryker's claims of breach of the Non–Compete Agreement as well as the claims of actual and/or threatened misappropriation of trade secrets and tortious interference with contract against Blue Belt. This factor weighs in favor of the preliminary injunction.

**B.** *Irreparable Injury*
The Court finds that absent a preliminary injunction, the harm to Stryker is irreparable. It is well settled in the Sixth Circuit that "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992). "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* at 512. "Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.; see also Kelly Services, Inc. v. Noretto*, 495 F.Supp.2d 645, 659–60 (E.D.Mich.2007).

*7 Additionally, the unauthorized use—actual or threatened—of confidential information constitutes irreparable harm sufficient for issuance of an injunction. *Henkel Corp. v. Cox*, 386 F.Supp.2d 898, 904 (E.D.Mich.2005) (likelihood of success shown on claim of actual or threatened misappropriation of alleged trade secrets under Michigan law, MICH. COMP. LAWS § 445.1902); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F.Supp.2d 525, 533 (S.D.N.Y.2004) ("irreparable harm is presumed where a trade secret has been misappropriated, even in the absence of an employment agreement").

Here, the finding of irreparable harm is reinforced by the terms of § 7.5 of the Non–Compete Agreement, acknowledging irreparable harm and providing that an injunction may issue. Under the facts presented, including evidence that Bruty has Confidential Information as defined in the Non–Compete Agreement; some of Stryker's existing customers were targeted in Bruty's plans for sales and marketing at Blue Belt; at least some evidence that employee recruitment activity for Blue Belt targeted existing Stryker employees and was channeled to or through Bruty; and these companies coexist in a highly competitive market, the Court is convinced that Stryker would suffer irreparable harm absent injunctive relief.

**C.** *Substantial Harm to Others*
In considering whether injunctive relief will cause "substantial harm to others," a court considers the balance of hardship between the parties. *Earnings Performance Group, Inc. v. Quigley*, No. 03–73733, 2003 U.S. Dist. LEXIS 26294, at *27–28 (E.D.Mich. Dec. 15, 2003). Defendants contend that a preliminary injunction will cause substantial harm to them, and to Bruty in particular, by depriving him of an income and livelihood. However, as Stryker points out, any harm to Defendants was foreseeable and avoidable. Bruty signed the Non–Compete Agreement and evidence establishes that Blue Belt was aware of the Non–Compete Agreement prior to hiring Bruty, was advised to consider it, and in fact consulted with legal counsel concerning the Non–Compete Agreement, but chose nonetheless to proceed with hiring Bruty (*see* Eric Timko Dep. at 99–107, Pls. Reply, Ex. 1). This factor offers Defendants no shield against injunctive relief, having taken a calculated risk of harm. Additionally, the short duration of Bruty's employment with Blue Belt, less than three months, does not speak to serious harm from enjoining his services to the company while this action is resolved.

Stryker Corp. v. Bruty, Not Reported in F.Supp.2d (2013)

2013 WL 1962391, 35 IER Cases 1161

D. *Public Interest*

The Court acknowledges that there are competing public interests at issue. In Stryker's favor, it is well-established that the public has a substantial interest in the enforcement of contractual obligations. *Kelly Services,* 495 F.Supp.2d at 661 ("public has a substantial interest in the enforcement of valid contractual obligations"); *see also Superior Consulting Co., Inc. v. Walling,* 851 F.Supp. 839, 848 (E.D.Mich.1994) (pointing out that the Michigan legislature has explicitly endorsed reasonable noncompetition covenants and holding that the public interests in protecting confidential information and enforcing valid employment contracts weighed in favor of issuing the preliminary injunction).

**\*8** On the other hand, as Defendants contend, developing and bringing to market an innovative robotic surgical tool and better medical technology is in the best interest of the public. However, in weighing the specific outcomes at issue in this case, the Court does not find that the latter interest is served by denying a preliminary injunction. There is no evidence that enjoining Bruty's employment with Blue Belt, in keeping with his Non–Compete Agreement, significantly hinders Blue Belt from bringing its product to market. This factor weighs in favor of Stryker.

## IV. DISPOSITION

In light of the evidence before the Court, and having considered the relevant factors, the Court is persuaded that Stryker has carried its burden of showing that the requested injunctive relief is warranted. Stryker's Motion for Preliminary Injunction is GRANTED. The TRO entered by this Court on March 19, 2013 is continued pending entry of a preliminary injunction.

## V. SECURITY

Federal Rule of Civil Procedure 65(c) provides that the court shall issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). "While ... the language of Rule 65(c) appears to be mandatory, and [ ] many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle–Picher Indus., Inc.,* 55 F.3d 1171, 1176 (6th Cir.1995) (citation omitted); *Urbain v. Knapp Bos. Mfg. Co.,* 217 F.2d 810, 815–16 (6th Cir.1954)). The parties have not set forth any positions in this regard, and the Court finds no particular purpose to be served by the posting of security under the circumstances presented and given Plaintiffs' substantial assets. The Court will continue to waive the security requirement of Rule 65(c). Defendants are free to contest this issue if they wish to do so.

An Order consistent with this Opinion will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1962391, 35 IER Cases 1161

---

**End of Document**

© 2024 Thomson Reuters  No claim to original U S  Government Works

ATTACHMENT F

Two Men and a Truck International, Inc. v. Rupright, Not Reported in Fed. Supp. (2016)

2016 WL 8808790

2016 WL 8808790
Only the Westlaw citation is currently available.
United States District Court, W.D.
Michigan, Southern Division.

TWO MEN AND A TRUCK
INTERNATIONAL, INC., Plaintiff,
v.
James RUPRIGHT, Defendant.

No. 1:16–cv–23
|
Signed 01/14/2016

**Attorneys and Law Firms**

Ivonne Marie Soler, Bernard J. Fuhs, Butzel Long PC, Detroit, MI, for Plaintiff.

James Rupright, Goshen, IN, pro se.

## ORDER GRANTING MOTION FOR A TEMPORARY RESTRAINING ORDER

Paul L. Maloney, United States District Judge

**\*1** Plaintiff Two Men and a Truck International (TMT) filed a verified complaint and an ex parte motion for a temporary restraining order (ECF No. 2). TMT relies on a non-compete provision of its franchise agreement. TMT requests the Court enjoin a former franchisee, Defendant James Rupright, from operating a competing moving company within the geographic area of the former franchise. Having reviewed the complaint, motion, and exhibits, the Court will grant the requested injunctive relief.

### I.

Decisions granting or denying a motion for a temporary restraining order fall within the discretion of a district court. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (quoting *Northeast Ohio Coalition for Homeless and Service Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). Under Rule 65, a court may issue a temporary restraining order, without notice to the adverse party, only if two conditions are met. Fed. R. Civ. P. 65(b)(1). First, the moving party must establish specific facts

through an affidavit or a verified complaint showing that an immediate and irreparable injury will result to the moving party before the adverse party can be heard in opposition to the motion. Fed. R. Civ. P. 65(b)(1)(A). Second, the counsel for the moving party must certify in writing any efforts made to give notice and the reasons why notice should not be required. Fed. R. Civ. P. 65(b)(1)(B). In addition, the court must consider each of four factors: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order. *Ohio Republican Party*, 543 F.3d at 361 (quoting *Northeast Ohio Coalition*). The four factors are not prerequisites that must be met, but are interrelated concerns that must be balanced together. *See Northeast Ohio Coalition*, 467 F.3d at 1009.

### II.

On January 11, 2011, Defendant James Ruprick signed a TMT franchise agreement on behalf of Vesco Movers, Inc. (ECF No. 1–1 "Franchise Agreement" PageID.61 and 62.) The agreement allowed Vesco Movers to operate a TMT franchise in South Bend, Indiana, and included St. Joseph and Elkhart Counties in Indiana. (Compl. 6; Franchise Agreement PageID.62.) The Franchise Agreement contains a forum clause and a choice of law clause, stating that lawsuits would be brought in a state or federal court in Michigan and governed by Michigan law. (Franchise Agreement at 41 PageID.56.) Article VIII of the Franchise Agreement provides for confidentiality and non-competition. (*Id.* at 37–40 PageID.52–55.) The covenant not to compete lasts for two years after expiration or termination of the Franchise Agreement. (*Id.* at 39 PageID.54.) The non-compete clause generally prohibits franchisees from engaging in competitive businesses within the franchise marketing area. (*Id.*) Article VIII also contains a provision for injunctive relief, in which the franchisee agrees that any violation of the confidentiality and the non-compete provisions will irreparably harm TMT and that TMT will have the right to obtain injunctive relief, including a temporary restraining order and without first posting bond or any security. (*Id.* at 39–40 PageID.54–55.)

**\*2** On March 20, 2015, TMT terminated the franchise agreement, effective March 25. (Compl. ¶ 12; ECF No. 1–4 "Termination Letter" PageID.100–04.) TMT alleges, on January 8, 2016, it received a telephone call from Rupright

Two Men and a Truck International, Inc. v. Rupright, Not Reported in Fed. Supp. (2016)

2016 WL 8808790

asking if the non-compete obligations ended on January 11 because he wanted to rent some trailers and drop them off at customers' houses. (Compl. ¶ 15.)

TMT alleges Rupright has been violating the non-compete clause. The telephone call prompted an investigation by TMT. TMT discovered that Rupright has been operating Action Movers, a competing business in the same geographic area. (Compl. ¶ 16.) Action Movers was incorporated in Indiana on April 6, 2015. (ECF No. 1–5 PageID.106–07.) The registered agent and incorporator for Action Movers is Celesta Penney. (*Id.* PageID.107.) In addition to owning and operating Action Movers, Ms. Penney is the office manager at the Old Bag Factory. (ECF No. 1–7 PageID.115.) Rupright purchased the Old Bag Factory in 2010 (ECF No. 1–8 PageID.120) and Rupright is listed as the registered agent for the Old Bag Factory (ECF No. 1–9 PageID.125.) Action Movers and the Old Bag Factory are located in the same building. (*Compare* ECF No. 1–6 PageID.110 *and* ECF No. 1–8 PageID.119.)

## III.

TMT is entitled to a temporary restraining order. First, TMT has complied with the Rule 65 requirements. TMT filed a verified complaint. When Rupright called TMT in January 2016, TMT informed Rupright that the conduct about which he inquired would violate his non-complete obligations.

The four factors weigh in favor of granting temporary, emergency injunctive relief. Assuming Rupright did call TMT in January 2016, TMT has established a connection between Rupright and Action Movers. Rupright's involvement with Action Movers violates the non-compete clause of the franchise agreement. The non-compete agreement would likely be enforceable, at least in part under Michigan law as to duration and geographic scope. Therefore, TMT has demonstrated a likelihood of success on the merits. TMT has also established irreparable harm on this record. By signing the franchise agreement, Rupright agreed that a violation of the non-compete agreement would constitute irreparable harm. Rupright's access to TMT's confidential materials also creates a situation where competition with a limited geographic area would be unfair. The remaining two factors do not weigh heavily in favor of either Rupright or TMT. Shutting down Action Movers, even for a short time, would harm Action Movers more than TMT. At the same time, the operation of Action Movers as a competing business harms TMT, at least in the South Bend area. The

individuals most affected by the TRO are those customers of Action Movers who have contracted for services that while the TRO is in effect. Finally, the public has an interest in fair competition and in having individuals and businesses uphold their contractual obligations.

In addition to enjoining Rupright from providing moving services, TMT requests this Court order Rupright to return all confidential information and to cease using TMT's proprietary software. But TMT has not established that Rupright possesses any of its confidential information or that he has been using its proprietary software.

Accordingly, Three Men and a Truck's motion for a temporary restraining order (ECF No. 2) is **GRANTED**.

1. James Rupright and his agents, employees and those acting in concert with him (collectively "Rupright") are temporarily enjoined from operating or otherwise engaging in a moving company or other similar business within St. Joseph and Elkhart Counties in Indiana. Specifically, Rupright shall not contract to or otherwise agree to provide any moving services for the duration of this Order. Rupright may honor any written contracts to provide moving services which were made prior to the time this Order issued and for which services must be provided before the hearing for a preliminary injunction. In other words, Rupright may fulfill written contracts that existed prior to January 14, 2016, and which will be completed before January 28, 2016, at 9:00 a.m. At the hearing for a preliminary injunction, Rupright will provide the Court and the Plaintiff with an accounting of those contracts performed after the TRO issued, which will include the customer's name, address, and telephone number, information pertinent to the moving services provide, and the charge to the customer.

**\*3** 2. Plaintiff Three Men and a Truck will not be required to post a bond or other security.

3. This temporary restraining order will remain in effect through 12:00 p.m. (noon),on Thursday, January 28, 2016, unless the Court issues an order prior to that date and time extending or dissolving this temporary restraining order.

4. A hearing for a preliminary injunction will be held on Thursday, January 28, 2016, at 9 a.m. The hearing will occur in room 174 in the federal courthouse located at 410 W. Michigan in Kalamazoo, Michigan.

**Two Men and a Truck International, Inc. v. Rupright, Not Reported in Fed. Supp. (2016)**

2016 WL 8808790

5. Any response by Defendant Rupright should be filed before 12:00 p.m. (noon) on Tuesday, January 26, 2016.

6. Plaintiff Three Men and a Truck will serve this Order and the accompanying Notice of Hearing on Defendant Rupright forthwith and shall file proof of service.

7. This temporary restraining order issues on Thursday, January 14, 2016, at 9:45 a.m.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8808790

---

**End of Document**

© 2024 Thomson Reuters  No claim to original U S  Government Works

# ATTACHMENT G

**STATE OF MICHIGAN**
**KENT COUNTY CIRCUIT COURT**

ACRISURE, LLC,

Plaintiff,

v

KYLE RANNEY,

Defendant.

Case No. 23-_____-CB *β*

Honorable     J. ACKERT

05828

---

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
Warner Norcross + Judd LLP
150 Ottawa, Ave, Ste. 1500
Grand Rapids, MI 49503
616.752.2000
Attorneys for Plaintiffs

---

**TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**

---

At a session of said Court, held in the City of Grand Rapids,
County of Kent, State of Michigan, this
2/ˢᵗ day of _June_ , 2023

PRESENT HONORABLE **T. J. ACKERT**
Circuit Court Judge

This Court has read the Verified Complaint and the Motion for Temporary Restraining Order and Brief in Support. Based on the foregoing, it appears that Plaintiff does not have an adequate remedy at law and that the actions of Defendant will cause immediate and irreparable injury to Plaintiff by injuring Plaintiffs' goodwill with customers and employees and by using and/or disclosing Plaintiff's confidential information. It is recognized that this Order is entered without notice to prevent immediate and irreparable harm which would result from the delay required to affect such notice. Therefore,

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

A. This Order will expire, absent modification or extension by this Court or stipulation of the Parties, fourteen (14) days from the date this Order is entered;

B. Defendant is prohibited from, directly or indirectly, using, disclosing, furnishing, or making available Acrisure, LLC's ("Acrisure") Confidential Information as the term is defined and used in Paragraph 8 of the Employment Agreement (Producer) dated December 1, 2020 ("Employment Agreement") among the Parties;

C. Defendant is prohibited from, directly or indirectly, contacting or engaging in any communication with any Acrisure or an Affiliated Entity customer for which Defendant had responsibility prior to leaving Acrisure, as those terms are defined and used in Paragraph 10 of the Employment Agreement;

D. Defendant is prohibited from, directly or indirectly, contacting or engaging in any communication with any Acrisure or an Affiliated Entity prospective customer about whom Defendant obtained knowledge during employment with Acrisure, as those terms are defined and used in Paragraph 10 of the Employment Agreement;

E. Defendant is prohibited from, directly or indirectly, requesting, advising, or encouraging any customer of Acrisure or of an Affiliated Entity to terminate or curtail its relationship with Acrisure or an Affiliated Entity, or requesting or advising any person to refrain from becoming a customer or supplier of Acrisure or an Affiliated Entity, as those terms are defined and used in Paragraph 10 of the Employment Agreement;

F. Defendant is prohibited from, directly or indirectly, requesting, advising, or encouraging any employee, agent, representative or independent contractor of Acrisure or an Affiliated Entity to terminate his, her, or its relationship with Acrisure or an Affiliated Entity, or requesting or advising any person to refrain from becoming an employee, agent, representative or independent contractor of Acrisure or of an Affiliated Entity, as those terms are defined and used in Paragraph 10 of the Employment Agreement;

G. Defendant is ordered to deliver all of Acrisure's property and Confidential Information, as the term is used and defined in Paragraph's 8 and 9 of the Employment Agreement, in Defendant's possession to Acrisure, including all such documents stored electronically;

2

H.  Plaintiff and Defendant are ordered to participate in expedited discovery during the period prior to the hearing on the Order to Show Cause, including depositions and subpoenas duces tecum; and

I.  Defendant shall appear before this Court on July 5 , 2023, at 2pm, or as soon thereafter as counsel may be heard, and show cause, if any there be, why a preliminary injunction in the manner described above shall not issue.

**THIS ORDER DOES NOT RESOLVE THE LAST PENDING CLAIM AND DOES NOT CLOSE THIS CASE.**

6- 21- 2023

10:00 AM

IT IS SO ORDERED.

Hon. _____
Circuit Court Judge

3

**STATE OF MICHIGAN**
**KENT COUNTY CIRCUIT COURT**

ACRISURE, LLC,

Case No. 24-_0 2 8 6 6_-CB

         Plaintiff,

Honorable

v.

MATTHEW KELLY, CHRISTOPHER
IOVINO, ROBERT KEMPNER,
MICHAEL RELLA, ROBERT TRAGER,
and ERIC WAGNER,

**Rec'd & Filed**

**MAR 22 2024**

**KENT COUNTY**
**CIRCUIT COURT**

         Defendants.

---

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
James R. Carroll (*pro hac vice* forthcoming)
Christopher G. Clark (*pro hac vice* forthcoming)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

---

**MOTION FOR TEMPORARY ADMISSION TO PRACTICE**

Pursuant to Rule 8.126 of the Michigan Court Rules (MCR), Attorney Edward J.

Bardelli, P53849, moves for permission for the temporary admission of James R. Carroll to

represent Plaintiff Acrisure, LLC in this action. In support of the motion, Edward J. Bardelli states as follows:

1.  James R. Carroll is licensed to practice and is a member in good standing of the bar of the Commonwealth of Massachusetts.

2.  James R. Carroll's contact information is as follows:

    Skadden, Arps, Slate, Meagher & Flom LLP
    500 Boylston Street
    Boston, MA  02116
    (617) 573-4800
    james.carroll@skadden.com

3.  Edward J. Bardelli has read the accompanying affidavit of James R. Carroll and has made reasonable inquiry as to the statements therein. Edward J. Bardelli believes that the statements made in the affidavit are true and agrees to ensure that the procedures of MCR 8.126 are followed.

Based upon the foregoing, and as set forth in James R. Carroll's affidavit and accompanying attachments, Edward J. Bardelli moves for permission for the temporary admission of James R. Carroll to practice in this case.

DATED:  March 22, 2024

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, MI 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

Attorneys for Plaintiff Acrisure, LLC

**STATE OF MICHIGAN**
**KENT COUNTY CIRCUIT COURT**

---

ACRISURE, LLC,

          Plaintiff,

v.

MATTHEW KELLY, CHRISTOPHER
IOVINO, ROBERT KEMPNER,
MICHAEL RELLA, ROBERT TRAGER,
and ERIC WAGNER,

          Defendants.

Case No. 24-_____ -CB

Honorable

---

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
James R. Carroll (*pro hac vice* forthcoming)
Christopher G. Clark (*pro hac vice* forthcoming)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

---

**AFFIDAVIT OF JAMES R. CARROLL**

**JAMES R. CARROLL**, being sworn, states as follows:

1. I am an attorney currently licensed to practice law and in good standing in the Commonwealth of Massachusetts.  My Certificate of Good Standing in the Commonwealth of Massachusetts is attached as Attachment A.

2. I have previously been licensed to practice in no state other than Massachusetts.

3. I have sought a license to practice law in no state other than Massachusetts.

4. I am not disbarred or suspended in any jurisdiction.

5. I am not subject to any pending disciplinary action.

6. I have no disciplinary dispositions.

7. I am familiar with the Michigan Rules of Professional Conduct, Michigan Court Rules, and Michigan Rules of Evidence.

8. I have appeared or practiced in no cases in Michigan within the past 365 days.

James R. Carroll
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts  02116
(617) 573-4800

COMMONWEALTH OF MASSACHUSETTS           )
SUFFOLK COUNTY                          )

Signed and sworn before me in Suffolk County, Massachusetts, by James R. Carroll on March 22, 2024.

Timothy Holden, Notary Public
Commonwealth of Massachusetts, County
    of Suffolk
My commission expires:  January 24, 2025
Acting in Suffolk County

TIMOTHY HOLDEN
Notary Public
Commonwealth of Massachusetts
My Commission Expires: January 24, 2025

2

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

———————

BE IT REMEMBERED, that at the Supreme Judicial Court holden at Boston

within and for said County of Suffolk, on        **March 14, 1990**,

said Court being the highest Court of Record in said Commonwealth:

## James Carroll

being found duly qualified in that behalf, and having taken and subscribed

the oaths required by law, was admitted to practice as an Attorney, and, by virtue

thereof, as a Counsellor at Law, in any of the Courts of the said Commonwealth:

that said Attorney is at present a member of the Bar, and is in good standing

according to the records of this Court*.

In testimony whereof, I have hereunto set my hand and affixed the

seal of said Court, this   **twentieth**   day of   **March**

in the year of our Lord **two thousand and twenty-four.**

MAURA S. DOYLE, Clerk

\* Records of private discipline, if any, such as a private reprimand imposed by the Board of Bar Overseers or by any court, are not covered by this certification. X3116.

Amended January 2022, effective February 2022 for digital and/or electronic attestation for the Supreme Judicial Court for the County of Suffolk.

**STATE OF MICHIGAN**
**KENT COUNTY CIRCUIT COURT**

ACRISURE, LLC,

          Plaintiff,

v.

MATTHEW KELLY, CHRISTOPHER
IOVINO, ROBERT KEMPNER,
MICHAEL RELLA, ROBERT TRAGER,
and ERIC WAGNER,

          Defendants.

Case No. 24-**02866**-CB

Honorable

**Rec'd & Filed**

MAR 22 2024

**KENT COUNTY**
**CIRCUIT COURT**

---

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
James R. Carroll (*pro hac vice* forthcoming)
Christopher G. Clark (*pro hac vice* forthcoming)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

---

## MOTION FOR TEMPORARY ADMISSION TO PRACTICE

Pursuant to Rule 8.126 of the Michigan Court Rules (MCR), Attorney Edward J.

Bardelli, P53849, moves for permission for the temporary admission of Christopher G. Clark to

represent Plaintiff Acrisure, LLC in this action. In support of the motion, Edward J. Bardelli states as follows:

1.  Christopher G. Clark is licensed to practice and is a member in good standing of the bars of the Commonwealth of Massachusetts and the State of New York.

2.  Christopher G. Clark's contact information is as follows:

    Skadden, Arps, Slate, Meagher & Flom LLP
    500 Boylston Street
    Boston, MA  02116
    (617) 573-4800
    christopher.clark@skadden.com

3.  Edward J. Bardelli has read the accompanying affidavit of Christopher G. Clark and has made reasonable inquiry as to the statements therein. Edward J. Bardelli believes that the statements made in the affidavit are true and agrees to ensure that the procedures of MCR 8.126 are followed.

Based upon the foregoing, and as set forth in Christopher G. Clark's affidavit and accompanying attachments, Edward J. Bardelli moves for permission for the temporary admission of Christopher G. Clark to practice in this case.

DATED:  March 22, 2024

_____
Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, MI 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

Attorneys for Plaintiff Acrisure, LLC

2

**STATE OF MICHIGAN**
**KENT COUNTY CIRCUIT COURT**

_____

ACRISURE, LLC,                              Case No.  24-_____ -CB

                    Plaintiff,              Honorable

v.

MATTHEW KELLY, CHRISTOPHER
IOVINO, ROBERT KEMPNER,
MICHAEL RELLA, ROBERT TRAGER,
and ERIC WAGNER,

                    Defendants.

_____

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
     MEAGHER & FLOM LLP
James R. Carroll (_pro hac vice_ forthcoming)
Christopher G. Clark (_pro hac vice_ forthcoming)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

_____

### AFFIDAVIT OF CHRISTOPHER G. CLARK

**CHRISTOPHER G. CLARK**, being sworn, states as follows:

1. I am an attorney currently licensed to practice law and in good standing in the Commonwealth of Massachusetts and the State of New York.  My Certificate of Good Standing in the Commonwealth of Massachusetts is attached as Attachment A.

2. I have previously been licensed to practice in no state other than Massachusetts and New York.

3. I have sought a license to practice law in no state other than Massachusetts and New York.

4. I am not disbarred or suspended in any jurisdiction.

5. I am not subject to any pending disciplinary action.

6. I have no disciplinary dispositions.

7. I am familiar with the Michigan Rules of Professional Conduct, Michigan Court Rules, and Michigan Rules of Evidence.

8. I have appeared or practiced in no cases in Michigan within the past 365 days.

_____

Christopher G. Clark
Skadden, Arps, Slate, Meagher & Flom LLP
500 Boylston Street
Boston, Massachusetts  02116
(617) 573-4800

COMMONWEALTH OF MASSACHUSETTS  )
SUFFOLK COUNTY         )

Signed and sworn before me in Suffolk County, Massachusetts, by Christopher G. Clark on March 22, 2024.

Timothy Holden, Notary Public
Commonwealth of Massachusetts, County
of Suffolk
My commission expires:  January 24, 2025
Acting in Suffolk County

TIMOTHY HOLDEN
Notary Public
Commonwealth of Massachusetts
My Commission Expires: January 24, 2025

2

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

————

BE IT REMEMBERED, that at the Supreme Judicial Court holden at Boston

within and for said County of Suffolk, on      **November 28, 2005,**

said Court being the highest Court of Record in said Commonwealth:

## Christopher G. Clark

being found duly qualified in that behalf, and having taken and subscribed

the oaths required by law, was admitted to practice as an Attorney, and, by virtue

thereof, as a Counsellor at Law, in any of the Courts of the said Commonwealth:

that said Attorney is at present a member of the Bar, and is in good standing

according to the records of this Court*.

In testimony whereof, I have hereunto set my hand and affixed the

seal of said Court, this   **twentieth**   day of   **March**

in the year of our Lord **two thousand and twenty-four.**

MAURA S. DOYLE, Clerk

\* Records of private discipline, if any, such as a private reprimand imposed by the Board of Bar Overseers or by any court, are not covered by this certification. X3116.

Amended January 2022, effective February 2022 for digital and/or electronic attestation for the Supreme Judicial Court for the County of Suffolk.

# EXHIBIT 2

**17th Circuit Court Name Search**

# Register of Actions

Confirmation of whether charges in criminal cases are misdemeanors or felonies is not available from the Kent County Circuit Court Clerk's Office.

Information is available at <u>http://legislature.mi.gov/documents/mcl/pdf/mcl-chap750.pdf</u>.

Case #: 24-02866-CBB
File Date: 03/22/2024
ACRISURE LLC et al vs. KELLY, MATTHEW et al

| ACRISURE LLC, - PLAINTIFF |
|---|

| |
|---|
| **Other Parties:** ACRISURE LLC, null null - PLAINTIFF |
| **Other Parties:** KELLY, MATTHEW null - DEFENDANT |
| **Other Parties:** IOVINO, CHRISTOPHER null - DEFENDANT |
| **Other Parties:** KEMPNER, ROBERT null - DEFENDANT |
| **Other Parties:** RELLA, MICHAEL null - DEFENDANT |
| **Other Parties:** TRAGER, ROBERT null - DEFENDANT |
| **Other Parties:** WAGNER, ERIC null - DEFENDANT |

| | | |
|---|---|---|
| 1 | 03/25/2024 | SCHEDULED Event: MOTION FOR PRELIMINARY INJUNCTION Date: 04/22/2024 Time: 8:30 am Judge: ACKERT, HONORABLE TJ Location: 17TH CIRCUIT COURT- COURTROOM #10A |
| 2 | 03/22/2024 | APPEARANCE OF ATTORNEY JARROD HOWARD TROMBLEY (Attorney) on behalf of ACRISURE LLC (PLAINTIFF) |
| 3 | 03/22/2024 | APPEARANCE OF ATTORNEY EDWARD J. BARDELLI (Attorney) on behalf of ACRISURE LLC (PLAINTIFF) |
| 4 | 03/22/2024 | MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT |
| 5 | 03/22/2024 | MOTION FOR TEMORARY ADMISSION TO PRACTICE AND AFFIDAVIT OF CHRISTOPHER G. CLARK |
| 6 | 03/22/2024 | MOTION FOR TEMPORARY ADMISSION TO PRACTICE AND AFFIDAVIT OF JAMES R. CARROLL |
| 7 | 03/22/2024 | ELECTRONIC FILING FEE Receipt: 1359385 Date: 03/22/2024 |
| 8 | 03/22/2024 | FILING FEES FOR NEW CASE Receipt: 1359385 Date: 03/22/2024 |

| | | |
|---|---|---|
| **9** | 03/22/2024 | VERIFIED COMPLAINT FOR TEMPORARY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF (34 PGS & 54 PGS EXHIBITS) |
| **10** | 03/22/2024 | SUMMONS ISSUED MATTHEW KELLY (DEFENDANT); CHRISTOPHER IOVINO (DEFENDANT); ROBERT KEMPNER (DEFENDANT); MICHAEL RELLA (DEFENDANT); ROBERT TRAGER (DEFENDANT); ERIC WAGNER (DEFENDANT); |

# EXHIBIT 3

**STATE OF MICHIGAN**
**KENT COUNTY CIRCUIT COURT**

ACRISURE, LLC,

       Plaintiff,

v.

MATTHEW KELLY, CHRISTOPHER
IOVINO, ROBERT KEMPNER,
MICHAEL RELLA, ROBERT TRAGER, &
ERIC WAGNER,

       Defendant.

Case No.  24-**02866**_____ -CB

Honorable

T.J. ACKERT
(P-37123)

---

Edward J. Bardelli (P53849)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@wnj.com
jtrombley@wnj.com

-and-

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
James R. Carroll (*pro hac vice* forthcoming)
Christopher G. Clark (*pro hac vice* forthcoming)
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
christopher.clark@skadden.com

Attorneys for Plaintiff Acrisure, LLC

REC'D & FILED
KENT COUNTY
CIRCUIT COURT
2024 MAR 22  PM 1:2

---

**TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**

---

At a session of said Court, held in the City of Grand Rapids,
County of Kent, State of Michigan, this
_____ day of **MAR 2 5 2024**, 2024

PRESENT HONORABLE \_\_\_**T. J. ACKERT**
Circuit Court Judge

This Court has read the Verified Complaint and the Motion for *Ex Parte* Temporary
Restraining Order, Preliminary Injunction and Brief in Support. Based on the foregoing, Plaintiff
does not have an adequate remedy at law and that the actions of Matthew Kelly, Christopher
Iovino, Robert Kempner, Michael Rella, Robert Trager, and Eric Wagner (collectively, the
"Defendants") will cause immediate and irreparable injury to Plaintiff by injuring Plaintiff's
goodwill with customers and employees and by using or disclosing Plaintiff's confidential
information. It is recognized that this Order is entered without notice to prevent immediate and
irreparable harm which would result from the delay required to affect such notice. Therefore,

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

A.    This Order will expire, absent modification or extension by this Court or
stipulation of the Parties, fourteen (14) days from the date of this Order;

B.    Defendants are restrained and enjoined from, directly or indirectly, using,
disclosing, furnishing, or making available Acrisure, LLC's ("Acrisure")
Confidential Information as the term is defined and used in Paragraph 8 of
the Employment Agreements among the Parties;

C.    Defendants are ordered to immediately return all of Acrisure's property and
Confidential Information, as the term is used and defined in Paragraphs 8
and 9 of the Employment Agreements, in Defendants' possession, custody
or control to Acrisure, including all such documents stored electronically;

D.    Defendants are restrained and enjoined from altering, deleting, or otherwise
destroying any information relevant to these proceedings, including without
limitation communications with any individual or entity, correspondence to
Defendants' personal email accounts and/or text message or other
messaging platforms, communications concerning Acrisure's Confidential
Information, as that term is defined in Paragraph 8 of the Employment
Agreements, or communications with Acrisure's employees;

E.   Defendants are restrained and enjoined from, directly or indirectly, for themselves or for any other person or entity, contacting or engaging in any communication with any Acrisure or an Affiliated Entity customer or prospective customer for whom Defendants had responsibility before leaving Acrisure to secure business competitive to the products and services provided by Acrisure or Affiliated Entity, as those terms are defined and used in Paragraph 10 of the Employment Agreements;

F.   Defendants are restrained and enjoined from, directly or indirectly, for themselves or for any other person or entity, requesting, advising, or encouraging any customer of Acrisure or of an Affiliated Entity to terminate or curtail its relationship with Acrisure or an Affiliated Entity, or requesting or advising any person or entity to refrain from becoming a customer or supplier of Acrisure or an Affiliated Entity, as those terms are defined and used in Paragraph 10 of the Employment Agreement;

G.   Defendants are restrained and enjoined from, directly or indirectly, for themselves or for any other person or entity, requesting, advising, or encouraging any employee, agent, representative or independent contractor of Acrisure or an Affiliated Entity to terminate his, her, or its relationship with Acrisure or an Affiliated Entity, or requesting or advising any person or entity to refrain from becoming an employee, agent, representative or independent contractor of Acrisure or of an Affiliated Entity or otherwise pursuing, employing or retaining (as an employee, agent, representative or independent contractor or otherwise) any employee, agent, representative or independent contract of Acrisure or of an Affiliated Entity, as those terms are defined and used in Paragraph 10 of the Employment Agreements;

H.   Plaintiff is granted limited expedited discovery and Defendants are directed to produce, no later than seven (7) days after the date of this Order, the following documents: (1) from December 1, 2023, to present, all documents and communications relating to attempts to solicit, encourage, or recruit current or former employees of Acrisure to another entity, including but not limited to Woodruff Sawyer & Co. ("Woodruff Sawyer"); (2) from December 1, 2023, to present, all documents and communications with Woodruff Sawyer relating to each Defendants', individually or collectively, potential employment and/or employment with Woodruff Sawyer; (3) from December 1, 2023, to present, all documents and communications relating to attempts to solicit, encourage, or recruit current or former customers of Acrisure to another entity, including but not limited to Woodruff Sawyer; (4) all documents and communications relating to any proprietary or confidential information of Acrisure.

3

I.      Plaintiff is hereby granted limited expedited discovery and Plaintiff is authorized to serve a document subpoena on Woodruff Sawyer seeking the production of the documents identified in the immediately preceding paragraph; and

J.      Defendants shall appear before this Court on ___April 22___, 2024, at _8:30_ or as soon thereafter as counsel may be heard, and show cause, if any there be, why a preliminary injunction shall not issue.

**THIS ORDER DOES NOT RESOLVE THE LAST PENDING CLAIM AND DOES NOT CLOSE THIS CASE.**

IT IS SO ORDERED.

Hon. _____

**T. J. ACKERT**

Circuit Court Judge

1:00 pm  3-25-2024

4

# EXHIBIT 4

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

--------------------------------------------------------

ACRISURE, LLC,

          Plaintiff,

Case No. 24-02866-CB

HON. T.J. ACKERT

v

GOOD CAUSE ORDER UNDER MCR
3.310(B)(3) EXTENDING TERM OF
TEMPORARY RESTRAINING ORDER
DATED MARCH 25, 2024 UNTIL APRIL 22,
2024

MATTHEW KELLY, CHRISTOPHER
IOVINO, ROBERT KEMPNER,
MICHAEL RELLA, ROBERT TRAGER,
and ERIC WAGNER,

          Defendants.

_____/

The Court entered a Temporary Restraining Order and Order to Show Cause on March 25, 2024 (TRO) under MCR 3.310(B)(1). However, the Court will be on vacation for two weeks beginning April 1, 2024 and could not secure a date for a hearing within the 14 days before expiration of the TRO. The Court, on its own motion, finds good cause to extend the TRO an additional 14 days through April 22, 2024 to allow the parties to be heard on the TRO and show cause. MCR 3.310(B)(3).  The TRO shall expire by its terms on April 22, 2024 unless otherwise extended by applicable law or court rule. All other orders not inconsistent with this order remain enforceable.

IT IS SO ORDERED.

_____
Hon. T.J. Ackert, Circuit Judge

1

# EXHIBIT 5

1    SHOOK, HARDY & BACON LLP
2    MARC P. MILES (SBN 197741)
     mmiles@shb.com
3    Jamboree Center
     5 Park Plaza, Suite 1600
4    Irvine, California 92614-2546
     Tel: 949.475.1500 | Fax: 949.475.0016
5
6    ABIGAIL HUDSON (SBN 327632)
     ahudson@shb.com
7    2049 Century Park East, Suite 3000
     Los Angeles, CA 90067
8    Tel: 424.285.8330 | Fax: 424.204.9093
9
     Attorneys for Defendant
10   ACRISURE OF CALIFORNIA, LLC

11                    UNITED STATES DISTRICT COURT
12                 SOUTHERN DISTRICT OF CALIFORNIA
13

14   SCOTT J. TUCKER, an individual       Case No. **'24CV15   L     BGS**
15
                    Plaintiff,            **DEFENDANT ACRISURE OF**
16                                        **CALIFORNIA, LLC'S NOTICE OF**
            vs.                           **REMOVAL**
17
18   ACRISURE OF CALIFORNIA, LLC a
19   Michigan Limited Liability Company;
     and DOES 1-10, inclusive,
20
                    Defendants.
21
22
23
24
25
26
27
28

TO THE CLERK OF THE ABOVE ENTITLED COURT:

PLEASE TAKE NOTICE THAT Defendant Acrisure of California, LLC ("Acrisure"), pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, hereby removes to this Court the claims pending as Case No. 37-2023-00052326-CU-BT-NC in the Superior Court of California, County of San Diego.

## I.    Nature of the Removed Case

1.    Plaintiff Scott Tucker filed this civil action against Acrisure in the Superior Court of California, County of San Diego, on December 1, 2023. A true and correct copy of the Summons and Complaint is attached as Exhibit A to the Declaration of Abigail Hudson ("Hudson Decl."), which is attached as **Exhibit 1**. Plaintiff served the Complaint on Acrisure on December 5, 2023. (Hudson Decl. ¶ 4).

2.    Plaintiff asserts two causes of action, including one claim for declaratory relief and one claim for unlawful and unfair business practices under Business & Professions Code § 17200 *et. seq*. (Hudson Decl., Ex. A). Acrisure denies these claims.

3.    Plaintiff seeks declaratory judgment, temporary and permanent injunctive relief, and restitution. *See, e.g*., Compl. (Hudson Decl., Ex. A at Prayer for Relief).

## II.    Acrisure Satisfies the Procedural Requirements for Removal.

4.    Generally, a notice of removal shall be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of the initial pleading. *See* 28 U.S.C. § 1446(b).

5.    Plaintiff served the initial pleading, and Acrisure received it, on December 5, 2023. (Hudson Decl., ¶ 4).

6.    As explained below, the parties are diverse because they are citizens of different states, and the amount in controversy exceeds the threshold under 28 U.S.C. § 1332(a).

7.    Acrisure filed this Notice of Removal on January 3, 2024, "within 30 days after receipt by the defendant, through service or otherwise, of a … paper from

2

which it may first be ascertained that the case is one which is or has become removable." *See* 28 U.S.C. §1446(b)(3). This Notice of Removal is therefore timely filed.

8.    Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Acrisure in the state action are contained in the attached Exhibit 1. (Hudson Decl. Ex. A).

9.    This Court is the proper venue for removal under 28 U.S.C. § 1446(a) because it is "the district and division embracing the place where such action is pending," namely San Diego County.

10.   Pursuant to 28 U.S.C. § 1446(d), written notice of this removal will be filed with the Clerk of the Superior Court of California, County of San Diego, and Acrisure will serve a copy of this Notice of Removal on all parties to the state action.

## III.   Removal Is Proper Because This Court Has Subject Matter Jurisdiction Pursuant to 28 U.S.C. §§ 1332 and 1441.

11.   This Court has subject matter jurisdiction because this is a civil action between citizens of different states in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest. 28 U.S.C. § 1332(a).

### A.    Diversity of citizenship exists between the parties.

12.   Removal under 28 U.S.C. § 1441(b) is appropriate because complete diversity of citizenship exists between Plaintiff and Acrisure.

13.   A diverse defendant is entitled to have its case heard in federal court. *See Guaranty Trust Co. v. York*, 326 U.S. 99 (1945) ("Diversity jurisdiction is founded on assurance to non-resident litigants of courts free from susceptibility to potential local bias."); *Young v. Ford Motor Co*., No. 1:07-cv-00297-LJO-SMS, 2007 WL 1847663 (E.D. Cal. June 27, 2007) ("A defendant's right to remove a case that could be heard in federal court is at least as important as the plaintiff's right to the forum of his choice") (citation omitted). Accordingly, Congress and federal appellate courts have taken steps to combat gamesmanship and improper reliance on a purported

1    presumption against removal aimed at depriving a nonresident defendant of its right to

2    have its case heard in federal court. *See, e.g., Academy of Country Music v.*

3    *Continental Casualty Co.*, 991 F.3d 1059 (9th Cir. 2021) (reversing remand and

4    holding notice of removal need not prove subject matter jurisdiction; allowing right of

5    appeal when remand based not on a colorable § 1447(c) ground); *Destfino v. Reiswig*,

6    630 F.3d 952 (9th Cir. 2011) (allowing removal by later-served defendants, noting

7    Supreme Court has "relaxed its presumption against removal"); *see generally*, Federal

8    Courts Jurisdiction and Venue Clarification Act of 2011, Public Law 112–63 (Dec. 7,

9    2011) (amending removal statute to allow removal more than one year after

10   commencement of the action where plaintiff hides the actual amount in controversy to

11   prevent removal, a principle that also applies to re-removal).

12       14.    For purposes of removal based on diversity of citizenship, a plaintiff's

13   state of residence is presumptively considered to be his or her state of citizenship. *See*

14   *Bradley Min. Co. v. Boice*, 194 F.2d 80, 84 (9th Cir. 1951); *see also Anderson v. Watt*,

15   138 U.S. 694, 706 (1891) ("The place where a person lives is taken to be his domicile

16   until facts adduced establish the contrary.").

17       15.    Plaintiff resides in Encinitas, California. (Hudson Decl., Ex. A at ¶ 26).

18   He is therefore a citizen of California.

19       16.    A limited liability company is considered to be a citizen of all of the

20   states of which its members are citizens. *Johnson v. Columbia Props. Anchorage, LP*,

21   437 F.3d 894, 899 (9th Cir. 2006).

22       17.    Defendant Acrisure of California, LLC is a Michigan limited liability

23   company that is wholly owned by Acrisure, LLC, which is wholly owned by Acrisure

24   Intermediate, Inc., a Delaware corporation with its principal place of business in

25   Michigan. Acrisure Intermediate, Inc. is a wholly-owned subsidiary of Acrisure

26   Holdings, Inc., a Delaware corporation with its principal place of business in

27   Michigan. (Declaration of Christopher Manoly, attached as **Exhibit 2** ("Manoly

28

DEFENDANT ACRISURE OF CALIFORNIA, LLC'S NOTICE OF REMOVAL

1  Decl."), at ¶ 2). Therefore, Defendant Acrisure of California, LLC is a citizen of
2  Delaware and Michigan.

3  18. This Court therefore has original jurisdiction of this action under 28
4  U.S.C. § 1332 because the sole named defendant is a citizen of Delaware and
5  Michigan, while Plaintiff is a citizen of California.

6  **B.** **The amount-in-controversy requirement is satisfied.**

7  19. The amount in controversy in this action exceeds $75,000, exclusive of
8  interest and costs.

9  20. To determine the amount in controversy, a district court should first
10 "consider whether it is 'facially apparent' from the complaint that the jurisdictional
11 amount is in controversy," *i.e.*, that the amount exceeds the threshold. *Abrego v. Dow*
12 *Chem. Co.,* 443 F.3d 676, 690 (9th Cir. 2006) (citation omitted). If that is not facially
13 apparent, a court then considers whether the notice of removal plausibly alleges that
14 the amount exceeds the threshold. *See Dart Cherokee Basin Operating Co. v. Owens*,
15 574 U.S. 81, 87–88 (2014). Plausible allegations alone may be sufficient; evidence is
16 required only if the plaintiff contests, or a court questions, the plausibility of the
17 defendant's allegations. *Id.* at 89, 95; *Arias v. Residence Inn by Marriott*, 936 F.3d
18 920, 922 (9th Cir. 2019). If the defendant's allegations are challenged, then "both
19 sides submit proof and the court decides, by a preponderance of the evidence, whether
20 the amount-in-controversy requirement has been satisfied." *Dart Cherokee Basin*, 574
21 U.S. at 87–88.

22 21. A defendant's showing may rely on reasonable assumptions when
23 estimating the amount in controversy. *Arias*, 936 F.3d at 922. It does not "need to
24 prove to a legal certainty that the amount in controversy requirement has been met."
25 *Dart Cherokee Basin*, 574 U.S. at 88–89 (citing H.R. Rep. No. 112-10 at p. 16
26 (2011)). The standard is preponderance of the evidence. Where a defendant shows that
27 damages would exceed the threshold, "it then becomes plaintiff's burden to show, as a
28 matter of law, that it is certain he will not recover the jurisdictional amount." *Canesco*

5

1    *v. Ford Motor Co.*, No. 3:21-cv-00425-BEN, 2021 WL 5122231, at *7 (S.D. Cal.
2    Nov. 4, 2021) (quoting *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199
3    F. Supp. 2d 993, 1001 (C.D. Cal. 2002)).

4        22.    Here, it is not "facially apparent" that the amount in controversy exceeds
5    $75,000. Plaintiff seeks declaratory judgment, restitution, and reasonable attorneys'
6    fees—on top of prejudgment interest and any further relief the Court may deem
7    proper. (Hudson Decl., Ex. A at Prayer for Relief). However, based on Plaintiff's
8    claims, the amount in controversy exceeds $75,000.

9        **i.    Plaintiff's declaratory judgment claim alone meets the amount in**
10            **controversy threshold.**

11       23.    "In actions seeking declaratory or injunctive relief, it is well established
12    that the amount in controversy is measured by the value of the object of the litigation."
13    *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). "The value of
14    the declaratory or injunctive relief does not need to be an exact valuation." *Meyer v.*
15    *Howmedica Osteonics Corp.*, No. 14CV2496 AJB NLS, 2015 WL 728631 at *4 (S.D.
16    Cal. Feb. 19, 2015).

17       24.    In similar cases analyzing the enforceability of a non-compete in a
18    declaratory judgment action, the courts "examined the revenues generated by an
19    employee" subject to the non-compete to determine "whether the jurisdictional
20    minimum has been met." *Mahoney v. Depuy Orthopaedics, Inc.*, CIV F 07–1321 AWI
21    SMS, 2007 WL 3341389, *4 (E.D. Cal. Nov. 8, 2007) (holding the amount in
22    controversy threshold was satisfied, where the plaintiff generated between $2.4
23    million and $3.9 million in annual sales revenues, finding it unlikely that profit
24    attributable to the plaintiff would be equal or less than $75,000 based on revenues
25    earned); *see also Meyer*, 2015 WL 728631 at *4 ("Inferring a $75,000 profit from
26    $650,000 in revenue requires only a slim profit margin and is entirely reasonable.");
27    *Luna v. Kemira Specialty, Inc.*, 575 F. Supp. 2d 1166, 1175 (C.D. Cal. 2008) (finding
28

the amount in controversy threshold met based on sales revenue earned by employee seeking declaratory judgment on enforceability of non-compete).[1]

25.     Here, Plaintiff serves as Principal and Chief Executive Officer of J.S. Tucker Insurance Services, which operates as a fictitious business name of Acrisure of California, LLC. (Manoly Decl. ¶ 3).

26.     Plaintiff's duties as Principal and Chief Executive Officer of J.S. Tucker Insurance Services include, among other duties, "the solicitation and sale of insurance policies and related products and services on behalf of Employer and servicing existing and new customers of Employer." (Manoly Decl. ¶ 4, Ex. A). As Principal and Chief Executive Officer of J.S. Tucker Insurance Services, he also had responsibility for the budget, operation, and achievement of financial objectives associated with the J.S. Tucker Insurance Services business. (Manoly Decl. ¶ 4).

27.     In his role, Plaintiff himself generated $1,534,386 in revenue for Acrisure, from over four hundred clients, during the trailing twelve-month period starting in November 2022 and ending in October 2023. (Manoly Decl. ¶ 5). Plaintiff's agency operation, J.S. Tucker Insurance Services, of which Plaintiff is Principal and Chief Executive Officer, generated $2,134,597 in revenue during the same period. (*Id.*). Certain of Plaintiff's clients, like Hi Tech Honeycomb, Inc. and Orion Construction Corporation, generated revenue in amounts over $75,000 each, during the same period. (*Id.*).

28.     In light of the amount of Acrisure's revenue attributable to Plaintiff, it is appropriate to infer Plaintiff generated well over $75,000 in profits for Acrisure over

---

[1] *See also Bell v. PSS World Med., Inc.*, 2013 WL 5555480, at *2 n.3 (N.D. Ga. Oct. 8, 2013) ("[T]he value of the litigation to the plaintiff is ... the difference between what the plaintiff can earn with and without complying with restrictive covenants."); *Basicomputer Corp. v. Scott*, 791 F. Supp. 1280, 1286 (N.D. Ohio 1991), *aff'd* 973 F.2d 507 (6th Cir.1992) (considering commissions, profits from sales revenue, and estimated loss of revenue to determine the amount in controversy in an action seeking enforcement of non-competition covenants).

DEFENDANT ACRISURE OF CALIFORNIA, LLC'S NOTICE OF REMOVAL

the past year alone. *See, e.g., Meyer*, 2015 WL 728631 at \*4 (inferring profits of at least $75,000 where revenue generated ($650,000) was much lower than that at issue here ($1.5 million to $2.2 million)).

29.    Should the Court enter the declaratory judgment requested by Plaintiff, thereby rendering the non-compete provisions within his Employment Agreement unenforceable and Plaintiff free to compete with Acrisure, Acrisure would be at risk of losing over $2 million in revenue, and profits certainly well over $75,000. Indeed, if even one of Plaintiff's high-revenue clients (like Hi Tech Honeycomb or Orion Construction Corporation) were to follow Plaintiff to a new employer, Acrisure stands to lose in excess of $75,000 in revenue from the loss of one of those single accounts alone. Thus, the revenue generated by Plaintiff for Acrisure establishes that the amount in controversy requirement is satisfied. *See Mahoney*, 2007 WL 3341389 at \*4; *Meyer*, 2015 WL 728631 at \*4.

    **ii.    Plaintiff's claim for attorneys' fees adds to the amount in controversy.**

30.    "A court must include future attorneys' fees recoverable by statute or contract when assessing whether the amount-in-controversy requirement is met." *Kee v. Hiossen, Inc.*, No. 19-cv-1440-WQH-BLM, 2019 U.S. Dist. LEXIS 190295 at \*11-12 (S.D. Cal. Nov. 1, 2019); *Fritsch v. Swift Transp. Co. of Arizona, LLC*, 899 F.3d 785, 794 (9th Cir. 2018) ("a court *must* include future attorneys' fees recoverable by statute or contract when assessing whether the amount-in-controversy requirement is met") (emphasis added).

31.    In his Complaint, Plaintiff asserts that he "seeks to recover from Acrisure attorneys' fees under California Code of Civil Procedure section 1021.5." (Hudson Decl., Ex. A at ¶ 66). While attorneys' fees are generally unrecoverable for alleged unfair business practices in violation of California Business and Professions Code sections 16600 and 17200 *et seq.*, section 1021.5 of the Code of Civil Procedure does permit the recovery of attorneys' fees to "a successful party . . . in any action which

has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit . . . has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." Cal. Code Civ. P. § 1021.5.

32.    Additionally, under his Employment Agreement, Plaintiff agreed to the following: "In the event of litigation to enforce the rights granted by this Agreement, the non-prevailing party shall be responsible to pay the attorneys' fees, court costs and related expenses of litigation incurred by the prevailing party." (Manoly Decl., Ex. A).

33.    If successful, Plaintiff is expected to claim attorneys' fees (as pled in his Complaint) in an amount over $75,000. Although Acrisure denies that Plaintiff is entitled to any attorneys' fees—under either section 1021.5 of the Code of Civil Procedure or Plaintiff's Employment Agreement—the amount of those fees is also included in the amount in controversy for purposes of diversity jurisdiction.

34.    In sum, based on reasonable assumptions regarding the revenue Plaintiff generates for Acrisure and Plaintiff's demand for attorneys' fees, the available information reveals that the amount in controversy exceeds the $75,000 threshold necessary for diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). *Canesco v. Ford Motor Co.*, 570 F. Supp. 3d 872, 902 (S.D. Cal. 2021) ("[t]he ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will actually owe").

35.    Should the Court require further proof of the amount in controversy, Acrisure requests the ability to conduct jurisdictional discovery by interrogatories or depositions to support that the amount-in-controversy is satisfied pursuant to 28 U.S.C. § 1332.

Dated: January 3, 2024

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: */s/ Abigail Hudson*
    Abigail Hudson

    Attorney for Defendant
    ACRISURE OF CALIFORNIA, LLC

DEFENDANT ACRISURE OF CALIFORNIA, LLC'S NOTICE OF REMOVAL

SHOOK, HARDY & BACON LLP
MARC P. MILES (SBN 197741)
mmiles@shb.com
Jamboree Center
5 Park Plaza, Suite 1600
Irvine, California 92614-2546
Tel: 949.475.1500 | Fax: 949.475.0016

ABIGAIL HUDSON (SBN 327632)
ahudson@shb.com
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: 424.285.8330 | Fax: 424.204.9093

Attorneys for Defendant
ACRISURE OF CALIFORNIA, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SCOTT J. TUCKER, an individual

                    Plaintiff,

        vs.

ACRISURE OF CALIFORNIA, LLC a
Michigan Limited Liability Company;
and DOES 1-10, inclusive,

                    Defendants.

Case No \_\_'24CV15\_\_\_L\_\_\_BGS\_\_\_

**DECLARATION OF ABIGAIL
HUDSON IN SUPPORT OF
DEFENDANT ACRISURE OF
CALIFORNIA, LLC'S NOTICE OF
REMOVAL**

I, Abigail Hudson, declare and state as follows:

1.     I am an attorney licensed to practice before all of the courts of the State of California, an attorney at the law firm of Shook, Hardy & Bacon L.L.P., and counsel of record for Defendant Acrisure of California, LLC ("Acrisure") in the above-entitled action. This declaration is based upon my personal knowledge, except as to those matters stated on information and belief and, as to those matters, I believe them to be true. If called upon as a witness, I could and would competently testify as to the facts set forth herein.

2.     Plaintiff Scott J. Tucker ("Plaintiff") filed this civil action against Acrisure on December 1, 2023 in the Superior Court of California, County of San Diego, styled *Scott J. Tucker v. Acrisure of California, LLC*, Case No. 37-2023-00052326-CU-BT-NC.

3.     Attached as **Exhibit 1** is a true and correct copy of Plaintiff's Summons to Acrisure and Original Complaint, which was filed in the San Diego County Superior Court.

4.     Plaintiff served the Complaint on Acrisure on December 5, 2023. (*See* Ex. A).

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 3, 2024 in Los Angeles, California.

> */s/ Abigail Hudson*
> ABIGAIL HUDSON

1    SHOOK, HARDY & BACON LLP

2    MARC P. MILES (SBN 197741)
3    mmiles@shb.com
     Jamboree Center
4    5 Park Plaza, Suite 1600
     Irvine, California 92614-2546
5    Tel: 949.475.1500 | Fax: 949.475.0016

6    ABIGAIL HUDSON (SBN 327632)
7    ahudson@shb.com
     2049 Century Park East, Suite 3000
8    Los Angeles, CA 90067
     Tel: 424.285.8330 | Fax: 424.204.9093
9

10   Attorneys for Defendant
     ACRISURE OF CALIFORNIA, LLC
11
                    UNITED STATES DISTRICT COURT
12
                 SOUTHERN DISTRICT OF CALIFORNIA
13

14
     SCOTT J. TUCKER, an individual       Case No  '24CV15   L    BGS
15
16                                        DECLARATION OF
                                          CHRISTOPHER MANOLY IN
17             Plaintiff,                  SUPPORT OF DEFENDANT
                                          ACRISURE OF CALIFORNIA,
18                                        LLC'S NOTICE OF REMOVAL
          vs.
19

20
     ACRISURE OF CALIFORNIA, LLC a
21   Michigan Limited Liability Company;
     and DOES 1-10, inclusive,
22
23             Defendants.

24

25

26

27

28

1    I, Christopher Manoly, declare and state as follows:

2    1.    I am the West Region Regional Executive Vice President at Acrisure,
3    LLC. The West Region includes several states along the west coast of the United
4    States, one of which is California. This declaration is based upon my personal
5    knowledge, except as to those matters stated on information and belief and, as to those
6    matters, I believe them to be true. If called upon as a witness, I could and would
7    competently testify as to the facts set forth herein.

8    2.    Acrisure of California, LLC is a Michigan limited liability company.
9    Acrisure of California, LLC is wholly owned by Acrisure, LLC, which is wholly
10   owned by Acrisure Intermediate, Inc., a Delaware corporation with its principal place
11   of business in Michigan. Acrisure Intermediate, Inc. is a wholly-owned subsidiary of
12   Acrisure Holdings, Inc., a Delaware corporation with its principal place of business in
13   Michigan.

14   3.    Plaintiff Scott Tucker entered into an Employment Agreement with
15   Acrisure of California, LLC, in connection with Acrisure of California, LLC's
16   purchase of J and S Holdings Western, Inc. d/b/a JS Tucker Insurance Services on
17   March 1, 2018. Attached as **Exhibit A** is a true and correct copy of Mr. Tucker's
18   Employment Agreement. Mr. Tucker has served as Principal and Chief Executive
19   Officer of J.S. Tucker Insurance Services, which operates as a fictitious business name
20   for Acrisure of California, LLC.

21   4.    Mr. Tucker's duties as Principal and Chief Executive Officer of J.S.
22   Tucker Insurance Services include, among other duties, "the solicitation and sale of
23   insurance policies and related products and services on behalf of Employer and
24   servicing existing and new customers of Employer." (*See* Exhibit A, Employment
25   Agreement ¶ 5). As Principal and Chief Executive Officer of J.S. Tucker Insurance
26   Services, he also had responsibility for the budget, operation, and achievement of
27   financial objectives associated with the J.S. Tucker Insurance Services business.

28

2

MANOLY DECLARATION ISO
NOTICE OF REMOVAL

5.     For the trailing twelve-month period beginning in November 2022 and ending in October 2023, Mr. Tucker generated revenue in the amount of $1,534,386 from over four hundred clients. For the same trailing twelve-month period, J.S. Tucker Insurance Services, of which Mr. Tucker is Principal and Chief Executive Officer, generated total revenue of $2,134,597. Certain of Mr. Tucker's clients, like Hi Tech Honeycomb, Inc. and Orion Construction Corporation, generated revenue in amounts over $75,000 each, during the same period.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 3, 2024 in Irvine, California.

CHRISTOPHER MANOLY

3

# EXHIBIT 6

## STATE OF MICHIGAN
## KENT COUNTY CIRCUIT COURT

**ACRISURE, LLC**,
a Michigan limited liability company,

       Plaintiff

v.

**MATTHEW KELLY, CHRISTOPHER IOVINO, ROBERT KEMPNER, MICHAEL RELLA, ROBERT TRAGER, & ERIC WAGNER**, individually,

       Defendants

**Case No. 24-02866-CB**

**Hon. T.J. ACKERT**

---

**Edward J. Bardelli  (P53849)**
**Jarrod H. Trombley (P83517)**
**WARNER NORCROSS + JUDD LLP**
*Attorneys for Plaintiff*
150 Ottawa Avenue, Suite 1500
Grand Rapids, Michigan 49503
(616) 752-2000
ebardelli@snj.com
jtrombley@wnj.com

**Michael L. Gutierrez (P79440)**
**Daniel V. Barnett (P82372)**
**BUTZEL LONG, P.C.**
*Attorneys for Defendants*
300 Ottawa Ave NW, Suite 620
Grand Rapids, Michigan 49503
(616) 988-5600
gutierrez@butzel.com
barnett@butzel.com

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
**James R. Carroll** (*pro hac vice* forthcoming)
**Christopher G. Clark** (*pro hac vice* forthcoming)
*Co-Counsel for Plaintiff*
500 Boylston Street
Boston, Massachusetts 02116
james.carroll@skadden.com
christopher.clar@skadden.com

---

### DEFENDANTS' NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. 1446(b)

**NOW COME** all Defendants, by and through their attorneys, BUTZEL LONG, P.C., and for

their Notice of Removal Pursuant to 28 U.S.C. 1446(b), state as follows:

## NOTICE OF REMOVAL

1.      On or about March 22, 2024, Plaintiff filed an action in the 17th Judicial Circuit Court for the County of Kent, State of Michigan, bearing Case No. 24-02866-CB (the "State Court Suit"). Defendants were served on March 25 and March 26, 2024.

2.      On March 27, 2024, Defendants, pursuant to 28 USC 1446(b), filed a Notice of Removal with respect to the State Court Suit. A copy of said Notice is attached hereto as **Exhibit 1**.

3.      Diversity of citizenship exists pursuant to 28 USC 1332(a)(1) and the amount in controversy exceeds $75,000 as required by 28 USC 1332(a). As such, this matter is properly within the jurisdiction of the United States District Court for the Western District of Michigan, Southern Division, and is subject to removal under 28 USC 1441(b).

4.      Defendants state that this action is properly removable and respectfully notifies this Court and Plaintiff that this action has been removed to the United States District Court for the Western District of Michigan, Southern Division.

**WHEREFORE**, Defendants respectfully put this Court on notice that this matter has been removed to the United States District Court for the Western District of Michigan, Southern Division.

Respectfully submitted,

**BUTZEL LONG**

Date: March 27, 2024                    By:     /s/  Michael L. Gutierrez
**Michael L. Gutierrez (P79440)**
**Daniel V. Barnett (P82372)**
*Attorneys for Defendants*
300 Ottawa Avenue, NW, Suite 620
Grand Rapids, Michigan 49503
(616) 988-5600
gutierrez@butzel.com
barnett@butzel.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2024, I electronically filed the above document with the Clerk of the Court using the Business Court's E-Filing System, which will send notification of such filing to all counsel of record.

Respectfully submitted,

**BUTZEL LONG**

Date: March 27, 2024

By:   /s/ Daniel V. Barnett

**Michael L. Gutierrez (P79440)**
**Daniel V. Barnett (P82372)**
*Attorneys for Defendants*
300 Ottawa Avenue, NW, Suite 620
Grand Rapids, Michigan 49503
(616) 988-5600
gutierrez@butzel.com
barnett@butzel.com